# Exhibit 2

---

**EXPERT REPORT OF HAL PORET REGARDING
SURVEY TO ASSESS WHETHER "POLAROID"
HAS BECOME GENERIC IN THE CONTEXT OF
INSTANT CAMERAS AND FILM FOR INSTANT CAMERAS**

---

PREPARED BY:

Hal Poret

President, Hal Poret LLC

142 Hunter Ave

Sleepy Hollow, NY 10591

June 2023

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE -------------------------------------------------- 3
STUDY AUTHORSHIP AND QUALIFICATIONS --------------------------- 4
STUDY DESIGN ------------------------------------------------------------------- 5
SUMMARY OF FINDINGS -------------------------------------------------------- 12
METHODOLOGY ------------------------------------------------------------------- 13
    THE RELEVANT UNIVERSE OF INTEREST------------------------- 13
    SAMPLING PLAN ------------------------------------------------------- 15
    INTERVIEWING PROCEDURES---------------------------------------- 19
    DATA PROCESSING ---------------------------------------------------- 19
    DOUBLE-BLIND INTERVIEWING ------------------------------------ 19
    INTERVIEWING PERIOD----------------------------------------------- 20
    QUALITY CONTROL ---------------------------------------------------- 20
DETAILED FINDINGS----------------------------------------------------------- 25

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA FILE

## *BACKGROUND AND PURPOSE*

Counsel for Polaroid retained me to design and conduct a survey to assess whether POLAROID has become generic in the context of instant cameras and film for instant cameras. This report details the design, methodology, execution and results of both surveys. As discussed in more detail below, the survey showed that POLAROID is overwhelmingly perceived as a brand name for instant cameras and film for instant cameras (identified as a brand by 91.0% of relevant consumers), not a generic term.

In the course of designing my surveys and preparing this report, I reviewed the First Amended Complaint, Counterclaims and Answer, Second Amended Counterclaims and Answer to First Amended Complaint, and Answer to Second Amended Counterclaims, Polaroid US website, and Fujifilm US website.

The fees charged for my work on this matter through the completion of this report is $35,000. This includes the fees paid to outside vendors I used to conduct the surveys, my time in connection with the preparation of the survey, analysis and report. For any additional work on this matter, I am being compensated at my ordinary hourly rate of $825. My fees are not contingent on the nature of my opinions or the outcome of the proceeding.

## AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC.

I have personally designed, supervised, and implemented well over 1,000 surveys regarding the perceptions and opinions of consumers. Over 500 have involved consumer perception with respect to trademarks, and over 500 have been conducted online. I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research (publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*); the International Trademark Association; and the National Advertising Division of the Council of Better Business Bureaus (NAD). I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold a bachelor's and a master's degree in mathematics and a J.D. from Harvard Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## *STUDY DESIGN*

A total of 200 respondents participated in this online survey among actual and prospective consumers of instant cameras and film for instant cameras.[1]

The survey employed the well-accepted Teflon format for assessing whether a term is generic. Following the Teflon format, respondents in the survey were shown a series of terms (including the POLAROID term at issue) one at a time and for each term were asked if they believe the term is a brand name (i.e. trademark) or a common name (i.e. generic), if they know.

To control for response-order bias, two versions of the survey were administered, and each was taken by half of all respondents. Version 1 of the survey first presented the concept of a "brand name," followed by the concept of a "common name." Meanwhile, Version 2 first presented the concept of a "common name," followed by a "brand name."

As this was an online survey, all the instructions and questions were displayed on respondents' computer screens and each question appeared on its own screen.

<u>Version 1</u>

After a series of initial screening questions, all respondents were prompted as follows:

> This survey is about **brand** names and **common** names. In a few moments you will be asked about a number of terms that you may or may not have seen or heard before. But first, please read the next two screens about what we mean by a <u>**brand**</u> name and what we mean by a <u>**common**</u> name.

---

[1] See the Relevant Universe and Sampling sections of this report for more information regarding who qualified for and completed the survey.

On a new screen, respondents were then informed:

> <u>Brand names</u> are names that companies use to identify <u>who</u> a product comes from.  Brand names primarily let the consumer know that a product comes from one specific company.
>
> For example, KELLOGG, CHEVROLET, and IPAD are all <u>brand</u> names.  These terms primarily identify for a consumer <u>who</u> a product comes from.

Followed by an explanation of common names on the next screen:

> <u>Common names</u> are words used to identify a <u>type</u> of product – in other words, <u>what</u> the product is, not who makes it.  Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.
>
> For example, CEREAL, CAR, and TABLET are all <u>common</u> names.  These terms primarily identify for the consumer what <u>type</u> of product a company is selling.

Respondents were then asked:

> Do you understand the difference between a brand name and a common name?
>
> - Yes
> - No
> - Don't know

Respondents who answered "Yes," continued with the interview.  Those who indicated they did not understand or were unsure about the concept of a "brand name" versus "common name" did not continue and did not ultimately count toward the final number of completed interviews.

Next, respondents' understanding of brand names versus common names was tested to further verify they understood the concept. First, respondents were asked:

Which type of name would you say **SAMSUNG** is?

- Brand name
- Common name
- Don't know

Followed by:

Which type of name would you say **TELEVISION** is?

- Brand name
- Common name
- Don't know

Respondents who correctly answered that SAMSUNG is a brand name and that TELEVISION is a common name continued with the survey. Respondents who did not correctly answer both these questions were excluded from further participation and did not count toward the final number of completed interviews.

Respondents who continued were then instructed:

We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of <u>instant cameras and instant camera film</u>.

For each term you are shown, please answer whether you think the term is a ***brand*** name or a ***common*** name. Or if you don't know, you may select that option.

One at a time, respondents were then shown five terms until all five terms had been seen. As each term appeared on screen, respondents were asked:

Do you think this is a ...

- Brand name
- Common name
- Don't know

The list of terms shown to respondents included the following term at issue:

## POLAROID

The survey also included two trademark (i.e. brand name) terms:

## FUJIFILM

## LEICA[2]

The survey also included two generic (i.e. common name) terms:

## HIGH-SPEED

## FILTER

---

[2] The first 21 respondents in the survey were shown the term LOMOGRAPHY instead of LEICA. Shortly after launching the survey, I did additional research and learned that although LOMOGRAPHY is used by a particular company as a trademark, it is also used within the photography community as a generic term for a style or genre of photography. The fact that LOMOGRAPHY is not a clear-cut example of a term that is a brand renders it less suitable for use in the survey as a benchmark brand example. Therefore, after the initial 21 interviews, LOMOGRAPHY was changed to LEICA in the survey, and the remaining 179 respondents saw the term LEICA. LEICA ultimately served as a more suitable benchmark against which to measure recognition of a brand name.

Asking respondents about all five of these terms provided benchmarks against which to measure the proportion of respondents who perceive POLAROID as a brand name or common name. Including equal numbers of brand and common names in addition to the test term at issue (POLAROID) avoids any potential bias in responses regarding POLAROID.

To account for response bias due to the order in which the terms were asked, half of all respondents saw the term POLAROID first. The remaining four terms were then presented one at a time in randomized order. This ensured that the survey would include a subset of data for which none of the other terms could have impacted responses to POLAROID, since the other terms were not shown until after a response to POLAROID had been submitted. Meanwhile, the other half of the 200 respondents never saw POLAROID first. Instead, POLAROID was always seen after at least one of the other terms and the order in which it was presented with respect to any of the other terms was randomized along with the other terms.

This concluded the survey for respondents in Version 1.

<u>Version 2</u>

Respondents in Version 2 took an identical survey with the sole exception that the term "common name" was always presented ahead of the term "brand name." This consistently occurred in three locations throughout the survey.

First, in Version 2, the term "common name" was presented in front of "brand name" in all descriptions or questions regarding common name versus brand names. For example, the following instruction was initially shown to respondents in Version 2:

> This survey is about **common** names and **brand** names.  In a few moments you will be asked about a number of terms that you may or may not have seen or heard before.  But first, please read the next two screens about what we mean by a <u>**common**</u> name and what we mean by a <u>**brand**</u> name.

Respondents were next shown the concept of what a common name is, followed by the concept of what a brand name is. In Version 1 of the survey these two concepts were presented in reverse order.

Second, any time respondents were provided response options to select either "common name" or "brand name" as a possible answer, the order of these two response options was reversed from Version 1. That is, response options to these types of questions were always presented as follows to respondents in Version 2:[3]

- Common name
- Brand name
- Don't know

Third, the order in which the following two questions (which assessed whether or not respondents correctly perceived SAMSUNG to be a brand name and TELEVISION to be a common name) were asked was reversed.  Accordingly, respondents in Version 2 were first asked:

> Which type of name would you say TELEVISION is?

- Common name
- Brand name
- Don't know

Followed by:

---

[3] In Version 1 "brand name" was presented as the first option and "common name" was presented second.

Which type of name would you say SAMSUNG is?

- Common name
- Brand name
- Don't know

Aside from these changes to the order in which "common name" and "brand name" were shown throughout the survey, all aspects of the survey between Version 1 and Version 2 were identical.

This concluded the survey for all respondents.

Screenshots of the survey will be provided in Appendix C.

## *SUMMARY OF KEY FINDINGS*

This section details key survey findings.  Other survey results are discussed further in the Detailed Findings section below.

91.0% of respondents identified POLAROID as a brand name, as compared to only 9.0% answering that it is a common name.

Based on the survey results, it is my opinion that the term POLAROID is perceived as a brand name and is not a generic term in the context of instant cameras and film for instant cameras.

<u>See</u> Detailed Findings section below for additional information on results.  The full data is provided in Appendix D.

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The universe for this survey consisted of U.S. consumers, age 16 and older who have purchased an instant camera or film for an instant camera in the past twelve months or are likely to do so in the next twelve months.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

First, after initial demographic questions, all potential respondents were asked:

> In the past 12 months, which of the following types of products, if any, have you personally purchased or had someone purchase for you?
>
> *(Select all that apply)*

The following table displays the list of randomized options from which respondents could select as many as applied to them, and the proportion of final respondents who selected each:

| Purchased in Past 12 Months | | |
|---|---|---|
| N=200 | N | % |
| An instant camera | 111 | 55.5% |
| Film for an instant camera | 95 | 47.5% |
| A standard camera | 82 | 41.0% |
| Film for a standard camera | 67 | 33.5% |
| A digital camera | 104 | 52.0% |
| A memory card for a digital camera | 111 | 55.5% |
| None of these | 21 | 10.5% |

Next, all respondents were asked:

In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to personally purchase or have someone purchase for you?

*(Select all that apply)*

The following table displays the proportion of final respondents who selected each:

| Likely to Purchase in Next 12 Months | | |
|---|---|---|
| N=200 | N | % |
| An instant camera | 110 | 55.0% |
| Film for an instant camera | 120 | 60.0% |
| A standard camera | 76 | 38.0% |
| Film for a standard camera | 70 | 35.0% |
| A digital camera | 107 | 53.5% |
| A memory card for a digital camera | 96 | 48.0% |
| None of these | 7 | 3.5% |

Respondents who selected at least one of the following options in response to either of these questions were considered part of the relevant sample universe and qualified to participate in the main survey:

- An instant camera
- Film for an instant camera

Upon completion of the main survey, all respondents were asked the following question for classification purposes:

Do you or does anyone in your household work for any of the following?

*(Select all that apply)*

The following table displays the list of randomized options from which respondents could select, and the proportion of final respondents who selected each:

| Related Employment | | |
| --- | --- | --- |
| N=200 | N | % |
| A company or store that makes or sells cameras or film | 9 | 4.5% |
| A company or store that makes or sells accessories for camera/photo accessories | 19 | 9.5% |
| An advertising or market research company | 18 | 9.0% |
| None of these | 169 | 84.5% |

Excluding respondents who work or have a member of their household who works in a field related to the survey topic from my analysis would not meaningfully impact the results of this study or my conclusions.

This concluded all screening and classification questions for all respondents.

The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling plan involved a random selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases and TTAB proceedings. Online surveys are also the dominant form of survey used in connection with litigation surveys.[4] I have personally designed

---

[4] Kugler, Matthew B. and Henn Jr., R. Charles, "Internet Surveys in Trademark Cases: Benefits, Challenges and Solutions," in Trademark and Deceptive Advertising SURVEYS: Law, Science, and Design, eds. Shari Seidman Diamond and Jerre B. Swann (2d. Ed. 2022) at 291 (hereinafter "Kugler and Henn"). As of 2019, approximately 90% of U.S. adults are connected to the internet, through a smartphone, tablet, laptop, or other computer, including 99 percent of those

and executed numerous internet surveys that have been accepted by courts and the TTAB.

The sample of panelists used in the survey was provided by Dynata, a leading supplier of online sample for surveys.  I have worked with Dynata on many surveys and have found its procedures and panels to be highly reliable.  Dynata has large and diverse panels consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research.  Use of online panels is extremely common and well-accepted as a sampling method for surveys used as evidence in litigation.[5]

Dynata utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Through the following techniques, Dynata employs specific process behavior, pattern analysis, statistics and algorithms to ensure top quality data:

- Digital Fingerprinting technology to ensure high quality participants. This includes checking for duplicate participants by evaluating variables, such as email address, matches across several demographic data, and device-related data.
- Double-Opt-In engaged panelists
- Third Party technologies to create non-bias decisions
- Country-specific and relevant incentive model

---

between the ages of 30 and 49 and 98 percent of those between 18 and 29. Id. at 291-2922 (citing *Internet/Broadband Fact Sheet*, Pew Res. Ctr. (June 12, 2019).

[5] Id. at 293-295.  Panel surveys are a form of non-probability survey.  Almost all surveys submitted as evidence in litigation are non-probability surveys, most involving the use of online panels.  Id. at 308 (Experts "thus nearly always use nonprobability surveys of opt-in internet panels, which are widely recognized as sufficiently reliable for litigation purposes."); 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition Sec 32:165 (5th ed. 2019) ("almost all courts" have found non-probability surveys "sufficiently reliable to be admitted into evidence.")

- Post-collection disqualifications including straightlining[6] with Product Manager consultation, verbatims, and speeders

Such panel-level checks are well-accepted to contribute to the reliability of a sample of online panelists.[7]

Additionally, Dynata profiles its panelists and keeps up-to-date on standard demographics, such as age, gender, region, household demographic, interests and hobbies.

A sampling plan was carefully structured in order to represent the demographics of relevant customers – i.e. consumers of instant cameras or film for an instant camera.

Throughout the survey, I monitored the rate of qualification within each individual age and gender group. I then calibrated these individual incidence rates against U.S. Census data by age and gender and set revised age and gender quotas for the final sample size of 200. The following table displays the final proportion of sample achieved by age and gender:

---

[6] "Straightlining" in online surveys is defined as behavior exhibited by respondents when they repeatedly select the same response in a question series or grid.
[7] Kugler and Henn at 300-301.

| Final Number of Respondents by Age and Gender | | | | |
|---|---|---|---|---|
| | Men | | Women | |
| | N | % | N | % |
| 16 – 24 | 26 | 13.0% | 32 | 16.0% |
| 25 – 34 | 30 | 15.0% | 36 | 18.0% |
| 35 – 44 | 26 | 13.0% | 24 | 12.0% |
| 45 – 54 | 7 | 3.5% | 6 | 3.0% |
| 55 – 64 | 2 | 1.0% | 4 | 2.0% |
| 65 and older | 3 | 1.5% | 4 | 2.0% |

This methodology for producing a representative sample of the relevant category (here, consumers of instant cameras of film for instant cameras) is standard and well-accepted, as it naturally weights the survey sample proportionately to the rates at which each age/gender group are purchasers of the relevant type of products.[8] For instance, as shown above, younger respondents were represented in the survey at far higher rates because they have far higher rates of purchasing instant cameras or film for instant cameras.

Survey invitations were sent across the U.S. in geographic proportion to Census data. The following table displays the final proportion of sample achieved by region:

---

[8] Kugler and Henn at 309-310.

| Final Number of Respondents by Region (N=200) | | |
|---|---|---|
| | N | % |
| Northeast | 34 | 17.0% |
| West | 62 | 31.0% |
| Midwest | 18 | 9.0% |
| South | 41 | 20.5% |
| Southeast | 45 | 22.5% |

Since the rate of identifying POLAROID as a brand name was very high among both men and women, within all age groups, and in every geographic region, the precise demographics of the survey respondents was not material to the results. The results could be re-weighted based on any proportion of age, gender and geography and the conclusion would not change at all.

**INTERVIEWING PROCEDURES**

The online survey was programmed and hosted by Dynata, a company specializing in web survey programming and data collection and processing. My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

**DATA PROCESSING**

Data was collected by Dynata and made available to Hal Poret, LLC through an electronic portal on an ongoing basis. The data set showing respondents' answers to all questions will be provided in electronic form.

**DOUBLE-BLIND INTERVIEWING**

The study was administered under "double-blind" conditions. That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but

the service involved in providing the sample and administering the online interviews (Dynata) was similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PERIOD

Interviewing was conducted from June 2, 2020 through June 6, 2020.

## QUALITY CONTROL

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent is a live person. The test employed in this survey is a CAPTCHA[9] program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender.  This information was checked against the sample provider's (Dynata's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to the main survey.  Such measures are commonly implemented and well-accepted to validate the identity and characteristics of the panelist and that the panelist is paying attention and entering information accurately.[10]

Additionally, respondents were then asked to select their age range as a redundancy check – i.e., a measure to ensure that respondents enter consistent information and to

---

[9] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell computers and Humans Apart."
[10] Kugler and Henn at 300-301.

exclude those who contradict a previous answer. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the survey.[11]

These combined steps ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select any social media services they have used in the past month. Respondents could select as many as applied to them from a list of eleven options, including, "None of these" and one fictitious name: Trouba. Respondents who selected "Trouba" were identified as "yea-sayers" and unable to continue with the survey.[12]

The following question was also asked and permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately:

> For quality assurance, please type the word "Survey" in the blank next to the "Other" box below and then click to continue.
>
> - Strongly agree
> - Agree
> - Neutral
> - Disagree
> - Strongly disagree
> - Other _____

---

[11] Such a question is recognized as increasing the reliability of the process. Neal, David T. "Psychological Considerations in Designing Trademark and False Advertising Survey Questionnaires" in Trademark and Deceptive Advertising SURVEYS: Law, Science, and Design, eds. Shari Seidman Diamond and Jerre B. Swann (2d. Ed. 2022) (hereinafter "Neal") at 282.

[12] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

Respondents who selected "other" and typed a response in the blank continued with the survey. Those who failed to follow the instructions were excluded.[13]

A review was conducted of all open-ended answers, including responses to this question, and respondents who failed to follow instructions for this question, or gave other non-responsive or nonsense answers to open-ended questions were removed from the final data. This is also a standard practice that increases the reliability and quality of the data.[14]

Respondents were then also asked to carefully read these instructions:

*     Please take the survey in <u>one</u> session without interruption.
*     Please keep your browser maximized for the entire survey.
*     While taking the survey, please do not consult any other websites or other electronic or written materials.
*     Please answer all questions on your own without consulting any other person.
*     If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above instructions. Only respondents who understood and agreed to the instructions then continued to the main section of the survey.

These various validation and quality control measures collectively ensured the integrity and reliability of the process and the sample of panelists by ensuring that only

---

[13] This quality control question is recognized as ensuring respondents are paying sufficient attention and providing thoughtful answers and are not rushing too quickly through a survey. Kugler and Henn at 302; Neal at 282.

[14] Kugler and Henn at 302-303.

respondents who are paying a sufficient degree of attention and providing appropriate and responsive answers are included in the final data pool.[15]

An initial "pilot" or "pretest" phase of the survey was first carried out among a smaller sample of respondents, and the data was analyzed to test the reliability of the survey questionnaire and methodology, and to ensure that there were no problems with the survey. This method is well-accepted to increase the reliability of the process by providing the opportunity to detect any unanticipated problems with the survey during the earliest portion of data collection.[16] My analysis of the initial wave of results indicated that the survey functioned properly. Accordingly, no changes were made,

---

[15] No respondents were excluded from the survey based on the amount of time they took to complete the survey. The above-discussed validation and quality control procedures are more scientific, superior methods of weeding out respondents who rush through a survey too quickly than attempting to judge the quality of an interview based solely on the amount of time the respondent took. In fact, recent research suggests that the amount of time respondents take to complete a survey is a poor indicator of data quality that is not an effective basis for evaluating an interview. Robert Walker, Raymond Pettit & Joel Rubinson, *The Foundations of Quality Initiative: A Five-Part Immersion into the Quality of Online Research*, 49 J. Advert. Res. 464, 471 (2009) ("..recent research suggests that total interview time may be a biased indicator of data quality.") Given that time of completion can be a poor indicator of data quality, that litigation surveys are relatively short surveys that do not raise substantial concerns about respondent inattention, and that the validation and quality control procedures detailed above are highly effective at addressing any data quality concerns, it is recognized that respondents not recommended to routinely exclude respondents from surveys based on time of completion. Kugler and Henn at 305.

[16] See Ross, Ivan, "The Use of Pilot Tests and Pretests in Consumer Surveys, Trademark and Deceptive Advertising SURVEYS: Law, Science, and Design, eds. Shari Seidman Diamond and Jerre B. Swann (2d. Ed. 2022). It is standard to accomplish such a "pilot" or "pretest" function by starting the survey on a small scale and evaluating the resulting data quality before continuing to complete the survey, as opposed to conducting an entirely separate pilot/pretest survey that is not part of the main survey to be disclosed in the expert report. Kugler and Henn at 299 Fn 24 ("Pretesting need not take the form of a separate or formal "pilot" survey. Often, researchers will launch a survey and pause data collection after the first 20 or so respondents have completed the questionnaire to evaluate whether respondents understand the questions. If the results suggest that respondents understand, the survey can continue; if respondents appear to misunderstand portions of the questionnaire, it can (and should) be modified before being re-launched.")

and the survey was completed as initially designed.  The initial/pilot wave of interviews is included in the final data set.

## DETAILED FINDINGS

### I.    Results Among All Respondents

Respondents identified POLAROID as a brand name at rate of 91.0%, as compared to only 9.0% who identified the term as a common name:

| All Respondents – POLAROID Results Compared to Other Common Names | | | | | |
|---|---|---|---|---|---|
| N=200 | POLAROID | FUJIFILM | LEICA[17] | HIGH-SPEED | FILTER |
| Brand name | 91.0% 182 | 92.5% 185 | 79.3% 142 | 6.5% 13 | 4.0% 8 |
| Common name | 9.0% 18 | 5.0% 10 | 6.1% 11 | 91.0% 182 | 94.5% 189 |
| Don't know | 0.0% 0 | 2.5% 5 | 14.5% 26 | 2.5% 5 | 1.5% 3 |

As this table also shows the high rates of correctly identifying the trademarks FUJIFILM (92.5%) and LEICA (79.3%) as brands and the high rates of identifying the generic terms HIGH-SPEED (91.0%) and FILTER (94.5%) as common names further validates the reliability of the 91.0% brand result for POLAROID.

### II.    POLAROID Results by Subgroups

#### Results by Rotation

I also looked at results among the respondents who saw POLAROID first in rotation – i.e. respondents who saw POLAROID prior to being shown any other term in the survey – versus those who did not see POLAROID first in the succession of terms:

---

[17] LEICA was seen by 179 respondents for reasons explained in the Methodology section of this report.  Among the first 21 respondents who were asked about LOMOGRAPHY rather than LEICA, 2 identified LOMOGRAPHY as a brand (9.5%), 15 identified it as a common name (71.4%) and 4 (19.0%) did not know.  Among those 21 respondents, 20 (95.2%) identified POLAROID as a brand and 1 (4.8%) as a common name.

| POLAROID Results by Rotation | | | |
|---|---|---|---|
| | POLAROID (All respondents) | POLAROID Always Seen First (Rotation 1) | POLAROID Never Seen First (Rotation 2) |
| | N=200 | N=100 | N=100 |
| Brand name | 91.0% 182 | 94.0% 94 | 88.0% 88 |
| Common name | 9.0% 18 | 6.0% 6 | 12.0% 12 |
| Don't know | 0.0% 0 | 0.0% 0 | 0.0% 0 |

As this table shows, the brand result for POLAROID was very high among both subgroups. In particular, the 94.0% brand result for those who were shown POLAROID first could not have been impacted by any of the other terms that were not seen until the answer regarding POLAROID had been submitted.

### *Results by Version*

I also looked at results among the respondents who took Version 1 of the survey, in which the concept of "brand name" was presented first and "common name" second; versus those who took Version 2:

| POLAROID Results by Version | | | |
|---|---|---|---|
| | POLAROID (All respondents) | Version 1 | Version 2 |
| | N=200 | N=101 | N=99 |
| Brand name | 91.0% 182 | 91.1% 92 | 90.9% 90 |
| Common name | 9.0% 18 | 8.9% 9 | 9.1% 9 |
| Don't know | 0.0% 0 | 0.0% 0 | 0.0% 0 |

As this table shows, the brand result for POLAROID was very high in both versions.

***Results by Demographics***

I also looked at results by age, gender and geographic region:

| POLAROID Results by Age | | |
| --- | --- | --- |
| | Age 16 to 34 | Age 35 and older |
| | N=124 | N=76 |
| Brand name | 87.9% 109 | 96.1% 73 |
| Common name | 12.1% 15 | 3.9% 3 |
| Don't know | 0.0% 0 | 0.0% 0 |

| POLAROID Results by Gender | | |
| --- | --- | --- |
| | Male | Female |
| | N=94 | N=106 |
| Brand name | 86.2% 81 | 95.3% 101 |
| Common name | 13.8% 13 | 4.7% 5 |
| Don't know | 0.0% 0 | 0.0% 0 |

| POLAROID Results by Region | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Northeast | West | Midwest | South | Southeast |
| | N=34 | N=62 | N=18 | N=41 | N=45 |
| Brand name | 85.3% 29 | 91.9% 57 | 100.0% 18 | 87.8% 36 | 93.3% 42 |
| Common name | 14.7% 5 | 8.1% 5 | 0.0% 0 | 12.2% 5 | 6.7% 3 |
| Don't know | 0.0% 0 | 0.0% 0 | 0.0% 0 | 0.0% 0 | 0.0% 0 |

As these table shows, the brand result for POLAROID was very high among all demographic groups by age, gender, and geographical region.

## CONCLUSIONS

Based on the survey results, it is my opinion that the term POLAROID is perceived as a brand name and is not a generic term in the context of instant cameras and film for instant cameras.

Hal Poret

Dated:  June 2, 2023

# APPENDIX A

# CURRICULUM VITAE OF STUDY'S AUTHOR

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

*Education*

| 1998 | Harvard Law School, J.D., *cum laude* |
|------|----------------------------------------|
|      | • Editor/Writer – Harvard Law Record |
|      | • Research Assistant to Professor Martha Minow |

| 1995 | S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude* |
|------|----------------------------------------|
|      | • Statistics |
|      | • Taught calculus/precalculus/statistics |

| 1993 | Union College, B.S. in Mathematics with honors, *magna cum laude* |
|------|----------------------------------------|
|      | • Phi Beta Kappa |
|      | • Resch Award for Achievement in Mathematical Research |

*Employment*

2016 -    President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004 - 2015    Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004    Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003    Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2023   Pengu Swim School LLC v. **Blue Legend LLC**
       (Trial)                            USDC Southern District of TX

2023   **Nike** v. Customs By Ilene, Inc.
       (Deposition)                       USDC Central District of CA

2023   Golo LLC v. **Goli Nutrition**
       (Deposition)                       USDC District of Delaware

2023   **Darkowl LLC** v. Arkowl LLC
       (Deposition and Hearing)           USDC District of CO

2023   Maker's Mark Distillery v. **Spalding Group, Inc.**
       (Deposition)                       USDC Western District of KY

2023   Zamora v. **GT's Living Foods**
       (Deposition)                       Superior Court California

2023   World Champ Tech v. **Peloton Interactive**
       (Deposition)                       USDC Northern District of CA

2023   Global Apogee v. **Sugarfina et al.**
       (Deposition)                       USDC Central District of CA

2022   **adidas** v. Thom Browne
       (Deposition and trial)             USDC Southern District of NY

2022   Edible Arrangements v. **Green Thumb Industries**
       (Deposition)                       USDC Northern District of IL

2022   **Instagram** v. Instagoods
       (Deposition)                       USPTO Opposition

2022   **Sinomax** v. American Signature, Inc.
       (Deposition)                       USDC Southern District of OH

2022   **Jackpocket, Inc.** v. Jackpot.com
       (Deposition)                       USDC Southern District of NY

2022  **Premier Specialty Brands** (**Kamado Joe**) v. Phase 2 (d/b/a Vision Grills)
(Deposition)                              USDC Northern District of GA

2022  **Alcon Vision** v. Lens.com
(Deposition)                              USDC Eastern District of NY

2022  The Cookie Department v. **Hershey**
(Deposition)                              USDC Northern District of CA

2022  Rise Brewing Co. v. **PepsiCo.**
(Deposition)                              USDC Southern District of NY

2022  **Chartwell Studio Inc. v.** Team Impressions Inc.
(Deposition)                              USDC Northern District of IL

2022  **Diageo** v. Deutsch
(Deposition and trial)                    USDC Southern District of NY

2022  Stone Brewing v. **MillerCoors**
(Deposition and trial)                    USDC Southern District of CA

2022  Gibson v. **Armadillo**
(Deposition and trial)                    USDC Eastern District of TX

2022  **adidas** v. Fashion Nova
(Deposition)                              USDC District of OR

2022  Fishon v. **Premier Nutrition Corp.**
(Deposition and trial)                    USDC Northern District of CA

2022  **Zuru LLC** v. Lego Juris
(Deposition)                              USPTO Cancellation

2022  American Eagle Outfitters, Inc. v. **Walmart**
(Deposition)                              USDC Western District of PA

2022  Hansen v. **Newegg.com Americas, Inc.**
(Deposition)                              Superior Court California

2021  Coachella v. **Coachillin Holdings**
(Deposition)                              USPTO Opposition

2021  **S&P Global, Inc.** v. S&P Data LLC

(Deposition and trial)                    USDC Delaware

2021    **Wing Enterprises** v. Tricam Industries, Inc.
        (Deposition and trial)            USDC District of MN

2021    **Advance Magazine Publishers** v. Goncharova
        (Trial testimony)                 USPTO Opposition

2021    Wildfang v. **Target Corporation**
        (Deposition)                      USDC District of OR

2021    **Orgain** v. Iovate
        (Deposition)                      USDC Central District of CA

2021    Edwards Life Sciences v. **Meril Life Sciences**
        (Deposition)                      USDC Northern District of CA

2021    Publix. v. **Pharmapacks**
        (Deposition)                      USPTO Opposition

2021    **Tory Burch LLC** v. Olem Shoe Corp.
        (Deposition)                      USDC Southern District of NY

2021    **Heaven Hill** v. Log Still Distilling
        (Deposition)                      USDC Western District of KY

2021    **Kamado Joe** v. Dansons US LLC
        (Deposition)                      USDC Northern District of GA

2021    Kiva Health Brands, LLC v. **Kiva Brands Inc.**
        (Deposition)                      USDC Northern District of CA

2021    **Elevations Credit Union** v. Elevate Credit Union
        (Deposition)                      USDC District of UT

2021    Sharpe v. **GT'S Living Foods**
        (Deposition)                      USDC Central District of CA

2021    Mirzoyan v. **Hershey**
        (Deposition)                      Superior Court of California

2021    Furniture Dealer.net v. **Amazon.com**
        (Deposition)                      USDC District of MN

2021  **Treehouse Foods, Inc.** v. Keurig Green Mountain, Inc.
     (Deposition)                      USDC Southern District of NY

2021  Brady v. **Bayer**
     (Deposition)                      Superior Court of California

2021  Capri Sun v. **American Beverage Corporation**
     (Deposition)                      USDC Southern District of NY

2020  **Universal Electronics, Inc.** v. Roku Inc. et al.
     (Deposition)                      International Trade Commission

2020  Enchante Accessories v. **Turko Textiles**
     (Deposition)                      USDC Southern District of NY

2020  Greater Orlando Aviation Authority v. **Melbourne Airport Authority**
     (Deposition)                      USDC Middle District of FL

2020  **New Orleans Saints** v. WDI
     (Trial)                               American Arbitration Association

2020  Vanderbilt University v. **Scholastic**
     (Deposition)                      USDC Middle District of TN

2020  Pacific Packaging v. **Nutrisystem**
     (Deposition)                      USDC Central District of CA

2020  American Airlines v. **Delta Airlines**
     (Deposition)                      USDC Northern District of TX

2020  **FCA** v. Mahindra
     (ITC Modification trial testimony)     ITC Modification Proceeding

2020  Lontex Corporation v. **Nike**
     (Deposition and trial)             USDC Eastern District of PA

2020  Koenig v. **Vizio, Inc.**
     (Deposition)                      Superior Court California (LA County)

2020  Roley v. **Google**
     (Deposition)                      USDC Northern District of CA

2020    **Snaplock Industries** v. Swisstrax Corp.
        (Deposition)                          USDC District of Nevada

2020    TeamSnap v. **Team Mates Pty. Ltd**,
        (Deposition)                          USDC District of CO

2020    Bluetooth SIG V. **FCA, USA**
        (Deposition)                          USDC Western District of Washington

2020    **Monster Energy** v. VPX
        (Deposition)                          USDC Southern District of FL

2019    **George Sink PA Injury Law Firm** v. George T. Sink, Jr.
        (Arbitration trial)                   American Arbitration Association

2019    Cabrera v. **Bayer Corporation**
        (Deposition)                          USDC Central District of CA

2019    GDM Enterprises v. **Astral Health & Beauty**
        (Deposition)                          USDC Western District of MO

2019    **Yahoo** v. Mozilla
        (Deposition)                          Superior Court Santa Clara County, CA

2019    Scott Fetzer v. **John Henry, III**
        (Deposition)                  Court of Common Pleas, Cuyahoga County, OH

2019    **Illinois Tool Works** v. Poly-America
        (Deposition and trial)                USDC Northern District of TX

2019    **Adidas** v. Forever 21
        (Deposition)                          USDC District of Oregon

2019    TRP v. **Simalasan**
        (Deposition)                          USDC District of NV

2019    Ironhawk Technologies v. **Dropbox Inc.**
        (Deposition)                          USDC Central District of CA

2019    Universal Standard v. **Target Corporation**
        (Deposition)                          USDC Southern District of NY

2019    **FCA** v. Mahindra

(Deposition and ITC trial)                    ITC and USDC Eastern District of MI

2019    DealDash v. **ContextLogic**
        (Deposition)                          USDC Northern District of CA

2019    **Sprint** v. AT&T Mobility
        (Deposition and trial)                USDC Southern District of NY

2019    Merck & Co v. **Merck KGaA**
        (Deposition)                          USDC District of NJ

2019    **Arbor Pharmaceuticals** v. ANI Pharmaceuticals
        (Deposition)                          USDC District of Minnesota

2019    **American Cruise Lines** v. American Queen Steamboat Company
        (Deposition and trial)                USDC District of DE

2018    MZ Wallace v. **Oliver Thomas**
        (Deposition and trial)                USDC Southern District of NY

2018    VonRosenberg v. **Lawrence**
        (Deposition)                          USDC District of SC

2018    Kjaer Weis v. **Kimsaprincess, Inc.**
        (Deposition)                          USDC Central District of CA

2018    In re: NCAA Grant-in-Aid Cap Litigation
        (Deposition; Trial)                   USDC Northern District of CA

2018    **Under Armour** v. Battle
        (Deposition)                          USDC District of Maryland

2018    Federal Trade Commission v. **D-Link Systems**
        (Deposition)                          USDC Northern District of CA

2018    Ezaki Glico v. **Lotte International**
        (Deposition)                          USDC District of NJ

2018    Car Freshener Corporation v. **American Covers/Energizer Holdings**
        (Deposition)                          USDC Northern District of NY

2018    **Combe** v. Dr. August Wolff
        (Deposition and trial)                USDC Eastern District of VA

2018    In Re GM Ignition Switch Litigation
        (Deposition)                              USDC Southern District of NY

2018    Zetor v. **Ridgeway**
        (Trial Testimony Deposition)             USDC Western District of AR

2018    Superior Consulting v. **Shaklee**
        (Deposition; Hearing; Trial)             USDC Middle District of FL

2018    Monster Energy Company v. **Integrated Supply Network**
        (Deposition)                             USDC Central District of CA

2018    Sandoz v. **GlaxoSmithkline**
        (Deposition)                             USPTO Opposition

2018    Variety Stores v. **Walmart Stores, Inc.**
        (Trial)                                  USDC Eastern District of NC

2018    JB-Weld v. **Gorilla Glue Company**
        (Deposition)                             USDC Northern District of GA

2018    Bratton v. **The Hershey Company**
        (Deposition)                             USDC Western District of MO

2018    Leadership Studies v. **Blanchard Training & Development**
        (Deposition)                             USDC Southern District of CA


### *Presentations*

The McCarthy Series: U.S.P.T.O. v. Booking.com: What the Recent SCOTUS Ruling Means for Trademark Law
(McCarthy Institute Webinar, July 29, 2020)

Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags
(INTA Annual Meeting, May 21, 2019)

Consumer Perception Surveys - A Primer from Survey Experts and NAD
(ASRC Conference, Dec 7, 2018)

<u>What's New in Advertising Law, Claim Support and Self-Regulation?</u>
(ABA Seminar, November 17, 2015)

<u>How Reliable is Your Online Survey</u>
(2015 ASRC Annual Conference, September 29, 2015)

<u>What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims</u>
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

<u>Cutting Edge Developments in Trademark Surveys</u> (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

<u>Using Survey Experts in Trademark Litigation</u> (DRI Intellectual Property Seminar, May
9, 2013)

<u>Surveys in Trademark and Advertising Litigation </u> (2013 National CLE Conference,
Snowmass Colorado, January 2013)

<u>Internet Survey Issues</u> (PLI Hot Topics in Advertising Law Conference, March 2012)

<u>Measuring Consumer Confusion Through Online Surveys</u> (2011 Midwest IP Institute)
(September, 2011)

<u>Online Surveys as Evidence in Trademark Disputes</u> (International Trademark
Association Annual Conference, May 2011)

<u>Managing Intellectual Property Trademark Roundtable</u> (April 7, 2010)

<u>Recent Trends in Trademark Surveys</u> (Virginia State Bar Intellectual Property
Conference, October 2009)

<u>Trademark Surveys in US Litigation</u> (presentation for International Trademark
Association Annual Conference) (May 2009)

<u>How to Conduct Surveys for use in Trademark Disputes</u> (Practicing Law Institute
Advanced Trademark Law Conference) (May 2009)

<u>Trademark and Advertising Perception Studies for Legal Disputes</u> (Opinion Research
Corporation Seminar, June 2008)

<u>Understanding Advertising Perception Surveys</u> (Promotions Marketing Association
Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

Commentary: Response to the Commentary Entitled "The Science of Proving Trademark Dilution", 111 TMR 778 (July-August 2021)

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks that are Not Top-Of-Mind, 109 TMR 935 (Nov-Dec 2019)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

### *Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

### *Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

# QUESTIONNAIRE

| SCREENER |
| --- |

**BASE: ALL RESPONDENTS**

Q99   Insert Captcha [HIDE "YOU ARE HUMAN" SCREEN]

**BASE: ALL RESPONDENTS**

Q100.  Please enter your year of birth. **[PROGRAMMER: FORCE 4-DIGIT TEXT BOX. IF DOES NOT ENTER 4 DIGITS THEN SHOW ERROR MESSAGE INSTRUCTING RESPONDENT TO USE A 4-DIGIT FORMAT.  AFTER RESPONDENT ENTERS 4 DIGITS AND HITS CONTINUE, IF THEIR YEAR DOES NOT MATCH PANELIST'S PRELOAD THEN DISPLAY AN ERROR MESSAGE THAT READS, "**Please confirm you have entered your year of birth accurately.**" IF RESPONDENT'S YEAR STILL DOES NOT MATCH PANEL DEMO THEN TERMINATE.]**

**ASK IF: HAS NOT TERMINATED**

Q105   Are you… **[CHECK AGAINST PANEL VARIABLE AND TERMINATE IF IT DOES NOT MATCH]**

1.  Male [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "1" FOR MALE]
2.  Female [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "2" FOR FEMALE]

**ASK IF: HAS NOT TERMINATED**

Q107   Which of these age ranges includes your age?

**[TERMINATE IF UNDER 16 OR AGE RANGE NOT POSSIBLE BASED ON YEAR OF BIRTH ENTERED IN Q100. NOTE: DEPENDING ON IF THE REPSONDENTS BIRTHDAY HAS PASSED THEY MAY BE ONE OF TWO AGES BASED OFF THE YOB.]**

1.  Under 16 **[TERMINATE]**
2.  16-24
3.  25-34
4.  35-44
5.  45-54
6.  55-64
7.  65 +

**BASE: ANY NON-TERMINATES**

Q109  Which of the following social media services, if any, have you used in the past month?

*Please select all that apply*
[RANDOMIZE]
1. Snapchat
2. YouTube
3. TikTok
4. Instagram
5. Facebook
6. LinkedIn
7. Twitter
8. Tumblr
9. Pinterest
10. Trouba [**TERMINATE**]
11. None of these [**ANCHOR; EXCLUSIVE**]

[**Terminate if selects 109/10**]


**ASK IF: HAS NOT TERMINATED**

Q110  In what state do you live?
**[PROGRAMMER: Drop down menu of states plus D.C. Include an option for "Other" and terminate if it is selected.]**

Appendix B: Questionnaire

**ASK IF: HAS NOT TERMINATED**

Q125   In the <u>past</u> 12 months, which of the following types of products, if any, have you personally purchased or had someone purchase for you?

*(Select all that apply)*
[RANDOMIZE ORDER OF 1, 3, AND 5]
1. An instant camera
2. Film for an instant camera **[always show after 1]**
3. A standard camera
4. Film for a standard camera **[always show after 3]**
5. A digital camera
6. A memory card for a digital camera **[always show after 5]**
7. None of these **[ANCHOR; EXCLUSIVE]**

**ASK IF: HAS NOT TERMINATED**

Q130   In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to personally purchase or have someone purchase for you?

*(Select all that apply)*
[SHOW SAME OPTIONS IN SAME ORDER AS 125]

**[MUST SELECT AT LEAST ONE OF: 125=1, 125=2, 130=1, 130=2, TO CONTINUE; OTHERWISE, TERMINATE.]**

**ASK IF: HAS NOT TERMINATED**

Q160   For quality assurance, please type the word "Survey" in the blank next to the "Other" box below and then click to continue.

1. Strongly agree
2. Agree
3. Neutral
4. Disagree
5. Strongly disagree
6. Other _____ [DO NOT FORCE TEXT BOX]

[TERMINATE IF SELECTED 160/1-5 OR DOES NOT TYPE IN AN ANSWER.]

**<u>ASK IF: HAS NOT TERMINATED</u>**

Q170   You have qualified to take this survey.  Before continuing, please carefully read these instructions:

\*        Please take the survey in <u>one</u> session without interruption.

\*        Please keep your browser maximized for the entire survey.

\*        While taking the survey, please do not consult any other websites or other electronic or written materials.

\*        Please answer all questions on your own without consulting any other person.

\*        If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

    1.   I understand and agree to the above instructions

    2.   I do not understand or do not agree to the above instructions **[TERMINATE]**


**[PROGRAMMING NOTE: DISPLAY ANY TEXT WITH ITS OWN QUESTION NUMBER ON A SCREEN BY ITSELF]**

| **MAIN SURVEY – QUALIFIED RESPONDENTS ONLY** |
| --- |

**[PROGRAMMER: Randomize whether respondent gets Version 1 or 2 in subsequent places where this is a variable.]**

410.
**[IF VERSION 1 INSERT, "*brand*" FIRST & "*common*" SECOND IN THE FIRST & LAST SENTENCES.  IF VERSION 2 INSERT, "*common*" FIRST & "*brand*" SECOND.]**

This survey is about *(insert, without the quotes, "brand" or "common")* names and *(insert, without the quotes, "common" or "brand")* names.  In a few moments you will be asked about a number of terms that you may or may not have seen or heard before.  But first, please read the next two screens about what we mean by a *(insert & underline (without the "") "brand" or "common")* name and what we mean by a *(insert & underline (without the "") "common" or "brand")* name.

420.    **[IF VERSION 1, SHOW Q420-1 FIRST. IF VERSION 2, SHOW Q420-2 FIRST.]**

420-1
<u>Brand names</u> are names that companies use to identify <u>who</u> a product comes from.  Brand names primarily let the consumer know that a product comes from one specific company.

For example, KELLOGG, CHEVROLET, and IPAD are all <u>brand</u> names.  These terms primarily identify for a consumer <u>who</u> a product comes from.

420-2
<u>Common names</u> are words used to identify a <u>type</u> of product – in other words, <u>what</u> the product is, not who makes it.  Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.

For example, CEREAL, CAR, and TABLET are all <u>common</u> names.  These terms primarily identify for the consumer what <u>type</u> of product a company is selling.

**430.    [IF VERSION 1 INSERT, "*brand*" IN FIRST BLANK & "*common*" IN SECOND.  IF VERSION 2, VICE VERSA]**

Do you understand the difference between a _____ name and a ____ name?
1. Yes→ continue to 440
2. No→ *terminate*
3. Don't know → *terminate*

**440.    [IF VERSION 1, SHOW Q440-1 FIRST.  IF VERSION 2, SHOW Q440-2 FIRST]**

440-1  Which type of name would you say **SAMSUNG** is?
**[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2]**
1. Brand name → *continue*
2. Common name→ *terminate*
3. Don't know → *terminate*

440-2  Which type of name would you say **TELEVISION** is?
**[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2]**
1. Brand name → *terminate*
2. Common name→ *continue*
3. Don't know → *terminate*

450.    We would now like to ask you about a series of terms that you may or may not have seen or heard before in the context of <u>instant cameras and instant camera film</u>.
**[IF VERSION 1, SHOW:]**

For each term you are shown, please answer whether you think the term is a **_brand_** name or a **_common_** name.  Or if you don't know, you may select that option.

**[IF VERSION 2, SHOW:]**

For each term you are shown, please answer whether you think the term is a **_common_** name or a **_brand_** name.  Or if you don't know, you may select that option.

**[FOR Q460 THERE ARE 2 ROTATIONS OF THE ORDER OF FIVE TERMS. RESPONDENTS WILL BE ASKED ABOUT EACH TERM ONE AT A TIME:**
- **ONE-HALF OF RESPONDENTS IN <u>EACH VERSION</u> SHOULD GET EACH OF THE 2 ROTATIONS.**
- <u>**POLAROID**</u> **IS <u>ALWAYS FIRST IN ROTATION 1</u> AND ORDER OF ALL OTHER TERMS IS RANDOMIZED**
- <u>**POLAROID**</u> **IS <u>NEVER FIRST IN ROTATION 2</u>.  RANDOMIZE LOCATION OF POLAROID IN ANY OTHER SPOT AND THEN RANDOMIZE LOCATION OF ALL OTHER TERMS IN ORDERING.**
- **FOR EACH TERM, TRACK IF IT IS SEEN 1ST, 2ND, 3RD, 4TH OR 5TH**

| <u>ROTATION 1 - RANDOMIZE</u> | <u>ROTATION 2</u> |
|---|---|
| **POLAROID** [ANCHOR FIRST] | [POLAROID NOT FIRST] |
| **FUJIFILM** | |
| **LEICA** | |
| **HIGH-SPEED** | |
| **FILTER** | |

**[ASK Q460 FIVE TIMES FOR EACH RESPONDENT (ONE TIME FOR EACH TERM), FOR EACH OF THE FIVE TERMS, DISPLAY THE TERM IN UPPERCASE BOLD LETTERS, AND THEN THE QUESTION TEXT BENEATH THE TERM.]**

Q460. Do you think this is a ...
> *[MAKE "brand" TOP CHOICE IN VERSION 1 & SECOND CHOICE IN VERSION 2)*
> 1. Brand name
> 2. Common name
> 3. Don't know [**ANCHOR**]

[PROGRAMMER: IN DATA SHOW RESULTS TO Q460 AS ONE TABLE/COLUMN FOR EACH TERM, REGARDLESS OF ROTATION/VERSION – e.g. SHOW ALL RESULTS FOR "POLAROID" TOGETHER IN ONE COLUMN/TABLE, ETC.]

**<u>ASK: ALL QUALIFIED RESPONDENTS</u>**

Q300  Do you or does anyone in your household work for any of the following?

*(Select all that apply)*
[RANDOMIZE]
1.  A company or store that makes or sells cameras or film
2.  A company or store that makes or sells accessories for camera/photo accessories
3.  An advertising or market research company
4.  None of these **[ANCHOR; EXCLUSIVE]**

# APPENDIX C

# SCREENSHOTS OF PROGRAMMED SURVEY

Appendix C: Screenshots

## SCREENER

99



100



105



Appendix C: Screenshots

107



109

Which of the following social media services, if any, have you used in the past month?
*Please select all that apply*

- Tumblr
- Trouba
- Pinterest
- Instagram
- Snapchat
- LinkedIn
- Twitter
- Facebook
- YouTube
- TikTok
- None of these

Continue

Appendix C: Screenshots

110



125



Appendix C: Screenshots

130



**In the <u>next</u> 12 months, which of the following types of products, if any, are you likely to personally purchase or have someone purchase for you?**
*(Select all that apply)*

☐ A standard camera

☐ Film for a standard camera

☐ A digital camera

☐ A memory card for a digital camera

☐ An instant camera

☐ Film for an instant camera

☐ None of these

Continue

160

**For quality assurance, please type the word "Survey" in the blank next to the "Other" box below and then click to continue.**
*Select one*

○ Strongly agree

○ Agree

○ Neutral

○ Disagree

○ Strongly disagree

○ Other [_____]

Continue

Appendix C: Screenshots

170



MAIN SURVEY

410



420-1



Appendix C: Screenshots

420-2



Common names are words used to identify a type of product – in other words, what the product is, not who makes it. Common names primarily let the consumers know what type of product is being offered, and can be used by more than one company.

For example, CEREAL, CAR, and TABLET are all common names. These terms primarily identify for the consumer what type of product a company is selling.

Continue

430

Do you understand the difference between a *brand* name and a *common* name?

○ Yes
○ No
○ Don't know

Continue

440-1

Which type of name would you say **SAMSUNG** is?

○ Brand name
○ Common name
○ Don't know

Continue

Appendix C: Screenshots

440-2



450

460



Appendix C: Screenshots

0%

## FUJIFILM

Do you think this is a ...

○ Brand name
○ Common name
○ Don't know

Continue

82%

## LEICA

Do you think this is a ...

○ Brand name
○ Common name
○ Don't know

Continue

0%

## FILTER

Do you think this is a ...

○ Brand name
○ Common name
○ Don't know

Continue

Appendix C: Screenshots



300



# APPENDIX D

# NATIVE EXCEL DATA FILE