UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FUJIFILM NORTH AMERICA
CORPORATION,

              Plaintiff,

       - against -

PLR IP HOLDINGS, LLC and PLR BRAND
SERVICES, LLC,

          Defendants.

------------------------------------X
PLR IP HOLDINGS, LLC, PLR BRAND
SERVICES, LLC, POLAROID FILM B.V., and
POLAROID AMERICA CORP. d/b/a POLAROID
ORIGINALS,

    Counterclaim Plaintiffs,

       - against -

FUJIFILM NORTH AMERICA CORPORATION and
FUJIFILM CORPORATION,

    Counterclaim Defendants.
------------------------------------X

                      **MEMORANDUM AND ORDER**

                   17 Civ. 8796 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    In this intellectual property dispute, multiple entities affiliated with the Polaroid brand of cameras, film, and related products assert seven counterclaims sounding primarily in trademark infringement against multiple entities affiliated with the Fujifilm brand.  Fujifilm North America Corporation and Fujifilm Corporation (together, "Fujifilm") now move for summary judgment on the remaining six counterclaims asserted by Polaroid

IP B.V., PLR Brand Services, LLC, Polaroid Film B.V., and Polaroid America Corp. (together, "Polaroid").[1]  For the reasons described herein, Fujifilm's motion is granted in part and denied in part.

## FACTUAL BACKGROUND[2]

This Court has set out the facts of this case in a prior memorandum and order.  See Fujifilm North America Corp. v. PLR IP Holdings, LLC, 17 Civ. 8796 (NRB), 2019 WL 274967 (S.D.N.Y. Jan. 7, 2019).  Accordingly, we review only the facts necessary to address the instant motion.

Beginning in 1972, Polaroid Corporation, a predecessor to the entities involved in this action, sold a variety of products bearing what Polaroid terms its "Classic Border Logo," or "CBL." ECF No. 258 ("Fujifilm's Counterstatement to Polaroid's Rule 56.1 Statement") ¶ 1.  As depicted below, the CBL is a "vertically-oriented rectangle surrounding a small inner square, with the square positioned in a way that creates the visual impression of

---

[1]    On January 6, 2022, this Court granted a motion by Polaroid under Fed. R. Civ. P. 25(c) to substitute Polaroid IP B.V. for PLR IP Holdings, LLC and to change the names of Impossible B.V. and Impossible America Corp. to Polaroid Film B.V. and Polaroid America Corp., respectively.  ECF No. 121.

[2]    Unless otherwise noted, the facts considered and recited for purposes of the instant motion for summary judgment are drawn from Fujifilm's Rule 56.1 Statement, ECF Nos. 218-220, Polaroid's Counterstatement to Fujifilm's Rule 56.1 Statement, ECF No. 227, Polaroid's Annotated Rule 56.1 Statement, ECF No. 252, and Fujifilm's Counterstatement to Polaroid's Rule 56.1 Statement, ECF No. 258.

thin, typically white, borders along the top and sides and a thicker, typically white, border along the bottom." Id.



Polaroid owns two federal trademark registrations for the CBL. Id. ¶ 96.[3] The CBL is two-dimensionally depicted on packaging for Polaroid's products, and Polaroid characterizes the design of its film as a three-dimensional utilization of its CBL mark. ECF No. 252 ("Polaroid's Annotated Rule 56.1 Statement") ¶ 2.

Polaroid Corporation filed for Chapter 11 bankruptcy protection in October 2001. ECF No. 227 ("Polaroid's Response to Fujifilm's Rule 56.1 Statement") ¶¶ 4, 20. In 2008, Polaroid Corporation announced that it would "cease manufacturing of instant film products[,]" including its instant film products

---

[3]     These trademark registrations have the following registration numbers: 5,284,186 and 5,284,187. Fujifilm's Counterstatement to Polaroid's Rule 56.1 Statement ¶ 96.

bearing the CBL.  Id. ¶ 6.  Following this announcement, Impossible B.V. ("Impossible"), an independent entity based in the Netherlands, acquired Polaroid's last remaining film manufacturing facility, which was located in the Netherlands.  Polaroid's Response to Fujifilm's Rule 56.1 Statement ¶ 7.

In April 2009, in connection with Polaroid Corporation's Chapter 11 bankruptcy, various Polaroid entities entered into an Asset Purchase Agreement and Assignment Agreement, pursuant to which PLR IP Holdings, LLC acquired:

> [A]ll Intellectual Property . . . used by Sellers in connection with the operation of the Business, as historically operated by Sellers . . . including, without limitation, all rights to the name 'Polaroid' (and all rights to any other trade names, trademarks and service marks owned by Sellers; and the Intellectual Property filings listed on Schedule 1.1(f).

See Fujifilm's Counterstatement to Polaroid's Rule 56.1 Statement ¶¶ 3-6.

Following Polaroid's bankruptcy, Impossible and other retailers that partnered with Polaroid continued to sell Polaroid-manufactured and Polaroid-branded film bearing the CBL.  Id. ¶ 49.[4]  Throughout this same period, Polaroid continued to partner

---

[4]    PLR IP and Impossible also engaged in license negotiations in 2013 concerning the disclosures and trademark ownership statements required on the film packaging produced by Impossible for Polaroid film.  Fujifilm's

with public figures and prominent companies, such as Taylor Swift and Instagram, to license its trademarks and other intellectual property, including the CBL. Id. ¶¶ 62-64 68-82.

In or around September 2014, Fujifilm began developing an Instax camera that would use square-shaped film. Id. ¶ 98. Fujifilm began to sell this film in the United States in May 2017, using the brand name "Instax Square." Polaroid's Response to Fujifilm's Rule 56.1 Statement ¶ 38.[5]

On January 13, 2017, Polaroid, via counsel, sent a letter to Fujifilm alleging that its Instax Square film was "essentially identical to Polaroid's Classic Border Logo and trade dress[,]" and thereby "infringe[d] Polaroid's Intellectual Property." Fujifilm's Response to Polaroid's Rule 56.1 Statement ¶¶ 147-48.[6]

---

Counterstatement to Polaroid's Rule 56.1 Statement ¶ 233. Polaroid specifically requested that all Impossible packaging contain a trademark statement that "Polaroid, Polaroid Color Spectrum, Polaroid Classic Border Logo, Polaroid Spectra and Polaroid Image are trademarks of PLR IP Holdings, LLC, used under license." Id. ¶ 235.

[5]    Before launching its Instax Square film, Fujifilm sold Instax Mini and Instax Wide films, both of which had a rectangular image area. Fujifilm's Counterstatement to Polaroid's Rule 56.1 Statement ¶ 200.

[6]    The letter also alleged that sales of Fujifilm's Instax Square product "constitute[] a breach of the Sales and Purchase Agreement between Fujifilm and Polaroid." Id. ¶ 148. Approximately six years earlier, on January 11, 2011, following Polaroid's filing of bankruptcy, PLR Brand Services LLC and Fujifilm Corporation had entered into a Sales and Purchase Agreement pursuant to which Fujifilm agreed to manufacture and supply Polaroid with analog instant film and cameras. Id. ¶¶ 135-37; see ECF No. 235 ("Decl. of Erica Chanin"), Ex. 48 at 1. All products manufactured pursuant to the agreement were "packaged under Polaroid's trademark and in trade dress designated by Polaroid[,]" and the agreement included a provision stating that Fujifilm "agree[d] not to make use

---

After receipt of this letter, Fujifilm did not make any changes to the format of the Instax Square film or delay its launch.  Id. ¶ 149.

Fujifilm launched its Instax Square camera and film in the United States in May 2017.  Polaroid's Response to Fujifilm's Rule 56.1 Statement ¶ 38.  In or around September 2017, Impossible began to sell analog instant film, including film bearing the CBL, using the brand name "Polaroid Originals[.]"  Id. ¶¶ 45-46; Fujifilm's Response to Polaroid's Rule 56.1 Statement ¶ 80.[7]

## PROCEDURAL HISTORY

On November 13, 2017, Fujifilm North America Corporation filed suit against PLR IP Holdings, LLC and PLR Brand Services, LLC, seeking to obtain a declaration that Fujifilm's Instax Square products did not infringe any Polaroid trademark or trade dress rights and did not constitute unfair competition under New York or federal law, and seeking cancellation of Polaroid's trademark

---

of Polaroid's trademarks, brands, names or trade dress except in connection with Product to be delivered to Polaroid pursuant to this Agreement or upon the express written authorization of Polaroid."  Id. ¶ 137; See Decl. of Erica Chanin, Ex. 48 at 2, 5.

[7]    Approximately four years later, in 2021, the two Impossible entities, Impossible B.V. and Impossible America Corp. changed their names to Polaroid Film B.V. and Polaroid America Corp., respectively.  Polaroid's Response to Fujifilm's Rule 56.1 Statement ¶ 48.  PLR IP assigned its trademark rights to Polaroid IP B.V. on December 1, 2021.  Id. ¶ 47.

registrations for the CBL for non-use and functionality under 15 U.S.C. §§ 1064.  See ECF No. 1 ¶¶ 27-47.

In response to Fujifilm's Complaint, PLR IP Holdings, LLC, PLR Brand Services, LLC, Impossible B.V., and Impossible America Corp., d/b/a Polaroid Originals, filed an Answer with Counterclaims, ECF No. 14, asserting seven counterclaims against Fujifilm Holdings Corporation, Fujifilm North America Corporation, and Fujifilm Corporation, namely: (1) counterfeiting, in violation of 15 U.S.C. § 1114 (Claim One), id. ¶¶ 52-55; (2) federal trademark infringement, in violation of 15 U.S.C. § 1114 (Claim Two), id. ¶¶ 56-60; (3) federal unfair competition, in violation of 15 U.S.C. § 1125(a) (Claim Three), id. ¶¶ 61-65; (4) state law unfair and deceptive trade practices (Claim Four), id. ¶¶ 66-68; (5) common law trademark infringement and unfair competition (Claim Five), id. ¶¶ 69-73; (6) federal trademark dilution, in violation of 15 U.S.C. § 1125(c) (Claim Six), id. ¶¶ 74-78; and (7) state trademark dilution and injury to business reputation (Claim Seven), id. ¶¶ 79-82.  Polaroid filed an Amended Answer with Counterclaims less than one week later, on February 1, 2018, asserting the same counterclaims.  ECF No. 25 ¶¶ 51-81.

On June 1, 2018, Fujifilm filed a motion to dismiss Polaroid's counterclaim for counterfeiting, ECF No. 35, on the basis that

Polaroid had failed to plausibly allege the required elements of a counterfeiting claim under Section 32 of the Lanham Act, 15 U.S.C. § 1114, ECF No. 37 at 1.   This Court granted Fujifilm's motion in part and denied it in part, dismissing Polaroid's counterfeiting claim to the extent it was directed at Fujifilm's product packaging but denying Fujifilm's motion to the extent it alleged that Fujifilm's Instax Square film itself bears a counterfeit mark.   See Fujifilm, 2019 WL 274967, at *7.[8]

Fujifilm filed an Amended Complaint on November 1, 2019, ECF No. 70 ("Am. Compl."),[9] Polaroid filed an Answer to this Amended Complaint with Counterclaims on December 19, 2019, ECF No. 80,[10]

---

[8]    On August 26, 2020, Polaroid filed a Fact Stipulation pursuant to which it stipulated, in order "to dispose of the Counterfeiting Counterclaim without further effort by either party or the Court[,]" that its trademark registrations associated with the CBL "cover a two-dimensional representation of the [CBL] (e.g., as used on product packaging, in advertising, etc.) and not a three-dimensional representation of the [CBL] (e.g., the product configuration itself)." See ECF No. 105.  Accordingly, we need not address Claim One in this Order.

[9]    In this Amended Complaint, Fujifilm sought: (1) a declaration that Fujifilm's use of the "square within a square" form did not infringe any trade dress rights of defendants, infringe any federal trademark rights of defendants, or constitute any form of unfair competition under 15 U.S.C. § 1125(a) or New York law, id. ¶¶ 31-42; (2) cancellation of the PLR trademark registrations for non-use, functionality, and abandonment under 15 U.S.C. § 1064, id. ¶¶ 43-59; (3) cancellation of PLR trademark registration numbers 4,425,870 and 4,304,206 for fraud under 15 U.S.C. § 1064, id. ¶¶ 62-64; and (4) cancellation of PLR trademark registration numbers 4,425,870 and 5,284,186 for descriptiveness under 15 U.S.C. § 1052, id. ¶¶ 65-68.

[10]    In this Answer, Fujifilm asserted the following counterclaims: (1) counterfeiting, in violation of 15 U.S.C. § 1114 (Claim One), id. ¶¶ 57-60; (2) federal trademark infringement, in violation of 15 U.S.C. § 1114 (Claim Two), id. ¶¶ 61-65; (3) federal unfair competition, in violation of 15 U.S.C. § 1125(a) (Claim Three), id. ¶¶ 66-70; (4) state law unfair and deceptive trade

and Fujifilm filed an Answer to Polaroid's Counterclaims on January 10, 2020, ECF No. 83.  The parties subsequently engaged in discovery.

On December 21, 2023, Fujifilm filed a motion for summary judgment.  ECF Nos. 147-54.  Polaroid opposed the motion, ECF Nos. 155-78, and it was fully briefed on February 16, 2024, ECF Nos. 181-85.  On July 24, 2024, the Court dismissed Fujifilm's motion without prejudice, determining that the parties' Rule 56.1 statements had been "filed in violation of this Court's Local Rules."  See Fujifilm North America Corp., 17 Civ. 8796 (NRB), 2024 WL 3520231, at *2 (S.D.N.Y. July 24, 2024).

On the same day it issued this decision, the Court wrote a letter to the parties "offer[ing] some guidance with respect to the anticipated filing of a renewed motion for summary judgment" and identifying specific issues with the briefing it had received. See ECF No. 189 at 1-4.  The Court also requested that Polaroid file a stipulation specifying "the claims to intellectual property that it is asserting and . . . the source of its asserted right" for each counterclaim.  Id. at 2.  On August 9, 2024, Polaroid

---

practices (Claim Four), id. ¶¶ 71-73; (5) common law trademark infringement and unfair competition (Claim Five), id. ¶¶ 74-78; (6) federal trademark dilution, in violation of 15 U.S.C. § 1125(c) (Claim Six), id. ¶¶ 79-83; and (7) state trademark dilution and injury to business reputation (Claim Seven), id. ¶¶ 84-87.

filed an Amended Stipulation, clarifying that it was asserting: (i) in connection with Claim Two, registered trademark rights in the two-dimensional CBL based on its six federal trademark registrations; (ii) in connection with Claims Three, Four, Six, and Seven, common-law trademark rights in the two-dimensional representation of the CBL; and (iii) in connection with Claims Four, Five, and Six, common-law trade dress rights in the three-dimensional CBL as reflected in the configuration of Polaroid's film. Id. ¶¶ 1-3. The Court subsequently issued a letter stating that it "d[id] not require further briefing or clarification" regarding Polaroid's Amended Stipulation and requested that the parties "confer and propose a briefing schedule agreeable to both sides" if either party intended to file a motion for summary judgment. ECF No. 200.

On December 13, 2024, pursuant to a briefing schedule approved by the Court, ECF No. 202, Fujifilm filed a renewed motion for summary judgment as to Polaroid's six remaining counterclaims, ECF Nos. 205-06, 208, 217. Fujifilm also submitted a Rule 56.1 Statement, ECF Nos. 207, 218-20, and a Declaration by James DeCarlo, Fujifilm's counsel, attaching seventy-nine accompanying exhibits, ECF Nos. 209-16 (the "DeCarlo Decl."). Polaroid filed its opposition to Fujifilm's motion on January 17, 2025, ECF Nos.

221-22, 224-25, including with its briefing a Counterstatement to Fujifilm's Rule 56.1 Statement, ECF Nos. 226-27, and its own Rule 56.1 Statement, ECF Nos. 228-29, as well as a series of declarations and 377 accompanying exhibits, ECF Nos. 230-45.[11]  At the request of the Court, Polaroid also filed an Annotated Rule 56.1 Statement of Additional Material Facts on February 7, 2025. ECF Nos. 252-53.  Fujifilm's motion was fully briefed on February 12, 2025, ECF Nos. 255-56, at which time Fujifilm also submitted a Counterstatement to Polaroid's Rule 56.1 Statement, ECF Nos. 257-58.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could

---

[11]    The declarations submitted by Polaroid include: (1) Declaration of Scott Hardy, the former President and CEO of PLR IP Holdings, LLC, ECF Nos.230-31, with one accompanying exhibit; (2) Declaration of Erica Chanin, plaintiff's counsel, ECF Nos. 232-35 (together, the "Chanin Decl."), with 145 accompanying exhibits; (3) Declaration of Oskar Smolokowski, Chairman of the Board of Polaroid B.V., ECF Nos. 236-38 (together, the "Smolokowski Decl."), with 83 accompanying exhibits; (4) Declaration of Christopher Carani, Polaroid's expert and a registered patent attorney, ECF No. 239, with two accompanying exhibits; (5) Declaration of Hal Poret, Polaroid's expert, ECF No. 240 (the "Poret Decl."), with six accompanying exhibits; (6) Declaration of David Neal, Polaroid's expert, ECF No. 241, with two accompanying exhibits; and (7) Declaration of Bruce Kahn, Polaroid's expert, ECF Nos. 242-45, with 138 accompanying exhibits.

return a verdict for the nonmoving party.'" Nick's Garage, Inc.
v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)).

In evaluating a motion for summary judgment, the Court must
"resolve all ambiguities, and credit all factual inferences that
could rationally be drawn, in favor of the party opposing summary
judgment[.]" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184,
202 (2d Cir. 2007) (citations omitted).  "The moving party bears
the initial burden of demonstrating the 'absence of a genuine issue
of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288,
292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986)).

## DISCUSSION

Fujifilm contends that it is entitled to summary judgment on
all Polaroid's remaining counterclaims.  ECF No. 217 ("Mot.") at
1.  Specifically, Fujifilm asserts that: (1) Polaroid's
counterclaims predicated on its common-law rights in the CBL[12] fail

---

[12]    We note that Fujifilm does not use the term "CBL" in its motion, referring
instead to the "Configuration," which it defines as "common-law trade dress and
trademark rights in the configuration of Polaroid instant film and two-
dimensional depictions . . . of such film[,]" and the "Logo," which it defines
as "line-drawn 'logos' that depict square and rectangular-format Polaroid
instant film[.]"  See Mot. at 1.  For purposes of this Order, we will refer
broadly to the "CBL."  This term is intended to encompass the three-dimensional
configuration of Polaroid instant film, two-dimensional depictions of that film,

because (a) Polaroid abandoned such rights and, even if it did not abandon them, never acquired those rights from Polaroid Corporation, id. at 5-10, (b) the configuration of the CBL is functional and therefore incapable of trade dress protection, id. at 10-19, and (c) the CBL did not have secondary meaning when Fujifilm's Instax Square film entered the market in 2017, id. at 19-25; (2) Polaroid's counterclaims asserted against Fujifilm's promotional materials fail because any depiction of the CBL on such materials constituted a fair use, id. at 25-28; and (3) Polaroid's counterclaims predicated on actual confusion fail because no reasonable consumer would be likely to confuse Fujifilm's Instax Square film or promotional materials as originating from Polaroid, id. at 28-34.

Polaroid disputes each of Fujifilm's assertions, claiming that genuine disputes of material fact exist with respect to each argument that preclude a finding of summary judgment. ECF No. 225 ("Opp.") at 2. We address each argument in turn.

---

and any line drawings depicting Polaroid instant film. Where necessary, we will specify whether we are referring to the three-dimensional film bearing the CBL, two-dimensional depictions of that film, or line-drawn logos depicting the film.

### A.    Counterclaims Predicated on Polaroid's Common-Law Rights in the CBL

First, Fujifilm contends that all Polaroid's counterclaims predicated on its common-law rights must fail because Polaroid lacks any common-law rights in the CBL.  Mot. at 5-25.  Fujifilm posits four reasons for its position: (i) abandonment; (ii) lack of assignment of common law rights; (iii) functionality; and (iv) lack of secondary meaning.  Id.

#### 1. Abandonment

We begin by addressing Fujifilm's argument that Polaroid abandoned its common-law rights in the CBL following its announcement in 2008 that it would stop manufacturing analog instant film bearing the CBL.  Mot. at 5-7.

If a trademark owner "expressly abandons his mark . . ., others are no longer restrained from using it since it ceases to be associated in the public's mind with the owner's goods or services."  Defiance Button Machine Co. v. C & C Metal Products Corp., 759 F.2d 1053, 1059 (2d Cir. 1985), cert. denied, 474 U.S. 844 (1985) (citing Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 630 (2d Cir. 1980)).  To establish abandonment, "it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark."  Hermes

Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 110 (2d Cir. 2000) (citing Defiance Button Machine Co., 759 F.2d at 1059).

Lack of intent to resume use "may be inferred from circumstances[,]" and nonuse of a trademark for three consecutive years constitutes prima facie evidence of abandonment.  15 U.S.C. § 1127.  Where a party moves for summary judgment that a mark has been abandoned and establishes a prima facie case of abandonment, the nonmovant is required "to come forward only with such contrary evidence as, when viewed in the light most favorable to [the nonmovant], would permit a reasonable jury to infer that it had not abandoned the mark."  ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 149 (2d Cir. 2007).  Specifically, the trademark owner must "adduce sufficient evidence to permit a reasonable jury to conclude that, in the three-year period of non-use[,]" it "nevertheless maintained an intent to resume use of its registered mark in the reasonably foreseeable future."  Id.

Abandonment of a mark "constitutes a forfeiture of a property right," and, as a result, "must be proven by clear and convincing evidence."  Empresa Cubana Del Tabaco v. Culbro Corp., 213 F.R.D. 151, 156-57 (S.D.N.Y. 2003) (citing Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) ("[A]bandonment, being a forfeiture of a property interest, should be strictly proved.")).

Fujifilm contends that Polaroid Corporation abandoned any rights it held in the CBL even before it declared bankruptcy and subsequently executed the Asset Purchase Agreement and Assignment Agreement in 2009.  Mot. at 6.  Specifically, Fujifilm asserts that Polaroid Corporation's announcement in 2008 that it would decommission its remaining film manufacturing equipment and sell its discontinued film stock constituted an abandonment without intent to resume use in the reasonably foreseeable future.  Id.

The evidence provided by Polaroid, however, is sufficient to raise a genuine issue of material fact regarding whether Polaroid "maintained an intent to resume use" of the CBL during this period. ITC Ltd., 482 F.3d at 149.  Polaroid notes that the company's new owner publicly stated following Polaroid Corporation's bankruptcy that it "was not going out of business but merely needed time to restructure" and that it intended to continue "licens[ing] out Polaroid's intellectual property[,]" including its rights in the CBL.  Opp. at 9 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 19, 63).[13]  Polaroid also asserts that it engaged in "extensive licensing" of the CBL throughout this period, including in 2011 in

---

[13]    Polaroid also notes that Impossible and other third-party retailers continued to sell Polaroid film bearing the CBL through at least 2015.  Opp. at 16-17 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 46-48, 61).  However, this evidence is less persuasive, given that, at the time of the sales, Impossible was a wholly separate entity.

connection with the production of digital film using the "Zink" technology[14] and in 2014 in connection with a Taylor Swift album that featured the CBL on its cover. Id. at 9-10 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 62-64, 68-74).[15]   Further, Polaroid states that, between 2013 and 2014, it proposed a supply agreement pursuant to which Fujifilm would manufacture five million packages each year of Polaroid-branded analog film bearing the CBL. Id. at 9 (citing Polaroid's Annotated Rule 56.1 Statement ¶ 143). Polaroid also provides evidence sufficient to demonstrate that it engaged in policing efforts to protect the CBL throughout this period. See, e.g., Chanin Decl., Exs. 81-85 (email exchanges dated between 2010 and 2018 between Polaroid counsel and various third parties regarding their alleged infringement of the CBL). Finally, Polaroid asserts that the fact that it resumed manufacturing analog film bearing the CBL in March 2017 serves as evidence of its prior intent to resume use. Opp. at 11.

---

[14]    Polaroid introduced "Zink" photo paper and cameras in the early 2000s. Polaroid's Response to Fujifilm's Rule 56.1 Statement ¶¶ 85, 87.  Zink cameras and printers produced full-color photographs without requiring ink cartridges, through the application of heat to thermally sensitive Zink photo paper.  Id.

[15]    Although Polaroid also contends that its licenses earned significant royalty income throughout this period, Opp. at 10, the cited profit amounts are less persuasive because they are not specific to Fujifilm's licensing of the CBL.

Polaroid also invokes the doctrine of residual goodwill, which provides that a mark may continue to enjoy trademark protection even after a period of non-use. Opp. at 7-8. "[G]oodwill does not ordinarily disappear or completely lose its value overnight[,]" and "[a]s long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived." Defiance Button Machine Co., 759 F.2d at 1059-60 (determining that "destruction of a business' factory or its bankruptcy" cannot terminate goodwill where it had been "built up over a period of almost 100 years[,]" as the mark "represents the reputation developed by its owner for the nature and quality of goods or services sold by him"). Here, Polaroid has provided evidence sufficient to raise a genuine issue of material fact regarding its intent to keep its mark alive for use in resumed business following its decision to cease manufacturing of film bearing the CBL in 2008. See, e.g., Polaroid's Annotated Rule 56.1 Statement ¶¶ 19, 62-64, 68-74, 143; Chanin Decl. Exs. 81-85. Moreover, given Polaroid's longstanding use of the CBL for more than thirty years before its decision to cease manufacturing of analog instant film in 2008, it had undoubtedly "built up" goodwill

that "d[id] not . . . disappear or completely lose its value overnight[.]"  Defiance Button Machine Co., 759 2d. at 1060.

In sum, we agree that the evidence submitted by Polaroid is sufficient to raise a genuine issue of material fact with respect to abandonment, particularly in light of the "strict[]" proof required in this Circuit before a court may divest a party of a property interest under an abandonment theory.  Saratoga Vichy Spring Co., 625 F.2d at 1044.  A reasonable jury could rely on Polaroid's licensing activities, its proposed supply agreement with Fujifilm, its policing efforts, and its resumed manufacturing of analog instant film bearing the CBL in 2017 to determine that Polaroid maintained an intent to resume its use of the CBL following Polaroid Corporation's bankruptcy in 2008.

### 2. Lack of Assignment of Common Law Rights

Next, Fujifilm asserts that it is entitled to summary judgment on Polaroid's counterclaims premised on its common law rights because, it claims, the counterclaimant entities never received the relevant common law rights from Polaroid Corporation after it declared bankruptcy in 2008.  Mot. at 7-10.

Specifically, Fujifilm contends that Polaroid Corporation never transferred its rights in the CBL to the Polaroid counterclaim plaintiff entities pursuant to the Asset Purchase

Agreement ("APA") executed on April 16, 2009. Id.; see also DeCarlo Decl., Ex. 68 ("APA").[16] While the APA evidenced the parties' intent to convey rights in the future, Fujifilm claims, no transfer covering trade dress rights in the film configuration was ever consummated. Id.

The APA provided for the transfer to PLR Acquisition LLC of all properties and assets of the existing Polaroid entities, including:

> [A]ll Intellectual Property owned by Sellers or licensed to Sellers pursuant to an Acquired Contract or otherwise used by Sellers in connection with the operation of the Business, as historically operated by Sellers . . . , including, without limitation, all rights to the name 'Polaroid' (and all rights to any other trade names, trademarks and service marks owned by Sellers; and the Intellectual Property filings listed on Schedule 1.1(f)[.]

APA § 1.1(f).[17]

The agreement further provided that PLR Acquisition LLC would acquire these properties and assets "[a]t Closing[.]" Id. § 1.1.

---

[16]    The Asset Purchase Agreement provided for the purchase by PLR Acquisition LLC of various Polaroid entities and their assets, including: Polaroid Holding Company, Polaroid Corp., Polaroid Consumer Electronics, LLC, Polaroid Capital, LLC, Polaroid Latin America I Corp., Polaroid Asia Pacific, LLC, Polaroid International Holding, LLC, Polaroid New Bedford Real Estate, LLC, Polaroid Norwood Real Estate, LLC, and Polaroid Waltham Real Estate, LLC (defined as "Sellers"). APA at 1.

[17]    The term "Intellectual Property" was defined to include, inter alia, "registered and unregistered trademarks" and "all trade dress rights[.]" Id., Art. 11.

Section 3.1 of the APA stated that this Closing would occur on the "Closing Date[,]" which would take place "following the satisfaction or waiver . . . of all the conditions contained in Article 7 ["Conditions Precedent to Performance by Parties"] or on such other date or at such other place and time as may be mutually agreed to by the parties."  Id. § 3.1

Subsequently, on May 7, 2009, Polaroid Corporation and PLR IP Holdings, LLC executed a Trademark Assignment Agreement pursuant to which Polaroid Corporation assigned "all its right title and interest in and to the Marks[,]" defined as "the trademarks and service marks listed in the attached Schedule[,]" to PLR IP Holdings, LLC.  DeCarlo Decl., Ex. 69 at 1.  On the same day, PLR Acquisition, LLC and PLR IP Holdings, LLC executed an Acquired Intellectual Property Assignment and Assumption Agreement (the "Acquired IP Agreement") pursuant to which PLR Acquisition, LLC assigned to PLR IP Holdings, LLC, "to the extent not directly assigned to IP Holdings by Sellers, . . . all of the Acquired Intellectual Property and all Acquired Contracts . . . relating thereto[.]"  DeCarlo Decl., Ex. 70 § 1.

The language in the Asset Purchase Agreement is broad, covering "all Intellectual Property owned by Sellers or licensed to Sellers pursuant to an Acquired Contract or otherwise used by

Sellers in connection with the operation of the Business[.]" APA § 1.1(f). Such language clearly includes Polaroid Corporation's common-law rights in the CBL. Accordingly, the use of this language, when considered together with the assignment of intellectual property rights to PLR IP Holdings, LLC under the Trademark Assignment Agreement and the Acquired IP Agreement, is sufficient to support a reasonable inference that the parties' agreements transferred all intellectual property relevant to this action.

Further, Polaroid asserts that the "Closing" contemplated by the APA occurred on May 7, 2009, noting that the United States Bankruptcy Court for the District of Minnesota approved the sale in April 2009 and pointing to a Notice of Closing filed by Polaroid Corporation's counsel stating that "[t]he approved sale transaction between Buyer and Debtors officially closed on May 7, 2009 (the 'Closing')." Opp. at 13 (citing Chanin Decl., Ex. 87). Although we agree with Fujifilm that it is inapt to characterize the Notice of Closing as an "Order" issued by the Bankruptcy Court, Reply at 3, Fujifilm has not challenged Polaroid's contention that the Bankruptcy Court approved the APA.

Moreover, Fujifilm's contention that the Closing described in the APA never occurred is belied by public court documents filed

in connection with the Chapter 11 proceeding and other proceedings stating that the sale of Polaroid Corporation's assets was "consummated" in May 2009.  See, e.g., In re Polaroid Corp., et al., 424 B.R. 446, 448 (Bankr. D. Minn. 2010) ("The sale [of the Polaroid Debtors' assets] free and clear was consummated in May, 2009.").  In fact, during subsequent litigation brought by a party asserting a lien on Polaroid Corporation's assets, the Eighth Circuit upheld the sale "free and clear of all [c]laims and [i]nterest[,]" stating that the "finality rule . . . prevents the overturning of a completed sale to a good-faith purchaser in the absence of a stay[.]"  In re Polaroid Corp., 611 F.3d 438, 440-41 (8th Cir. 2010) (citing Nieters v. Sevcik (In re Rodriguez), 258 F.3d 757, 759 (8th Cir. 2001)).

Accordingly, Polaroid has sufficiently demonstrated that genuine issues of material fact exist with respect to whether Polaroid Corporation transferred its rights in the CBL to the counterclaim plaintiff entities.  Fujifilm's motion for summary judgment on Polaroid's counterclaims relevant to this issue is denied.

### 3. Functionality

Next, we address Fujifilm's argument that Polaroid's counterclaims premised on its common law rights in the CBL must

fail because the configuration of the CBL is functional and, therefore, incapable of trade dress protection.  Mot. at 10-19.

Fujifilm contends that "every component of the film's 'border,' their relative locations, and overall shape is dictated by function[,]" Mot. at 16, noting that analog instant film "includes all the components necessary to develop a photo in one self-contained unit[,]" Mot. at 10.  Polaroid, however, asserts that Fujifilm is precluded from asserting a functionality defense due to judicial estoppel.  Opp. at 26-28.

Judicial estoppel provides that, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position[.]"  Intellivision v. Microsoft Corp., 484 F. App'x 616, 618-19 (2d Cir. 2012) (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).  In determining whether judicial estoppel applies, courts consider three factors: (1) whether the party's "new position is 'clearly inconsistent' with its earlier position"; (2) whether "the party seeking to assert this new position previously persuaded a court to accept its earlier position"; and (3) whether "the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'"  Id. at 619 (quoting New Hampshire, 532

U.S. at 750-51).  Judicial estoppel applies to sworn statements made to administrative agencies, as well as to courts.  <u>See</u> <u>Mitchell v. Washingtonville Cent. Sch. Dist.</u>, 190 F.3d 1, 6 (2d Cir. 1999) (affirming application of judicial estoppel where plaintiff made factual averments in Social Security proceedings that were inconsistent with a prior ADA claim).

Polaroid asserts that Fujifilm's position that Polaroid's CBL trade dress is wholly functional is "clearly inconsistent" with Fujifilm's application for a design patent in connection with its own Instax Square film.  Opp. at 26-27.  On March 13, 2017, Fujifilm filed with the PTO an application for a design patent for the Instax Square, representing in its application that it had "invented a new, original and ornamental design for an INSTANT FILM" that closely resembled the CBL.  <u>Id.</u> at 27 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 160-62); <u>see also</u> Chanin Decl., Ex. 65.  The PTO relied on the representations made by Fujifilm in issuing Design Patent No. D821,484.  Chanin Decl., Ex. 65.

Design patents are granted only for "ornamental" designs. <u>See</u> 35 U.S.C. § 171(a) (permitting an inventor to obtain a patent for "any new, original and ornamental design for an article of manufacture").  To satisfy the "ornamental" requirement of the statute, "the design must not be governed solely by function, <u>i.e.,</u>

that this is not the only possible form of the article that could perform its function." Seiko Epson Corp. v. Nu-Kote Int'l, Inc., 190 F.3d 1360, 1368 (Fed. Cir. 1999).

Fujifilm contends that it did not represent to the PTO that its film was non-functional under trademark law, but only that its film design was sufficiently ornamental under design patent law, which protects inherently functional "articles of manufacture[.]" Reply at 11-12.[18]  However, we agree with Polaroid that, by seeking a design patent from the PTO, Fujifilm represented that the border for its analog instant film was not primarily functional, but sufficiently ornamental, and the PTO relied on this representation when it issued a design patent. See Chanin Decl., Ex. 65.  This representation is relevant to the functionality analysis for the CBL, given that, as discussed infra Section A.4.v., the parties'

---

[18]  We note that Fujifilm cites case law stating that, where a design patent and proposed mark are not identical, a "similar" design patent will "lack sufficient evidentiary value" to show non-functionality. See Reply at 11 (quoting In re Becton, Dickinson, 675 F.3d at 1375).  Fujifilm argues that there is not sufficient similarity between Polaroid film bearing the CBL and the claimed design. Id. at 12.  However, as discussed infra Section A.4.v., the evidence submitted by Polaroid indicates that the two products so closely resemble each other that Fujifilm's own executives have difficulty distinguishing between them.

Fujifilm also contends that, "in general, courts do not bind parties to their statements made or positions taken in ex parte application proceedings in front of the PTO."  Reply at 12 (quoting Kennedy v. Basil, 531 F. Supp. 3d 828, 839 (S.D.N.Y. 2021)).  However, this language is qualified, and Fujifilm withholds the fact that the court in Kennedy ultimately determined that plaintiff was judicially estopped from claiming she owned the trademarks at issue, based on statements she made to the USPTO.  531 F. Supp. 3d at 839-40.

products are nearly identical.  See <u>Krueger Intern., Inc. v.</u>
<u>Nightingale Inc.</u>, 915 F. Supp. 595, 605 (S.D.N.Y. 1996), <u>overruled</u>
<u>on other grounds by</u> <u>Landscape Farms, Inc. v. Columbia Cascade Co.</u>,
113 F.3d 373 (2d Cir. 1997) ("The existence of a design patent .
. . is relevant to the functionality defense" and "can serve as
evidence that a plaintiff's trade dress is not functional" and
"help rebut the functionality defense[.]").

    In sum, Polaroid has sufficiently raised genuine issues of
material fact regarding whether Fujifilm should be permitted to
benefit from the protection of a design patent for its Instax
Square film while contending that Polaroid's near-identical design
is entirely functional and unworthy of protection.  See <u>Yeda Rsch.</u>
<u>& Dev. Co. v. Imclone Sys., Inc.</u>, 443 F. Supp. 2d 570, 624 (S.D.N.Y.
2006) (applying the doctrine of judicial estoppel to bar defendants
from taking contrary position after "obtain[ing] the benefit of"
statements made to the PTO); <u>see also</u> <u>Mitchell</u>, 190 F.3d at 6
(applying doctrine of judicial estoppel to sworn statements made
to an administrative agency).  Accordingly, Fujifilm's motion for
summary judgment based on the alleged functionality of the
configuration of the CBL is denied.[19]

---

[19]    Fujifilm also contends that disputed issues of material fact exist that
preclude summary judgment on functionality.  Opp. at 28-34.  While we focus
primarily in this section on Polaroid's assertion that Fujifilm is precluded

### 4. Secondary Meaning

Finally, we address Fujifilm's argument that Polaroid's counterclaims premised on its common law rights in the CBL must fail because Polaroid cannot show that the configuration of the CBL had secondary meaning at the time that Fujifilm began to sell its Instax Square film.  Mot. at 19-25.

Secondary meaning exists when, "in the minds of the public, the primary significance of [the mark] . . . is to identify the source of the product rather than the product itself."  Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 216 (2d Cir. 2012) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)).  The Second Circuit has identified six non-exclusive factors to guide a court's inquiry into the existence of secondary meaning, namely: "'(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use.'"  Id. at 226 (quoting Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987)).

---

from asserting a functionality defense due to the doctrine of judicial estoppel, we agree that issues of fact remain regarding whether the CBL can properly be considered functional, particularly in light of the amount of time that has passed since Polaroid first filed its utility patents.  See, e.g., Polaroid's Annotated Rule 56.1 Statement ¶¶ 181, 182-97, 230-32.

Review of these six factors "is an inherently factual inquiry." RVC Floor Decor Ltd. v. Floor and Decor Outlets of America, Inc., 527 F. Supp. 3d 305, 318 (E.D.N.Y. 2021) (quoting Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 993 (2d Cir. 1987)). "[P]roof of secondary meaning entails vigorous evidentiary requirements[,]" and the proponent of a trademark bears the burden of proving that his or her mark had acquired secondary meaning by the time the allegedly infringing product came on the market. Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985) (internal citations omitted).

Here, the relevant question is whether the CBL had acquired secondary meaning by 2017, when the Fujifilm Instax Square became available for purchase in the United States. See Thompson Med. Co., 735 F.2d at 217. We examine each of the secondary meaning factors in turn.

### i. Factor One: Advertising Expenditures

For purposes of the secondary meaning analysis, advertising expenditures may show "indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product." Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc., No. 94 Civ. 2732 (SAS), 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996) (citation omitted). In

evaluating a party's expenditures, "[t]he Court should consider not only the total amount" expended, but also "whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source." <u>LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.</u>, 209 F. Supp. 3d 612, 655 (S.D.N.Y. 2016).

This factor favors Fujifilm, as Polaroid has provided little evidence of advertising expenditures specific to the CBL. As Fujifilm notes, no Polaroid-brand film bearing the CBL was manufactured between 2008 and 2017. Mot. at 22. Further, much of Polaroid's advertising during this period contained multiple marks, and Polaroid has not rebutted Fujifilm's contention that it had no separate marketing budget for the Configuration. <u>See, e.g.</u>, Opp. at 19-20. Similarly, although Polaroid has alleged that its licensing efforts and collaborations with high-profile celebrities served to reinforce recognition of the CBL in the years after it halted manufacture of analog instant film, <u>id.</u>, it has not provided evidence demonstrating that these strategic marketing efforts were specific to the CBL. <u>See, e.g.</u>, <u>MZ Wallace Inc. v. Fuller</u>, No. 18 Civ. 2265 (DLC), 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (no secondary meaning despite "millions of dollars of advertising expenditures[,]" because plaintiff "has not provided any indication of what portion of its advertising expenditures was

spent on such advertising as opposed to advertising featuring [plaintiff's] products that do not bear the Trade Dress").

### ii. Factor Two: Consumer Studies Linking the CBL to a Single Source

"[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning[.]" LVL XIII Brands, 209 F. Supp. 3d at 638 (citing Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998); Ergotron, Inc., 1996 WL 143903, at *8).

Polaroid has commissioned two secondary meaning surveys, and it contends that both surveys demonstrate that consumers associate the CBL with a single source – namely, Polaroid. Opp. at 16-17. The first survey, conducted in 2017 (the "2017 Survey"), measured consumer recognition of a two-dimensional representation of the CBL and showed a "significant level" of association with Polaroid as a single source. Id. at 16 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 94, 97); see also Poret Decl., Ex. 3. The second survey, conducted in 2023 (the "2023 Survey"), measured consumer recognition of the three-dimensional CBL in the form of Polaroid's analog instant film and showed that 40% of relevant consumers associated it with Polaroid as a single source. Id. (citing Polaroid's Annotated Rule 56.1 Statement ¶ 94); see also Poret Decl., Ex. 4.

Fujifilm takes issue with both surveys, contending that the 2017 Survey is irrelevant because it evaluated a line-drawing depiction of the CBL, and the 2023 Survey must be disregarded because it was conducted approximately six years after Fujifilm Instax Square film entered the market. Reply at 14. As an initial matter, Fujifilm's assertion that the 2017 Survey is irrelevant because it evaluated the two-dimensional logo, rather than the three-dimensional configuration, is unpersuasive. Polaroid has claimed rights in both two-dimensional and three-dimensional representations of the CBL. See, e.g., ECF No. 189 ¶¶ 1-3.

Further, Fujifilm is correct that "the date upon which [a] survey was taken can affect both the relevancy of the survey data and the weight a court should give it." RVC Floor Decor, Ltd. v. Floor and Decor Outlets of America, Inc., Case No. 18 Civ. 6449 (JS) (ARL), 2023 WL 2844249, at *4 (E.D.N.Y. Apr. 7, 2023). However, we note that, although Fujifilm contends that the results of the 2023 Survey should be disregarded because they post-date this litigation, the existence of continued consumer recognition of the CBL approximately six years after the introduction of Fujifilm Instax Square film strongly suggests the existence of secondary meaning at the time of Fujifilm's entry into the market. See Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 419 (6th

Cir.) ("A court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement," determining that consumer surveys conducted in 1999 and 2002 provided "strong statistical evidence" supporting the existence of secondary meaning in 1992 and 1997).[20]

Regardless, we agree with Fujifilm that both the 2017 and 2023 Surveys fall short of the 50% or greater recognition requirement necessary to definitively establish secondary meaning. See Empresa Cubana del Tabaco v. Culbro Corp., No. 97 Civ. 8399 (RWS), 2004 WL 602295, at *36 (S.D.N.Y. Mar. 26, 2004), aff'd in part, rev'd in part on other grounds, 399 F.3d 462 (2d Cir. 2005) ("In the Second Circuit, survey data showing 50% or greater recognition has generally been required to establish secondary meaning.") (collecting cases). Accordingly, this factor does not weigh heavily in either party's favor.

### iii. Factor Three: Unsolicited Media Coverage

"Extensive, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning."

---

[20]    Although Fujifilm claims that Polaroid "ignores this District's law about the timing of surveys[,]" claiming they cite "out-of-circuit authority[,]" Reply at 14, n.17, Fujifilm supports its own propositions by citing a Ninth Circuit case, a treatise, and an S.D.N.Y. case from 1963. Id. None of these sources are particularly persuasive.

RVC Floor Decor, Ltd., 527 F. Supp. 3d at 320 (internal quotations and citations omitted).

Polaroid contends that the CBL "has been recognized by newspapers, magazines, websites, and even celebrated in entire books[,]" Opp. at 21, and has provided numerous examples of media placements featuring the CBL in its papers, see Polaroid's Annotated Rule 56.1 Statement ¶¶ 87-89 (citing Smolokowski Decl., Exs. 77-83; Chanin Decl., Exs. 75-76, 96-97).[21]

Fujifilm correctly asserts that it is not clear, based on the record, whether these examples were solicited by Polaroid. See Gameologist Grp., LLC v. Scientific Games Intern., Inc., 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011) (articles solicited by plaintiff as part of promotional strategy do not support finding of unsolicited media coverage). However, given the volume of evidence

---

[21]    The specific media cited by Polaroid includes: a book by Peter Buse titled, The Camera Does the Rest: How Polaroid Changed Photography, Smolokowski Decl., Ex. 77; a book by Christopher Bonanos titled, Instant: The Story of Polaroid, id., Ex. 78; a January 7, 2017 article on Mashable.com titled, "Polaroid just reinvented its iconic camera[,]" id. Ex. 80; a September 20, 2016 article on DigitalTrends.com titled, "The Polaroid Snap Touch mixes nostalgic fun with digital camera essentials[,]" id., Ex. 81; a January 5, 2017 article on PetaPixel.com titled, "Polaroid Pop: A Digital Instant Camera for Iconic 3x4" Polaroid Pictures[,]" id., Ex. 82; a January 5, 2017 article on PopPhoto.com titled, "CES 2017: Polaroid Pop Camera Spits Out Prints in a Classic Aspect Ratio[,]" id., Ex. 83; an October 7, 2016 article on DigitalTrends.com titled, "Polaroid launches an app-based photo printing service to get real Polaroid prints from your phone[,]" Chanin Decl. Ex. 75; a November 3, 2017 article on DigitalTrends.com titled, "Got color? Polaroid Originals launches duochrome instant film[,]" id. Ex. 76; an April 8, 2023 article on GearPatrol.com titled, "The Best Instant Film Cameras That Embrace Nostalgia[,]" id., Ex. 96; and a January 25, 2023 article on Medium.com titled "Story of the World's Most Iconic Camera: Polaroid![,]" id., Ex. 97.

submitted by Polaroid showing depictions of the CBL in various forms of media during the relevant period, on balance, this factor slightly favors Polaroid.

### iv. Factor Four: Sales Success

Fujifilm contends that sales data for the five years before the alleged infringement is "the period most relevant to this suit."  Mot. at 20 (quoting Capri Sun GmbH v. American Beverage Corp., 595 F. Supp. 3d 83, 156 (S.D.N.Y. 2022) (citing Easy Spirit, LLC v. Skechers U.S.A., Inc., 515 F. Supp. 3d 47, 65 (S.D.N.Y. 2021)).

We agree with Fujifilm that sales of analog instant film bearing the IMPOSSIBLE mark before 2017 are irrelevant, as Polaroid did not sell this film itself.  Reply at 6.  Further, sales of other types of instant film, such as Spectra and Image instant film, are not persuasive evidence of sales success because they do not bear the CBL.  Id.  Accordingly, this factor favors Fujifilm.

### v. Factor Five: Attempts to Plagiarize the Mark

Secondary meaning may be supported by intentional copying, "particularly when the purpose is 'to benefit from the good will of the prior user through confusion.'"  Cartier, Inc. v. Four Star Jewelry Creations, Inc., 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004) (quoting New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312

F. Supp. 2d 195, 208-09 (D. Conn. 2004) (quoting <u>Laureyssens v.</u>
<u>Idea Group, Inc.</u>, 964 F.2d 131, 136 (2d Cir. 1992))).  The key
question is "whether the copying was done deliberately, so as to
benefit from [Polaroid's] name and good will."  <u>Id.</u>

     This factor leans decidedly in Polaroid's favor.  While
Fujifilm contends that "[t]here is no evidence that Fujifilm
intentionally copied the Configuration to benefit from
[Polaroid's] goodwill[,]" this assertion is belied by the factual
record submitted to the Court.  Documents produced by Fujifilm and
created by Fujifilm employees prior to the introduction of Instax
Square film clearly indicate that the company intended to benefit
from pre-existing recognition of the Polaroid brand, suggesting
that the use of square-format instant film would be "nostalgi[c]"
for consumers.  <u>See, e.g.</u>, Chanin Decl., Ex. 33 at 8.  For example,
a PowerPoint created by Fujifilm in 2016 asks, "Why SQUARE Format?"
and states: "Long before the rise of Instagram, square format film
cameras from . . . Polaroid were held in high esteem . . . , which
adds another touch of nostalgia to the format[.]"  Chanin Decl.,
Ex. 33 at 8.  The PowerPoint subsequently identifies "Polaroid
fans" as a reason to launch square-format film, describing the
group as a "[h]eretofore hopeless segment[.]"  <u>Id.</u> at 9.
Similarly, other internal Fujifilm materials identify the

"[h]istory of [the] [s]quare [f]ormat" and "Polaroid" as characteristics that make square-format instant film "special[,]" Chanin Decl., Ex. 67 at 3, and state that the square format was previously "adopted by the Polaroid Company" and has "persistent enthusiasts" and a "fashionable image[,]" id., Ex. 68 at 17; see also id., Ex. 35 (email from Fujifilm employee in August 2016 expressing concern that Instax Square prototype "may not be big enough to truly go after that nostalgic 'polaroid look'"); id., Ex. 34 (email from Fujifilm executive in 2018 stating that reason for Instax Square film "first and foremost is the original size of the retro Polaroid[,]" and "our inability to promote that is a definite hinderance").

Moreover, articles published around the time that Fujifilm launched its Instax Square film noted that it was nearly identical to Polaroid's analog instant film bearing the CBL. See, e.g., Chanin Decl., Ex. 95 (Time.com article dated January 26, 2017, stating that Fujifilm planned to "unveil a new film that will mimic Polaroid's famous square format"); id., Ex. 98 (PopularScience.com article dated April 19, 2017, stating that "[t]he square shape [of Instax Square] is important because it evokes the classic Polaroid films . . . True story: If you take an Instax camera to a party, it's almost guaranteed someone will still call it a Polaroid.").

As Polaroid notes in its opposition, even Fujifilm's own executives struggled to distinguish their product from Polaroid's.  Opp. at 22 (citing Polaroid's Annotated Rule 56.1 Statement ¶ 125); Chanin Decl., Ex. 39 (July 1, 2019 email from a Fujifilm executive stating, "I'm looking at a square instax on my desk and am not sure how to tell it's different [from Polaroid's film]").[22]

Fujifilm contends that it did not need or want to benefit from Polaroid's goodwill, as it "dominated more than 90% of the instant integral film market when INSTAX Square film launched." Reply at 8.  Fujifilm also asserts that the probative value of copying is limited in product design cases, as the alleged copier "may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers[.]"  Id. (citing Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwarz, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001), as amended (Oct. 22, 2001) (citations omitted)).  However, such arguments are less persuasive where, as here, the contemporaneous record clearly demonstrates that Fujifilm executives designed their product in a way that was

---

[22]    Notably, in the July 1, 2019 email, a second Fujifilm employee initially expressed concern that Fujifilm was "using a Polaroid product in [its] promotions[.]"  Chanin Decl., Ex. 39 at 3.  The Fujifilm executive responded: "I assumed it was a square instax, but I don't know the tricks in telling the difference.  I'm looking at a square instax on my desk and am not sure how to tell that it's different.").  Id. at 2.

intended to mimic the CBL, in an effort to capture Polaroid's audience and profit off of existing "nostalgia" for the brand.

Such evidence is more than sufficient to raise a genuine issue of material fact regarding Fujifilm's intent to capture, and capitalize on, Polaroid's pre-existing goodwill. Evidence of intentional copying is a strong indicator of secondary meaning.

### vi. Factor Six: Length and Exclusivity of the Mark's Use

"In connection with the length and exclusivity of [a] mark's use, no absolute time span can be posited as a yardstick in cases involving secondary meaning." Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 374 (E.D.N.Y. 2007) (quotation marks and citation omitted). However, courts in this Circuit have indicated that "continuous exclusive usage of a trade dress . . . over a five-year period" may support a finding of secondary meaning. Bubble Genius LLC v. Smith, 239 F. Supp. 3d 586, 600 (E.D.N.Y. 2017) (citing Landscape Forms, Inc. v. Columbia Cascade Co., 117 F. Supp. 2d 360, 366-67 (S.D.N.Y. 2000)).

Here, the record shows that Polaroid first introduced the CBL in 1972, Fujifilm's Rule 56.1 Statement ¶ 1, continued licensing of the CBL throughout the 2010s, Polaroid's Annotated Rule 56.1 Statement ¶¶ 62-74, and resumed manufacturing of analog instant film bearing the CBL in 2017, id. ¶ 80. Taken together, Polaroid

has shown more than forty years of exclusive use of the CBL prior to the introduction of Fujifilm's Instax Square film.  Accordingly, this factor weighs in Polaroid's favor.  NYC Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 315 (S.D.N.Y. 2010) (ten years of use "compel[led] a finding of secondary meaning"); Cartier, Inc., 348 F. Supp. 2d at 243 (designs in use for eight and over twenty years had been in use for "significant" lengths of time).

\*    \*    \*

In sum, Polaroid has raised genuine issues of material fact regarding whether the CBL had acquired secondary meaning at the time that Fujifilm launched its Instax Square film in 2017.  While two of the secondary meaning factors weigh in Fujifilm's favor and one factor is neutral, the three remaining factors weigh in favor of Polaroid.  Accordingly, we decline to grant summary judgment in Fujifilm's favor on this issue.

### B.  Fair Use

Next, we address Fujifilm's argument that images of developed Instax Square film on Fujifilm promotional materials constitute fair use and do not infringe Polaroid's trademark registration or common law rights.  Mot. at 25-28.

The fair use doctrine serves as a defense to a trademark infringement claim when "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of [a] party." 15 U.S.C. § 1115(b)(4). Fair use is established if the allegedly infringing trademark is used: "'(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith.'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 400 (2d Cir. 2009) (quoting EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 64 (2d Cir. 2000)).

Fujifilm asserts that images of Instax Square film on Fujifilm promotional materials are used descriptively, "other than as a mark[,]" and in good faith. Mot. at 26-27. Specifically, Fujifilm writes that its packaging merely depicts images of developed film to show consumers how a photograph taken in that format might look, and the only trademarks used on the accused promotional materials are the house marks Instax and Fujifilm, "the prominent display of" which evidences "[t]he non-trademark use" of the developed film images. See Mot. at 27 (citing Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30 (2d Cir. 1997)). It further asserts that the "display of [Fujifilm's] own

name or trademark in conjunction with the mark it allegedly infringes is evidence of good faith." Id. at 27-28 (quoting EMI Catalogue Partnership, 228 F.3d at 66).

However, Polaroid has stipulated that it will not assert any claims against Fujifilm based on images of developed instant film shown on packaging for Fujifilm Instax Square film, ECF No. 141 at 2, and, as a result, it does not substantially rebut Fujifilm's fair use defense, contending only that Fujifilm is not entitled to summary judgment on its fair use claim due to its bad faith. Opp. at 3-5. While Polaroid has raised genuine issues of material fact regarding Fujifilm's bad faith more generally, it has not done so in the specific context of Fujifilm's promotional materials, which prominently bear Fujifilm's "Fujifilm" and "Instax" marks. Further, as noted supra, this Court previously dismissed Polaroid's counterfeiting counterclaim to the extent it addressed Fujifilm's packaging and promotional materials, observing that "Fujifilm's famous 'Fujifilm' and 'Instax' marks are proverbially front and center on the Instax Square film packaging[.]" Fujifilm, 2019 WL 274967, at *5. Accordingly, summary judgment in favor of Fujifilm on this issue is warranted.

C.    **Likelihood of Confusion**

Finally, Fujifilm asserts that summary judgment is warranted on all Polaroid's counterclaims alleging confusion, as Polaroid cannot demonstrate a likelihood of initial interest or point-of-sale confusion involving Fujifilm Instax Square film.  Mot. at 28-34.[23]

---

[23]    Fujifilm contends that Polaroid "continue[s] to allege that the INSTAX Square promotional materials and the film itself . . . are likely to cause confusion with their alleged rights in the [CBL] in the 'initial interest' and 'post-sale' contexts."  Mot. at 28.  However, Polaroid states in its opposition that it alleges only that consumers are likely to be confused in the initial interest and post-sale contexts when encountering Instax Square film <u>outside</u> of its packaging.  Opp. at 22-23 (citing as examples "depict[ions] [of Instax Square film] on a third-party website" or "in a social media post or on someone's refrigerator").  This is further supported by Polaroid's stipulation filed on December 4, 2023, pursuant to which it stipulated that it would "not allege . . . that the <u>packaging</u> for Fujifilm's Instax Square film is likely to cause confusion" but instead that "Fujifilm's Instax Square <u>film</u> is likely to cause confusion in the initial-interest and post-sale contexts."  ECF No. 141 at 2 (emphasis in original).

Additionally, we note that Fujifilm claims that "[i]nitial interest confusion is a disfavored doctrine[,]" Mot. at 28 (citing <u>Soter Techs., LLC v. IP Video Corp.</u>, 523 F. Supp. 3d 389, 405 (S.D.N.Y. 2021)), contending that a plaintiff alleging initial interest confusion must prove intentional deception in order to prevail on such claims, <u>id.</u> at 29.  However, the cases it cites to support this contention are inapposite, as they each involve the use of the internet.  <u>See</u> Mot. at 29, n.20.  The Second Circuit has stated that a showing of intentional deception is required in cases where "a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website addresses[,]" and that requiring such a showing is appropriate "[b]ecause consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site."  <u>Savin Corp.</u>, 391 F.3d at 462 n.13.  Such cases are clearly inapposite here, where the film at issue is a physical product that is used and depicted beyond the internet.  Accordingly, we decline to accept Fujifilm's assertion that, without evidence of intentional deception, Polaroid's initial interest confusion theory must fail.

To prevail on a trademark infringement claim, "a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986) (citations omitted). "Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification." Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc., No. 02 Civ. 861 (LMM), 2002 WL 1543817, at *2 (S.D.N.Y. 2002) (citing McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1273 (S.D.N.Y. 1986)). In evaluating confusion, courts consider the eight-factor test identified in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). These factors include: "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." Star

-44-

Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005)
(citing Polaroid, 287 F.2d at 492).

"[T]he evaluation of the Polaroid factors is not a mechanical
process[.]" Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46
(2d Cir. 2000) (quotation marks and citation omitted). "[T]he
ultimate conclusion as to whether a likelihood of confusion exists
is not to be determined in accordance with some rigid formula[,]"
and "[e]ach case . . . presents its own peculiar circumstances."
Lois Sportswear, U.S.A., Inc., 799 F.2d at 872. Accordingly, in
evaluating the Polaroid factors, "a court should focus on the
ultimate question of whether consumers are likely to be confused."
Nabisco, Inc., 220 F.3d at 46 (quotation marks and citation
omitted). We consider each factor in turn.

### 1. Factor One: Strength of the Mark

"[T]he strength of a mark depends ultimately on its
distinctiveness, or its 'origin-indicating' quality, in the eyes
of the purchasing public." McGregor-Doniger Inc. v. Drizzle, Inc.,
599 F.2d 1126, 1131-32 (2d Cir. 1979), superseded on other grounds
by Fed. R. Civ. P. 52(a).

Fujifilm contends that the CBL line drawing "lacks inherent
distinctiveness" because it is "merely descriptive" of Polaroid's
film and has not acquired secondary meaning. Mot. at 30 (citing

Fujifilm's Rule 56.1 Statement ¶¶ 93, 96).  Fujifilm does not meaningfully dispute the strength of other two-dimensional and three-dimensional representations of the CBL.  Id.

However, Polaroid has provided evidence sufficient to raise a genuine issue of material fact regarding the strength of its mark, including, as discussed supra in Section A.4., its longstanding use, licensing activities, and press coverage over a period of more than forty years.  Opp. at 24 (citing Polaroid's Annotated Rule 56.1 Statement ¶¶ 19, 22-49, 50-67, 74-86).  Accordingly, this factor weighs in Polaroid's favor.

### 2. Factor Two: Similarity of the Marks

"Courts examine the similarity between the marks and the contexts in which they appear to assess the likelihood that consumers will be confused by the competing marks."  Perfect Pearl Co. v. Majestic Pearl & Stone, Inc., 887 F. Supp. 2d 519, 536 (S.D.N.Y. 2012) (citing Gruner + Jahr USA Pub. v. Meredith Corp., 991 F.2d 1072, 1078 (2d Cir. 1993)).

There can be no dispute that, when removed from its packaging, Fujifilm's Instax Square film is nearly identical to Polaroid's analog instant film bearing the CBL. As Polaroid notes, Fujifilm's own employees could not distinguish between Instax Square film and Polaroid film bearing the CBL.  Opp. at 25 (citing Polaroid's

Annotated Rule 56.1 Statement ¶ 116); <u>see also</u> Chanin Decl., Ex. 18 at 106:5-11 (excerpt from Hiromoto Matsushima's deposition in which he stated, "If you take a digital image it's really not possible to be sure as to which one it is [<u>i.e.</u>, Fujifilm Instax Square or Polaroid]."); Chanin Decl., Ex. 39 (July 1, 2019 email from a Fujifilm executive stating, "I'm looking at a square instax on my desk and am not sure how to tell it's different [from Polaroid's film]"). In the initial interest and post-sale contexts relevant to Polaroid's counterclaims, this factor weighs heavily in Polaroid's favor.

### 3. Factor Three: Proximity and Competitiveness of the Marks

In assessing this factor, courts examine "the nature of the products themselves and the structure of the relevant market." <u>Vitarroz v. Borden, Inc.</u>, 644 F.2d 960, 967 (2d Cir. 1981). This factor "has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products." <u>Brennan's, Inc. v. Brennan's Rest., L.L.C.</u>, 360 F.3d 125, 134 (2d Cir. 2004). Courts use both elements "to determine whether the two products have an overlapping client base that creates a potential for confusion." <u>Id.</u>

It is undisputed that both Polaroid and Fujifilm sell their relevant products within the same "area[] of commerce[,]" namely, the instant film market. Brennan's, Inc., 360 F.3d at 134. Further, both Fujifilm and Polaroid sell their analog instant film products throughout the United States. Accordingly, they are directly competitive and have an overlapping client base, thus heightening the possibility of confusion.[24]

### 4. Factor Four: Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." Star Indus., 412 F.3d 373 at 387 (citing The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996)).

Both Fujifilm and Polaroid agree that, because their products are already in competition, "there is really no gap to bridge[.]" Star Indus., 412 F.3d at 387; see Mot. at 38, n.24; Opp. at 35. Accordingly, this factor is not relevant to our analysis.

---

[24]    Fujifilm attempts to combat this characterization of the relevant market by asserting that Fujifilm Instax and Polaroid products are incompatible, that camera and film packaging for the respective products instructs consumers on how to purchase the correct film for the correct camera, and that Fujifilm's Instax photographs are smaller and "crisper" in appearance, thus appealing to a different audience. Opp. at 31. However, such assertions, even if true, are not significant enough to overcome the fact that both Fujifilm and Polaroid operate within the limited universe of analog instant film sellers within the United States.

-48-

### 5. Factor Five: Actual Consumer Confusion

"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 151 (2d Cir. 2003) (citing Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 228 (2d Cir. 1999), abrogated on other grounds by Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003)). "If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be [a] powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." Nabisco, Inc., 191 F.3d at 228 (citing McGregor-Doniger, Inc., 599 F.2d at 1136).

While a lack of consumer survey data generally serves as "evidence that actual confusion cannot be shown[,]" The Sports Auth., Inc., 89 F.3d at 964, "a [court] may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion[,]" id.

Polaroid has provided more than one hundred examples of social media posts and emails dating from 2017 and 2018 in which users misidentify Fujifilm Instax Square film as Polaroid analog instant film bearing the CBL. Opp. at 23 (citing Polaroid's Annotated

-49-

Rule 56.1 Statement ¶¶ 106-07, 109-113); <u>see also</u> Chanin Decl.,
Exs. 78-79.  Polaroid contends that this evidence of repeated
misidentification by consumers, on its own, precludes a finding of
summary judgment.  <u>Id.</u>

Given the volume and variety of this evidence, which includes
customer support emails, Twitter and Instagram posts, and other
online inquiries, Polaroid has sufficiently raised a genuine issue
of material fact with respect to the existence of actual
confusion.[25]  <u>See</u> <u>The Sports Auth., Inc.</u>, 89 F.3d at 964 (concluding
that evidence of actual confusion existed where plaintiff
submitted evidence of "extensive phone calls made to [defendant's]
restaurants seeking to contact [plaintiff's] stores" and vice
versa); <u>cf.</u> <u>The Fashion Exchange LLC v. Hybrid Promotions, LLC, et
al.</u>, 697 F. Supp. 3d 86, 109 (S.D.N.Y. 2023) (six emails received

---

[25]    We note that the record also includes evidence to support a conclusion
that Fujifilm was aware of the existence of customer confusion and, in some
cases, sought to take advantage of it.  Specifically, Polaroid submitted
deposition testimony in which a Fujifilm executive confirmed that Fujifilm had
purchased both "Polaroid" and "Polaroid Instax" as advertising keywords.  <u>See</u>
Chanin Decl., Ex. 2 at 235:22-236:22.  A Fujifilm employee also sent an article
titled "Taylor Swift . . . & More Celebs Who've Taken Retro Pics with Polaroid
Cameras[,]" which depicted a Fujifilm Instax Square photo, to other employees
on July 11, 2018, writing: "It's a good thing that we are paying Taylor Swift
so much money to promote the Polaroid name :)[.]" <u>Id.</u>, Ex. 36 at 2.  Similarly,
Fujifilm employees prepared a presentation in January 2018 that included results
from surveys measuring consumer recognition of Instax Square film, which noted
that brand awareness for Polaroid at the time was "still very strong despite
the actual sales force[.]" <u>Id.</u>, Ex. 50 at 34.

over ten years alleging confusion constitute only "de minimis and ambiguous reports of actual confusion").[26]

### 6. Factor Six: Bad Faith

This factor considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." W.W.W. Pharmaceutical Co., Inc. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993) (quoting Lang v. Retirement Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991) (internal quotation omitted)).

As discussed supra at Section A.4.v., Polaroid has provided evidence sufficient to raise a genuine issue of material fact regarding whether Fujifilm intentionally copied the configuration of the CBL when designing its Instax Square film. Fujifilm was

---

[26]     In its reply, Fujifilm cites the Second Circuit's decision in Reply All Corp. v. Gimlet Media, LLC, 843 F. App'x 392, 397 (2d Cir. 2021), in which plaintiff, a forum website, "relie[d] only on a handful of instances alleging consumer confusion" in connection with defendant's podcast utilizing the same name. See Reply at 15.  The court ultimately determined that these examples were not cognizable instances of actual consumer confusion, as they involved users mistakenly "tagging" one podcast while intending to tag the other or contacting one podcaster while intending to reach another, determining that such instances "d[id] not suggest that those potential consumers in any way confused [plaintiff's] and [defendant's] products, let alone that there was confusion that could lead to a diversion of sales, damage to goodwill, or loss of control over reputation." Id. (internal quotation and citation omitted). Polaroid's examples of actual confusion, by contrast, are more than de minimis, and appear to involve genuine consumer confusion over the brand name associated with different analog instant film products, which could very well lead to "diversion of sales, damage of goodwill, or loss of control over reputation[.]" Id.

aware of the existence of the CBL, and its own internal materials cite goodwill for Polaroid and the CBL as an affirmative reason to launch the Instax Square film.  <u>See, e.g.</u>, Chanin Decl., Exs. 33-35, 66-69, 92.  Accordingly, a reasonable juror could conclude that Fujifilm intended to deceive customers and trade on the goodwill engendered by Polaroid's CBL.  <u>See</u> <u>Luv N'Care, Ltd. v.</u> <u>Walgreen Co.</u>, 695 F. Supp. 2d 125, 131 (S.D.N.Y. 2010) (denying summary judgment where issue of intentional copying revealed a genuine dispute of material fact).

### 7. Factor Seven: Quality of the Products

"If an infringing product is of inferior quality, the senior user is entitled to protect the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user."  <u>Gillette</u>, 984 F.2d at 575 (internal citation and quotation marks omitted).

There is no evidence in the record concerning the quality of either party's product.  Accordingly, we cannot determine whether this factor weighs in favor of either party.[27]

---

[27]    Fujifilm contends that this factor weighs "heavily" in its favor solely because Polaroid has not alleged that Fujifilm's products are of inferior quality.  Mot. at 32.  However, given that the record is devoid of evidence on this point, we need not hold that this factor weighs in favor of either party.

### 8. Factor Eight: Consumer Sophistication

"This factor examines the sophistication of the typical consumers and the level of care they exercise when purchasing the products at issue." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 326 (S.D.N.Y. 2000). The theory of this factor is that "the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." Savin Corp., 391 F.3d at 461. In analyzing consumer sophistication, courts "consider[] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Star Indus., 412 F.3d at 390 (quoting The Sports Auth., Inc., 89 F.3d at 965).

Fujifilm contends that this factor also favors it, asserting, inter alia, that instant film cameras and film are "expensive[,]" that Instax Square and Polaroid products are incompatible, and that the instant film market is niche in light of today's technology. Mot. at 32-33. However, we find that Polaroid has sufficiently alleged that the relevant consumer base could still be susceptible to initial-interest and post-sale confusion, rather than point-of-sale confusion, as consumers could easily confuse the parties' nearly identical products when encountering them

outside of Fujifilm Instax or Polaroid packaging.  Opp. at 25
(citing <u>Focus Prods. Grp. Int'l LLC v. Kartri Sales Co.</u>, 647 F.
Supp. 3d 145, 226 (S.D.N.Y. 2022) (where "there is a high degree
of similarity between the parties' services and marks, the
sophistication of the buyers cannot be relied on to prevent
confusion") (quoting <u>Morningside Grp. Ltd. v. Morningside Cap.</u>
<u>Grp., L.L.C.</u>, 182 F.3d 133, 143 (2d Cir. 1999) (quotation marks
and citation omitted))).

*    *    *

In sum, triable issues of fact remain with regard to many of
the <u>Polaroid</u> factors, and particularly with respect to actual
consumer confusion and Fujifilm's bad faith.  Accordingly, summary
judgment is not warranted on Polaroid's counterclaims alleging
initial interest and point-of-sale confusion with respect to the
CBL.

**CONCLUSION**

In sum, Fujifilm's motion for summary judgment is granted in
part and denied in part.  Specifically, as stated in Section B.,
Fujifilm's motion is granted to the extent that Polaroid's
counterclaims are directed towards images of developed Instax
Square film on Fujifilm's promotional materials.  However, its
motion for summary judgment on Polaroid's remaining counterclaims

is denied.   The Clerk of the Court is respectfully directed to
terminate the motion pending at ECF No. 205.

Dated:    August 25, 2025
          New York, New York

                              _____
                                NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE