**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FUJIFILM NORTH AMERICA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>POLAROID IP B.V. and PLR BRAND SERVICES, LLC,<br><br>Defendants | Case No.: 1:17-cv-08796 (NRB) |
| POLAROID IP B.V., PLR BRAND SERVICES, LLC, POLAROID FILM B.V., and POLAROID AMERICA CORP., d/b/a POLAROID ORIGINALS,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>FUJIFILM NORTH AMERICA CORPORATION and FUJIFILM CORPORATION,<br><br>Counterclaim Defendants | |

**BRIEF IN SUPPORT OF POLAROID'S OMNIBUS MOTION TO EXCLUDE THE EXPERT TESTIMONY AND OPINIONS OF DEBORAH JAY, ITAMAR SIMONSON, AND JIM GANDY**

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND RELEVANT TO THE MOTION ..... 1

III. LEGAL STANDARD ..... 3

A. Dr. Jay's Surveys and Opinions Should Be Excluded ..... 5

i. Dr. Jay's Surveys and Testimony Are Not Relevant ..... 5

ii. Dr. Jay's Survey and Corresponding Testimony Are Not Reliable ..... 7

a. Dr. Jay Utilized Improper Control Stimuli ..... 8

b. Dr. Jay's Surveys Fail to Replicate Marketplace Conditions ..... 12

iii. Introduction of Dr. Jay's Surveys Would be Unduly Prejudicial ..... 13

B. Dr. Simonson's Surveys and Opinions Should Be Excluded ..... 15

i. Dr. Simonson Is Not Qualified to Offer Linguistic Opinion ..... 15

ii. Dr. Simonson's Rebuttal Secondary Meaning Survey Failed to Employ a Proper Control Stimulus ..... 18

C. Mr. Gandy's Testimony Should Be Excluded Under Rules 602 and 702(b) Because It Was Speculative ..... 21

IV. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bustamante v. KIND, LLC*,
100 F.4th 419 (2d Cir. 2024) ....................5

*C.A. May Marine Supply Co. v. Brunswick Corp*.,
649 F.2d 1049 (5th Cir. 1981) ....................7

*Coty Inc. v. Excell Brands, LLC*,
277 F. Supp. 3d 425 (S.D.N.Y. 2017)....................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................... *passim*

*Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc*.,
693 F. Supp. 3d 335 (E.D.N.Y. 2023) ....................16, 18

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................22, 23

*Gucci America, Inc. v. Guess?, Inc.*,
831 F. Supp. 2d 723 (S.D.N.Y. 2011)....................6, 7, 12, 13

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005)....................17, 22

*Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*,
No. 04 Civ.7203(DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ....................12, 14

*In re KIND LLC "Healthy & All Natural" Litig*.,
627 F. Supp. 3d 269 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024) ....................4

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)....................3

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016)....................21

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................14, 16

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
Nos. 02 Civ. 3691(DLC), 03 Civ. 707(DLC), 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ....................7, 9

*Medisim Ltd. v. BestMed LLC*,
861 F. Supp. 2d 158 (S.D.N.Y. 2012)....................7, 11

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
982 F.3d 113 (2d Cir. 2020)....................4

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)....................4

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010)....................16

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d (S.D.N.Y. 2004) ....................17, 22, 23

*San Diego Comic Convention v. Dan Farr Prods.*,
No. 14-cv-1865 AJB (JMA), 2017 WL 4227000 (S.D. Cal. Sept. 22, 2017)....................17

*Sharkey v. J.P. Morgan Chase & Co.*,
978 F. Supp. 2d 250 (S.D.N.Y. 2013)....................17, 22

*Starter Corp. v. Converse, Inc*.,
170 F.3d 286 (2d Cir. 1999)....................5, 7

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010)....................3, 8, 19

*Trouble v. Wet Seal, Inc*.,
179 F. Supp. 2d 291 (S.D.N.Y. 2001)....................11, 12, 14

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc*.,
800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd,* 511 F. App'x 81 (2d Cir. 2013)..............8, 10, 19

*Zaremba v. Gen. Motors Corp*.,
360 F.3d 355 (2d Cir. 2004)....................18

**Rules & Regulations**

Fed. R. Evid. 401 ....................13

Fed. R. Evid. 402 ....................7, 13

Fed. R. Evid. 403 ....................2, 4, 13, 14

Fed. R. Evid. 602 ....................21, 22

Fed. R. Evid. 702 .................... *passim*

Fed. R. Evid. 702(b)....................21, 22

Fed. R. Evid. 702(c) ........................................8, 13

Fed. R. Evid. 703 ........................................17, 18

**Other Authorities**

J. Thomas McCarthy, *McCarthy On Trademarks & Unfair Competition* (5th ed.) ......7, 12, 18, 19

National Research Council, *Reference Manual on Scientific Evidence* (Fed. Judicial Ctr., 2d ed. 2000) ........................................10

Shari S. Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (2d ed. 2022) ........................................9, 19, 20

## I. INTRODUCTION

Defendants/Counterclaim-Plaintiffs ("Polaroid") respectfully submit this Brief in Support of its Motion to Exclude the expert testimony and opinions, in whole or in part, of three of Plaintiffs/Counter-Defendants' ("Fujifilm") proffered experts: (1) Dr. Deborah Jay, who designed consumer surveys that exclusively measured point-of-sale confusion involving Fujifilm packaging, when no point-of-sale or packaging-based claims remain to be tried; (2) Dr. Itamar Simonson, who is not a linguist and yet offered unsubstantiated linguistic opinions on the term "Polaroid," and offered a secondary meaning survey that employed an improper control stimulus; and (3) Mr. Jim Gandy, who as a rebuttal expert seeks to offer purely speculative opinions regarding the considerations or thought processes of third-party patent examiners.

## II. FACTUAL BACKGROUND RELEVANT TO THE MOTION

In the years since this case was initially filed in 2017, the claims to be tried have been narrowed significantly through motion practice, voluntary dismissals, and stipulations. Polaroid's remaining claims allege that Fujifilm's Instax Square film, when encountered outside of the packaging, is likely to cause post-sale and initial-interest confusion and to dilute Polaroid's rights in its Classic Border Logo (the "CBL"). Fujifilm argues that Polaroid lacks any rights in the CBL because (1) Polaroid abandoned any rights it might have had in the CBL; (2) the CBL lacked secondary meaning at the time the Instax Square film was introduced to the market; and (3) the CBL configuration is functional and therefore incapable of receiving trademark protection. *See* ECF 70 & 83; *see also* ECF 206 at 2–4 (outlining several of Fujifilm's arguments).

To support their claims and defenses, both Polaroid and Fujifilm retained a veritable army of expert witnesses to help explain some of the nuanced aspects of the case, resulting in dueling experts on several topics. For example, Polaroid intends to proffer the expert testimony and

surveys of Mr. Hal Poret, who surveyed the secondary meaning of the "Polaroid" word mark and the CBL in both two- and three-dimensional form. *See* ECF 240 at 1–2. In rebuttal, Fujifilm designated its own survey expert, Dr. Itamar Simonson, to critique the Poret surveys. *See* Declaration of Erica Chanin ("Chanin Decl.") ¶¶ 7–8, Exs. 6 & 7 (Rebuttal Reports of Dr. Itamar Simonson). Fujifilm also retained Dr. Deborah Jay, who designed two point-of-sale likelihood of confusion surveys testing the front of the packaging of the Fujifilm Instax square film. *See id.* ¶¶ 3–4, Exs. 2 & 3 (Expert Reports of Dr. Jay). To critique Dr. Jay's surveys, Polaroid designated rebuttal expert Dr. David Neal. *See id.* ¶ 5, Ex. 4 (Rebuttal Report of Dr. Neal ("Neal Rebuttal Rpt.")). Because Fujifilm's procurement of design patents for film virtually identical to the CBL undermines its functionality defense, Polaroid hired Mr. Chistopher Carani as an expert in design patent examination practice and procedures before the U.S. Patent and Trademark Office ("USPTO"). ECF 239 at 1–2. In response, Fujifilm designated Mr. Jim Gandy on the same topics. *See* Chanin Decl. ¶ 2, Ex. 1 (Expert Report of Jim Gandy ("Gandy Rpt.")).

Polaroid does not seek to exclude all of Fujifilm's experts. Instead, Polaroid asks this Court only to exclude Fujifilm's proffered surveys and expert testimony, or portions thereof, where they are irrelevant, fail to satisfy the strictures of Federal Rules of Evidence 403 and 702, or amount to pure speculation. First, the Court should exclude Dr. Jay's *point-of-sale* confusion surveys involving Instax Square *packaging* because they are not relevant to any remaining claim or defense. Polaroid stipulated that it "will not allege at trial that the *packaging* for Fujifilm's Instax Square film is likely to cause confusion" and further made clear it only will allege that the "Instax Square *film* is likely to cause confusion in the initial-interest and post-sale contexts." ECF 141 at 2. Thus, any relevance Dr. Jay's surveys might have once possessed no longer exists, and the surveys should be excluded to avoid confusing the jury.

With respect to Dr. Simonson and Mr. Gandy, Polaroid's *Daubert* motions seek only to exclude portions of their testimony. Regarding Dr. Simonson's report, this Court should exclude: (1) linguistic opinions concerning the meaning of "Polaroid," because Dr. Simonson is not qualified to offer linguistic opinions; and (2) his rebuttal secondary meaning survey, because it utilized the wrong control stimulus. Regarding Mr. Gandy, this Court should exclude the portions of his testimony that amount to mere speculation regarding the United States Patent and Trademark Office's ("USPTO") specific decisions pertaining to Fujifilm's design patents.

## III. LEGAL STANDARD

The admissibility of expert witness testimony is governed by Fed. R. Evid. 702 as applied under the principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). Rule 702 provides that an expert witness must establish his or her expertise through "knowledge, skill, experience, training or education" before he or she is qualified to testify. Fed. R. Evid. 702.

Assuming expertise is established, expert testimony is admissible only if the "expert's scientific, technical, or other specialized knowledge will help the trier of fact," is relevant to facts or claims at issue, and is based on reliable principles and methods. *Id.*; *Daubert*, 509 U.S. at 597. Notably, the "word 'knowledge'" as used here requires "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Rule 702 requires the trial court to act as a gatekeeper in barring unsupported, unreliable and speculative expert opinion from trial. *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 229 (S.D.N.Y. 2010) (excluding expert survey for failure to replicate the actual marketplace and employ an adequate control). When determining whether an expert's methodology is reliable, courts should consider four non-exclusive factors: (1) whether the expert's theory or technique has been or can be tested; (2) "whether the theory or technique

has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error"; and (4) whether the technique has gained "general acceptance" in the relevant community, or "has been able to attract only minimal support within the community." *Daubert*, 509 U.S. at 593–94 (citations omitted); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122, 124 (2d Cir. 2020) (upholding exclusion of expert's conclusion where experts did not "otherwise reliably utilize[ ] scientific methods," and the conclusions were not supported by other studies (alteration in original)).

In *Daubert*, the Supreme Court recognized that the strictures of Rule 702 do not operate in a vacuum. Instead, Rule 702 works in tandem with Rule 403, which serves as a critical safeguard against expert evidence whose veneer of scientific credibility may mislead or confuse the jury. *Daubert*, 509 U.S. at 595. The *Daubert* Court cautioned that "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). The Second Circuit has followed that directive, holding that Rule 403 plays a "uniquely important role" in a district court's scrutiny of expert testimony, given the "unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Here, as the party offering the disputed expert testimony, Fujifilm bears the burden of showing "by a preponderance of the evidence" that the reports, surveys, opinions, and testimony of the respective experts are admissible. *In re KIND LLC "Healthy & All Natural" Litig*., 627 F. Supp. 3d 269, 282 (S.D.N.Y. 2022), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024). Fujifilm cannot meet that burden.

**A. Dr. Jay's Surveys and Opinions Should Be Excluded**

Dr. Jay's surveys and testimony should be excluded for at least two reasons. First, Dr. Jay's likelihood of confusion surveys have been rendered irrelevant. ECF 263 at 42–43 (citing ECF 141 at 2). Second, her surveys are methodologically unsound under Rule 702 and *Daubert* because they fail to replicate the marketplace conditions and employ an improper control stimulus.

i. Dr. Jay's Surveys and Testimony Are Not Relevant

Dr. Jay's surveys and testimony should be excluded because they pertain only to point-of-sale confusion arising from Fujifilm's packaging, which is not a claim remaining to be tried. *See generally* Chanin Decl. Exs. 2-3. To be admissible, expert testimony must "fit" the facts of the case and be "relevant to the task at hand." *Daubert*, 509 U.S. at 591–97. "Rule 702's 'helpfulness' standard" similarly "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id*. When an expert's opinions do not pertain to an issue that remains for trial, those opinions are neither relevant nor helpful and must be excluded. *Bustamante v. KIND, LLC*, 100 F.4th 419, 430 (2d Cir. 2024) (affirming exclusion of survey and testimony because "they provide[d] no useful information" and "[t]his rendered the survey and testimony based upon it not 'relevant to the task at hand'" (alteration in original) (citations omitted)); *Starter Corp. v. Converse, Inc*., 170 F.3d 286, 296 (2d Cir. 1999) (explaining that district courts are accorded "'wide latitude' in excluding evidence that possesses an undue risk of prejudice or confusion of the issues, or is found to be marginally relevant to the issues in the case" (citation omitted)).

Polaroid stipulated that it "will not allege at trial that the packaging for Fujifilm's Instax Square film is likely to cause confusion" and further made clear it only will allege that the "Instax Square *film* is likely to cause confusion in the initial-interest and post-sale contexts." ECF 141 at 2. The Court's summary judgment order conclusively resolved any other claims predicated on the

appearance of Fujifilm's Instax Square box at the point of sale. *See* ECF 263 at 42 & 43 n.23. The only confusion theory remaining to be tried is whether consumers encountering Fujifilm's Instax Square film, *once removed from its packaging* and in the *initial-interest* or *post-sale* contexts, are likely to wrongly believe the film comes from or is affiliated with Polaroid. *See* ECF 263 at 42–43 (citing ECF 141 at 2).

Dr. Jay's surveys only examined consumer reactions to the front panel of Fujifilm's Instax Square packaging. *See* Chanin Decl. ¶ 9, Ex. 8 (Deposition of Dr. Jay ("Jay Dep.")) at 20:11–16, 39:10–18, 63:12–64:14. Dr. Jay confirmed that she conducted only "a 'point of purchase' confusion survey." *Id.* at 39:10–18; *see also id.* ¶ 5, Ex. 4 (Neal Rebuttal Rpt.) ¶¶ 3.3–3.4 ("[A]ny opinions Dr. Jay offers must necessarily be limited to whether confusion is likely at the point of sale."). During her deposition, Dr. Jay expressly admitted that she was "not offering an opinion" on "whether the film, outside its packaging in the post-sale environment, is likely to cause confusion," explaining that she "ha[d]n't done a survey about a photograph outside of the package because [she] was testing point-of-purchase confusion." *Id.* ¶ 9, Ex. 8 (Jay Dep.) at 63:12–64:14. When asked directly, she confirmed that she "didn't show any consumer a piece of film." *Id.* at 61:2–8. Nor did she conduct any testing of "post-sale" or "initial-interest" confusion, conceding that she never even discussed those types of surveys with Fujifilm or its counsel. *Id.* at 20:2–10.

In *Gucci America, Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723 (S.D.N.Y. 2011), the court excluded a point-of-sale confusion survey after narrowing the case to post-sale confusion, explaining that "the differences between point-of-sale confusion and post-sale confusion are such that a survey designed to measure the former is irrelevant to the latter." *Id.* at 745–47, *on*

*reconsideration in part*, No. 09 Civ. 4373 SAS, 2011 WL 6326032 (S.D.N.Y. Dec. 16, 2011).[1] The same conclusion is appropriate here. "[A] survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues," *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (citing *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049 (5th Cir. 1981)); *see also* 5 J. Thomas McCarthy, *McCarthy On Trademarks & Unfair Competition* ("McCarthy") § 32:170 (5th ed.) ("Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate statement of the case, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury." (citation omitted)); and Fed. R. Evid. 402 ("[E]vidence which is not relevant is not admissible").

Accordingly, because Dr. Jay's opinions fail to "fit" the facts or issues that remain to be tried, they do not satisfy *Daubert*'s relevance requirement. *See Daubert*, 509 U.S. at 591. A finding of irrelevance alone is dispositive; thus, if the Court excludes Dr. Jay's surveys on this ground, no further analysis of their methodological flaws or risk of prejudice is required.

ii. Dr. Jay's Survey and Corresponding Testimony Are Not Reliable

Even if the Jay surveys were relevant—which they are not—they should be excluded because they employ an inherently unreliable survey methodology. *See Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 167 (S.D.N.Y. 2012), *on reconsideration in part*, No. 10 Civ. 2463(SAS), 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012). Courts in this District have long recognized that the proponent of a consumer survey must demonstrate that it was conducted in accordance with generally accepted survey principles. *See Mastercard Int'l Inc. v. First Nat'l Bank*

[1] The expert providing the basis for the exclusion in *Gucci*, was Dr. Itamar Simonson—an expert for Fujifilm here. Judge Scheindlin found persuasive the fact that "Dr. Simonson argues at great length that because of the vast differences between consumer behavior in the point-of-sale marketplace and the post-sale marketplace . . . a survey whose stated purpose is to assess point-of-sale confusion will have nothing relevant to say about post-sale confusion." 831 F. Supp. 2d at 745.

*of Omaha, Inc.*, Nos. 02 Civ. 3691(DLC), 03 Civ. 707(DLC), 2004 WL 326708, at *7 (S.D.N.Y. Feb. 23, 2004). Those principles include, at minimum, the use of a proper control stimulus as well as an accurate replication of the marketplace conditions. *See THOIP*, 690 F. Supp. 2d at 241 ("Because the Ford Survey failed to replicate actual marketplace conditions in which consumers encountered the products at issue here and failed to use an adequate control, it is not a reliable indicator of consumer confusion. Accordingly, the Ford Survey is inadmissible."). The failure to satisfy just one of these criteria may warrant exclusion of the survey. *Id.*

Two core flaws render Dr. Jay's results unreliable under Rule 702(c). First, Dr. Jay employed an improper control stimulus that failed to isolate the alleged source-identifying features of Fujifilm's film design and was not the closest non-infringing alternative. Second, Dr. Jay failed to replicate the post-sale or initial-interest marketplace. *See* ECF 263 at 42–43 (citing ECF 141 at 2). Either flaw independently warrants exclusion; together they make exclusion unavoidable.

**a. Dr. Jay Utilized Improper Control Stimuli**

Dr. Jay's surveys must be excluded because they employed an improper control stimulus that violated the most basic principles of survey design. *See* Chanin Decl. ¶ 5, Ex. 4 (Neal Rebuttal Rpt.) ¶¶ 3.3–3.4. A proper control isolates the variable being tested—here, the allegedly source-identifying trade dress—so that any measured "confusion" can be attributed to that feature alone. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 534 (S.D.N.Y. 2011) ("Here, Helfgott's controls were improper in that they included the very elements being assessed"), *aff'd,* 511 F. App'x 81 (2d Cir. 2013); *THOIP*, 690 F. Supp. 2d at 240. When the control is flawed, the entire survey collapses because "there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 534. The control stimulus was flawed in three material ways.

*First*, Dr. Jay's control design flouts one of the most fundamental principles of confusion-survey methodology—that "a control for an allegedly infringing mark should not itself be an infringing mark." Chanin Decl. ¶ 12, Ex. 11 (Shari S. Diamond, *Control Foundations: Rationales and Approaches*, in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 239 (2d ed. 2022)) at 250. Even Dr. Jay acknowledged this rule in her testimony, conceding that "the control should not be infringing." *Id.* ¶ 9, Ex. 8 (Jay Dep.) at 90:16–17. Yet, she disregarded this principle by selecting the packaging for Fujifilm's *Instax Mini* film—another product bearing the same Polaroid-style border and framing cues—as her control. *Id.* at 73:10–74:10.

Dr. Jay improperly assumed that because the *Instax Mini* had not been accused of infringement, it must therefore be non-infringing (i.e., unlikely to cause confusion). Dr. Neal testified that this reasoning was a "logical error," explaining that "something could be infringing—meaning it could be causing confusion—but because of legal peculiarities, it may not be accused. That does not mean it is non-infringing." Chanin Decl. ¶ 10, Ex. 9 (Deposition of Dr. Neal ("Neal Dep.") at 147:1–22.[2] Compounding this flaw, Dr. Neal noted that "evidence of actual confusion concerning the Instax Mini" existed, confirming that Dr. Jay's chosen control was anything but neutral and in fact "logically bias[ed] the results . . . in a manner favorable to Fujifilm." *Id.* at 147:19–148:2; Declaration of Dr. David Neal ¶¶ 3–4, Ex. 1. In short, by using a control that replicated the same allegedly infringing features and carried its own record of confusion, Dr. Jay guaranteed that her survey would understate consumer confusion.

[2] For example, the Instax Mini may well create confusion in the marketplace and be infringing but claims under federal and state law could be precluded by laches. Under those circumstances, the Instax Mini is an improper survey control even though it is not the subject of an infringement claim in litigation. Dr. Neal warned that such an approach would "allow any defendant to introduce any new infringing product provided they had previously put out another infringing product," effectively "transferring immunity . . . forward in time to any future products." Chanin Decl. ¶ 5, Ex. 4 (Neal Rebuttal Rpt.) ¶ 4.3.10.

_Second_, the control stimulus did not hold constant the *non*-accused elements of the Instax Square package. As Dr. Neal explained, "the Test and Control stimuli differ on a large number of dimensions that are wholly unrelated to the alleged similarity between the Instax Square film and Polaroid's Classic Border Logo." Chanin Decl. ¶ 5, Ex. 4 (Neal Rebuttal Rpt.) ¶ 4.3.5. A proper control "share[s] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *U.S. Polo Ass'n*, 511 F. App'x at 85 (quoting Shari S. Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evidence* 229 (Fed. Judicial Ctr., 2d ed. 2000)). The *Instax Mini* fails that standard. Among other differences, the control stimulus (a) has the words FUJIFILM and INSTAX in larger font than on the test, (b) changes the *word* "square" to "mini" despite no word-mark claims being asserted, (c) adds a yellow "10 x 2" bubble, (d) includes multiple photographs at the bottom of the package, (e) adds "XOXO" onto part of the border design, and (f) has the word "mini" highlighted in red on the top, as depicted below :

**Test Stimulus (Instax Square Packaging)** **Control Stimulus (Instax Mini Packaging)**







_Third_, her stimuli—both test and control—obscured part of the allegedly infringing design, as depicted below with regard to the test stimulus (Chanin Decl. ¶ 5, Ex. 4 (Neal Rebuttal

Rpt.) at 34):

| Dr. Jay's Test Group Stimulus | Image of Fujifilm's INSTAX SQUARE instant camera film Used in Dr. Jay's Test Group Stimulus | Image of Fujifilm's INSTAX SQUARE instant camera film Used in Dr. Jay's Test Group Stimulus on top of a Schematic of Polaroid's Full Classic Border Logo Trademark | Schematic Representation of How Polaroid's Classic Border Logo Trademark is Partially Depicted in Dr. Jay's Test Group Stimulus |
|---|---|---|---|
|   |  |  |  |

Dr. Jay's conscious decision to test packaging rather than the film itself meant she necessarily failed to test consumer reaction to the entire film outside of the context of the package. As Dr. Neal explained, this "would likely diminish confusion" and prevent a fair test of consumer perception. *Id.* ¶¶ 4.2.1–4, 4.2.8; Chanin Decl. ¶ 10, Ex. 9 (Neal Dep.) at 128:10–18. *See also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) ("Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question.").

These are not peripheral issues but fundamental methodological flaws that strike at the core of scientific reliability. A control that embeds the same allegedly infringing elements, introduces uncontrolled differences, and depicts only partial views of the product cannot yield a valid measure of consumer confusion arising from the film itself, which goes to the heart of this dispute. Chanin Decl. ¶ 5, Ex. 4 (Neal Rebuttal Rpt.) ¶ 4.3.8. Because Dr. Jay's errors undermine every interpretive step of her analysis, her surveys fail the standards of Rule 702 and *Daubert* and must be excluded in their entirety. *Medisim*, 861 F. Supp. 2d at 180.

**b. Dr. Jay's Surveys Fail to Replicate Marketplace Conditions**

Dr. Jay's surveys and testimony should also be excluded because they fail to replicate the marketplace conditions relevant to the issues remaining for trial. As discussed previously, rather than testing consumer perceptions of Fujifilm's Instax Square *film*, Dr. Jay confined her analysis to the product's *packaging*, and both surveys measured only "point-of-purchase confusion" and not initial-interest or post-sale confusion. Chanin Decl. ¶ 9, Ex. 8 (Jay Dep.) at 19:14–22, 20:11–16.

As commentators and courts have long recognized that perhaps the single most important requirement for an admissible consumer confusion research study is that the survey design adequately replicates the actual marketplace conditions under which consumers would encounter the parties' products. 3 McCarthy § 23:17. *See also Trouble*, 179 F. Supp. 2d at 308 ("Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions."). "While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so *only to the extent* that the survey replicates the real world setting which can create an instance of actual confusion." 3 McCarthy § 23:17 (emphasis added). When a survey fails to approximate marketplace conditions, its results are not merely unhelpful—they are misleading. *See Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203(DLC), 2006 WL 1012939, at *26 (S.D.N.Y. Apr. 19, 2006) (excluding survey that "says as little about post-sale confusion" where it failed to replicate marketplace conditions under which consumers would encounter the product and form post-sale associations).

As Fujifilm's other survey expert, Dr. Itamar Simonson, argued "at great length" in the *Gucci* case, the marketplace context for point-of-sale confusion differs entirely from that of post-

sale or initial-interest confusion. *Gucci*, 831 F. Supp. 2d at 745 ("Dr. Simonson argues at great length that because of the vast differences between consumer behavior in the point-of-sale marketplace and the post-sale marketplace, and because of the methodological differences involved in assessing whether a consumer is confused in either situation, ***a survey whose stated purpose is to assess point-of-sale confusion will have nothing relevant to say about post-sale confusion***." (emphasis added)).

Dr. Jay conceded that she did not include any of the conditions consumers would actually encounter in the post-sale or initial-interest environment. Chanin Decl. ¶ 9, Ex. 8 (Jay Dep.) at 71:10–72:16. For example, she acknowledged that she "didn't use one of Fujifilm's own social media posts depicting its Instax Square film as a stimulus," explaining that such materials "would not have been appropriate to show" because her survey was designed solely for the "point of purchase." *Id.* Dr. Jay's surveys therefore tested the wrong product in the *wrong environment*—rendering them irrelevant under Rule 402 and unreliable under Rule 702(c). Courts routinely exclude surveys on this basis, finding that the failure to replicate relevant market conditions "undermine[s] the reliability" of the survey results and, if anything, suggests "that the actual likelihood of confusion is even higher." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 450–51 (S.D.N.Y. 2017); *see also Gucci*, 831 F. Supp. 2d at 745–47. Because Dr. Jay's surveys tested consumer reactions only to the *packaging* at the point of purchase—and not to the film itself in the post-sale or initial-interest environments—they fail to replicate the marketplace conditions relevant to the issues remaining for trial and should be excluded.

iii. Introduction of Dr. Jay's Surveys Would be Unduly Prejudicial

Even if the Court were to find Dr. Jay's surveys admissible under Rule 702 and 401, they should still be excluded under Rule 403. A court should exclude evidence when its probative value

"is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

Trademark surveys "'should be excluded under Rule 403 when it is so flawed in its methodology' that the survey proves little and the jury is very likely to be misled." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) (citation omitted). *See also Juicy ZCouture*, 2006 WL 1012939, at *24 ("To be probative a survey must be 'directed to the relevant issues.'" (citation omitted)). Because expert testimony carries an aura of special reliability and trustworthiness, courts must apply Rule 403 with particular rigor to prevent jurors from being swayed by opinions that appear scientific but lack genuine probative worth. *See Malletier*, 525 F. Supp. 2d at 562. Indeed, in trademark cases, "the Court's gatekeeper function is of heightened importance because the 'pivotal legal question . . . virtually demands [expert] survey research.'" *Id.* at 562 (alterations in original). Thus, courts must "carefully scrutinize survey evidence[,] particularly where a jury rather than a bench trial is contemplated." *Id.* at 562; *Trouble*, 179 F. Supp. 2d at 307.

Even assuming arguendo that Dr. Jay's surveys were relevant—which they are not—their defects render them far more prejudicial than probative. The surveys tested the wrong environment, used a control that has caused and is designed to cause actual confusion, and relied on stimuli that obscured the very product at issue (the film itself). Allowing such evidence to reach the jury would only invite confusion and lend unwarranted credibility to unsound methodology. Because the minimal probative value of Dr. Jay's surveys is substantially outweighed by the danger of misleading or confusing the jury, exclusion under Rule 403 is required. *See Malletier*, 525 F. Supp. 2d at 566.

### B. Dr. Simonson's Surveys and Opinions Should Be Excluded

Fujifilm offered Dr. Itamar Simonson as a rebuttal expert to Polaroid's genericness and secondary meaning surveys prepared by Mr. Poret. While Polaroid does not seek to exclude Dr. Simonson's reports and testimony entirely, it does seek to limit the scope of Dr. Simonson's opinions in two respects.

First, in critiquing Mr. Poret's genericness survey, Dr. Simonson offered unsupported linguistic opinions on the term "Polaroid" despite having no experience in the fields of linguistics or lexicography and despite using no identifiable (much less generally accepted) linguistic methodology. Second, Dr. Simonson's secondary meaning survey of the CBL trade dress uses an improper control stimulus and thus cannot reliably measure secondary meaning. These portions of his rebuttal report (and testimony) should be excluded.

#### i. <u>Dr. Simonson Is Not Qualified to Offer Linguistic Opinion</u>

Rule 702 permits expert testimony only if the witness is qualified "by knowledge, skill, experience, training, or education" and if the proposed opinions are based on reliable methods that will assist the trier of fact. Fed. R. Evid. 702. Fujifilm cannot carry its burden with regard to the opinions in Paragraphs 45–70 of Dr. Simonson's report (the "Linguistic Opinions"), where he opines on the linguistic meaning and significance of third-party uses of the term "Polaroid." *See* Chanin Decl. ¶ 7, Ex. 6 (Dr. Simonson's Genericness Report ("Simonson Genericness Rpt.")) ¶¶ 45–70. Not only does he lack any education or experience with linguistics (or lexicography), he employed no methodology whatsoever—much less one that is employed by trained linguists and lexicographers.

*<u>First</u>*, Dr. Simonson readily admitted that he has *no* "expertise in linguistics or lexicography," has *never* studied or published in those fields, and has *never* been qualified to testify

as a linguist. *Id.* ¶ 11, Ex. 10 (Deposition of Dr. Simonson ("Simonson Dep.")) at 19:12–21:3 ("Q. Do you consider yourself having expertise in linguistics or lexicography? A. No."). He further conceded that he did not even know the difference between "linguistics" and "lexicography," could not define "lexicography," and has never reviewed or relied upon any linguistic corpora, such as COCA or iWeb, or consulted any dictionaries in forming his opinions. *Id.* at 29:1–30:7. His background is limited to marketing and consumer survey research—not linguistics—and thus provides no foundation to opine on the primary significance of the use of the term *Polaroid*[3]; he lacks even a working familiarity with basic linguistic concepts, such as proper nouns, capitalization, or the distinction between common and proper usage. *See id.* at 33:5–35:6 ("Q. Do you know what a proper noun is? A. You know, I studied it at some point. I don't recall." . . . "I'm not sure."). On this ground alone, the Linguistic Opinions should be excluded. *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 274 (S.D.N.Y. 2010) ("The qualifications listed in [the expert] report [perhaps] demonstrate that [the expert] is an expert in marketing . . . but there is no basis on which to infer that [the expert] is knowledgeable about or experienced," as it relates to any other subject at issue); *Malletier*, 525 F. Supp. 2d at 642 ("An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.").

In its response to Polaroid's pre-motion letter seeking leave to file this Motion, Fujifilm asserted that Dr. Simonson's testimony is necessary to rebut "speculation" about what social media posters "believed" when using the word "Polaroid." *See* ECF 274 at 1–2. But Fujifilm's

[3] Dr. Simonson's Linguistic Opinions are not based on survey data or consumer perception but on subjective interpretation of text examples, an area well outside his discipline. Such overreach is precisely what Rule 702 prohibits. *See Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*, 693 F. Supp. 3d 335, 353 (E.D.N.Y. 2023) ("Even if a court determines a witness to be qualified to offer an expert opinion, however, '[a] witness's qualification on areas of knowledge by no means qualifies him to express opinions outside of this field.'").

justification only underscores why Dr. Simonson's testimony must be excluded. Dr. Simonson is neither a linguist nor a mind reader. He cannot divine the intent or state of mind of anonymous internet users, and Rule 702 does not permit expert testimony to substitute speculation for evidence. Expert testimony is inadmissible if it "undertakes to tell the jury what result to reach," thereby "attempt[ing] to substitute the expert's judgment for the jury's." *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252 (S.D.N.Y. 2013) (alteration in original) (citation omitted). Courts in this Circuit consistently reject such attempts to have experts opine on what others "understood," "intended," or "believed." *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 539, 546, 566 (S.D.N.Y. 2004) (holding that opinions on "the intent, motives, or states of mind of . . . others have no basis in any relevant body of knowledge or expertise"); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert speculation on parties' motivations as "inadmissible"). Expert testimony is not a vehicle for conjecture, and Fujifilm cannot fill the evidentiary gap in its case through Dr. Simonson's speculation about others' mental impressions.

Second, Dr. Simonson's methodological lapses both reveal and reinforce his lack of qualification in linguistics, confirming that his opinions rest on speculation rather than expertise. *See Daubert, Inc.*, 509 U.S. at 593–94. This deficiency provides a separate and independent basis for exclusion under Rules 702 and 703.

Rather than conducting independent analysis, Dr. Simonson relied on a limited set of examples of "Polaroid" usage spoon-fed by Fujifilm's counsel—without understanding who collected them, the methodology employed by the anonymous collector, or whether they were representative. Chanin Decl. ¶ 11, Ex. 10 (Simonson Dep.) at 21:4–23:3; 29:7–30:7. Courts routinely reject such cherry-picked analysis. *See San Diego Comic Convention v. Dan Farr Prods.*,

No. 14-cv-1865 AJB (JMA), 2017 WL 4227000, at *7 (S.D. Cal. Sept. 22, 2017) (criticizing linguistic expert's "narrow field of documents, most of which were provided to him by Defendants"). Dr. Simonson also failed to consult linguistic corpora or dictionaries, ignored capitalization and grammatical function (i.e., whether "Polaroid" was capitalized and used as a proper noun), and made no effort to confirm (through a survey or otherwise) whether the alleged "generic" usage actually referred to Polaroid-branded film, the more obvious and likely explanation. Chanin Decl. ¶ 11, Ex. 10 (Simonson Dep.) at 29:1–30:7; 33:5–35:6; 39:10–40:13. His "analysis" consisted entirely of reviewing a handful of counsel-selected materials and asserting that some used "Polaroid" generically. *Id.* This is neither science nor expertise. *See Fantasia Distrib.*, 693 F. Supp. 3d at 354 (excluding expert who "fail[ed] to cite any recognized methodology or sound principles").

Because Dr. Simonson lacks relevant expertise and failed to apply any recognized or reliable method, his Linguistic Opinions are unsupported and inadmissible under Rules 702 and 703. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357–60 (2d Cir. 2004) (upholding exclusion of expert testimony where "opinions were speculative because they were based on . . . unsupported conjecture of how the accident occurred"). Allowing such unsupported testimony would only mislead and confuse the jury, not assist it.

ii. Dr. Simonson's Rebuttal Secondary Meaning Survey Failed to Employ a Proper Control Stimulus

Dr. Simonson's secondary meaning survey must also be excluded because it used an improper control (an image of Fujifilm's Instax Wide film) that artificially depressed the resulting measure of secondary meaning. *See* Chanin Decl. ¶ 8, Ex. 7 (Dr. Simonson's Secondary Meaning Report ("Simonson Secondary Meaning Rpt.")) ¶¶ 20–26, 45–56. While not required, survey data

is considered "direct evidence of secondary meaning." 2 McCarthy § 15:30. However, surveys that fail to use any control, or employ a deeply flawed control, should be "given less weight" or "excluded from evidence altogether." *Id.* § 32:187; *see also THOIP,* 690 F. Supp. 2d at 241 (excluding likelihood of confusion survey that failed to replicate marketplace conditions and "failed to use an adequate control"). This is because a survey without a proper control cannot isolate the causal inference being tested and thus is neither a valid nor reliable measure of secondary meaning. *See* Chanin Decl. ¶ 13, Ex. 12 (Shari S. Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence, 359 (3d ed. 2011)) at 397–99; 5 *McCarthy* § 32:187 ("[A] survey control is always necessary to pin down causation[.]").

As noted above, a proper control stimulus should share "as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *THOIP*, 690 F. Supp. 2d at 240 (citation omitted); Chanin Decl. ¶ 13, Ex. 12 (Diamond, *Reference Guide on Survey Research*) at 399. In the context of secondary meaning, the "characteristic whose influence is being assessed" is whether the CBL is associated by relevant consumers with only a single source (i.e., one company). *U.S. Polo Ass'n*, 511 F. App'x at 85; 1 McCarthy § 8:8.50 (explaining that "to prove a secondary meaning exists in alleged trade dress, . . . [a]ll that is required is that consumers associate the trade dress with a single source, even if the corporate name of that source is unknown").

The control stimulus in a secondary meaning survey is not there to control for "confusion" like in a confusion survey; rather, a secondary-meaning control must be one where the product design depicted is *not associated with a single source*. The control stimulus either must be a product design used by *many* companies or must be entirely fabricated such that it is used by *no* companies. As the leading treatise explains, a valid secondary meaning survey must use a control

stimulus "that cannot reasonably be the cause of a 'one-company' answer." Chanin Decl. ¶ 15, Ex. 14 (Vincent N. Palladino, *Secondary Meaning Surveys*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 79 (Shari S. Diamond & Jerre B. Swann, eds. 2012)) at 89[4]; *Id.* ¶ 14, Ex. 13 (Susan Schwartz McDonald, *Secondary Meaning Surveys*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design 79 (2d ed. 2022)) at 100 (noting that in a secondary meaning survey, the expert must use a control stimulus that "has no association with a single brand" thereby "introducing no noise of its own" into the survey).

Dr. Simonson erroneously applied the standard for a *confusion* survey control (i.e., the closest non-infringing alternative, *see supra* III.A.ii.a.) instead of following the standard for a *secondary meaning* control. His control, Fujifilm's Instax Wide film, emanates from a single source (Fujifilm), and thus cannot control for mistaken "one company" responses. As Mr. Poret explains, this flaw means "the answer that respondents associate the look of the [control] design with only one company cannot be deemed to be noise" because "[r]espondents who give such an answer may genuinely be aware of the control film and may genuinely associate it with one source, rendering it an improper control for gauging 'noise' for single-source association." Chanin Decl. ¶ 6, Ex. 5 (Mr. Poret's Rebuttal Report ("Poret Rebuttal Rpt.")) at 12.[5]

When asked about this during his deposition, Dr. Simonson could not identify *any* academic literature, court decision, or another expert who concluded that the proper control in a secondary meaning survey is a "non-infringing" one as opposed to one "that cannot reasonably be the cause of a 'one-company' answer." Chanin Decl. ¶ 11, Ex. 10 (Simonson Dep.) at 68:13–69:8,

---

[4] Dr. Simonson himself cited to this chapter. Chanin Decl. ¶ 8, Ex. 7 (Simonson Secondary Meaning Rpt.) ¶ 34 (quoting Vincent Palladino).

[5] Even if consumers were not thinking of Fujifilm as the single source, "[c]onsumers may . . . believe that the control design is essentially the same as the Classic Border Logo mark . . . . Accordingly, respondents who associate this control image with Polaroid may be evidence of genuine recognition of the Classic Border Logo rather than noise." Chanin Decl. ¶ 6, Ex. 5 (Poret Rebuttal Rpt.) at 9.

71:15–73:1. Dr. Simonson's inability to point to any authority supporting the control methodology he used—contrasted with the leading treatise espousing the opposite position—further supports the exclusion of his secondary meaning survey. While not dispositive, "[t]he fact of publication (or lack thereof) in a peer reviewed journal" is "a relevant . . . consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594. Similarly, "[w]idespread acceptance" of a methodology "can be an important factor in ruling particular evidence admissible." *Id.* By contrast, proof that "a known technique . . . has been able to attract only minimal support within the community" permits a court to view the methodology at issue "with skepticism." *Id.* (citations omitted).

In short, Dr. Simonson's secondary meaning survey should be excluded for failure to use the only accepted method for selecting a control stimulus in a secondary meaning survey. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 646 (S.D.N.Y. 2016) (excluding expert report where expert failed to show "that his methodology has been recognized by the courts or gained acceptance within the relevant expert community").

**C. Mr. Gandy's Testimony Should Be Excluded Under Rules 602 and 702(b) Because It Was Speculative**

Fujifilm designated Mr. Gandy to opine on USPTO processes and procedures in rebuttal to Polaroid's patent-procedure expert. Polaroid does not object to his qualifications to discuss the Patent Office's rules or administrative framework. Mr. Gandy's report, however, strays far beyond that limited role, venturing into conjecture about the factual history of Fujifilm's patent prosecutions and the supposed reasoning or deliberations of the USPTO examiners of Fujifilm's patent application. Rule 602 prohibits testimony based on speculation rather than personal knowledge, and Rule 702(b) bars expert opinions untethered to sufficient facts or reliable methods.

Mr. Gandy's attempt to reconstruct the mental processes of patent examiners is precisely the kind of unsupported speculation that these rules—and *Daubert* itself—are designed to exclude.

Mr. Gandy's report repeatedly ventures beyond permissible expert explanation into conjecture about "what the examiner would have considered" or "the examiner necessarily found" in the applications at issue. See Chanin Decl. ¶ 2, Ex. 1 (Gandy Rpt.) ¶¶ 47, 50, 52, 55, 68, 70, 73 (the "Speculative Opinions"). None of the Speculative Opinions rests on data, testing, or principles reliably applied under Rule 702(b); they are instead pure speculation about the examiner's intent and thought processes that exist nowhere in the prosecution record—and of which Mr. Gandy has no personal knowledge. Courts in this District have made clear that "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702." *Sharkey*, 978 F. Supp. 2d at 252 (citation omitted). Rule 602 bars such testimony because it is not grounded in personal knowledge, and Rule 702(b) forbids expert opinion "not based upon sufficient facts or data." *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (allowing expert to describe regulatory procedures but excluding opinions speculating on "knowledge, motivations, intent, state of mind, or purposes" of agency officials or parties).

Expert testimony that seeks to divine the intent or mental impressions of third parties, including government regulators and patent examiners, should be excluded. *See, e.g., Highland Cap. Mgmt.*, 379 F. Supp. 2d at 469 (excluding expert report that includes "speculation regarding the state of mind and motivations of certain parties" and concluding that "[n]one of this speculation is admissible either. These sorts of comments consist simply of inferences that [the expert] draws from other evidence in the case."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 ("[O]pinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.").

Under Rules 602 and 702(b), Mr. Gandy should not be permitted to offer the Speculative Opinions and testify about what individual examiners "considered," "intended," or "understood," nor to offer unsupported characterizations of the prosecution history that go beyond the record itself. *See In re Fosamax*, 645 F. Supp. 2d at 190; *In re Rezulin*, 309 F. Supp. 2d at 546. Because these opinions are speculative, unsupported by data, and outside Mr. Gandy's personal knowledge, they are inadmissible.

## IV. CONCLUSION

Polaroid respectfully requests that this Court exclude (1) Dr. Jay's surveys and corresponding testimony in their entirety; (2) Dr. Simonson's Linguistic Opinions and his fatally flawed secondary meaning survey; and (3) Mr. Gandy Speculative Opinions.

Respectfully submitted, this 19th day of November 2025.

**KILPATRICK TOWNSEND & STOCKTON LLP**

*/s/ R. Charles Henn Jr.*
R. Charles Henn Jr. (RH 1224)
Erica Chanin (pro hac vice)
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: chenn@ktslaw.com
echanin@ktslaw.com

Attorneys for Defendants & Counterclaimants

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing BRIEF IN SUPPORT OF POLAROID'S OMNIBUS MOTION TO EXCLUDE THE EXPERT TESTIMONY AND OPINIONS OF DEBORAH JAY, ITAMAR SIMONSON, AND JIM GANDY contains 7,237 words and therefore complies with the word-count limitations of Local Civil Rule 7.1(c).

*/s/ R. Charles Henn Jr.*
R. Charles Henn Jr. (RH 1224)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: chenn@ktslaw.com

Attorney for Defendants & Counterclaimants