UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FUJIFILM NORTH AMERICA CORPORATION,

Plaintiff,

- against -

POLAROID IP B.V. and PLR BRAND SERVICES, LLC,

Defendants.

------------------------------------X
POLAROID I.P. B.V., PLR BRAND SERVICES, LLC, POLAROID FILM B.V., and POLAROID AMERICA CORP., d/b/a POLAROID ORIGINALS,

Counterclaim Plaintiffs,

- against -

FUJIFILM NORTH AMERICA CORPORATION and FUJIFILM CORPORATION,

Counterclaim Defendants.

------------------------------------X

**MEMORANDUM AND ORDER**

17 Civ. 8796 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This longstanding intellectual property dispute, commenced in 2017, concerns competing instant film products and the extent to which trademark law protects Polaroid's alleged Classic Border Logo ("CBL") trade dress. Years of motion practice, dismissals, and stipulations have narrowed the claims considerably. Polaroid IP B.V., PLR Brand Services, LLC, Polaroid Film B.V., and Polaroid

America Corp. (collectively, "Polaroid")[1] allege that Fujifilm North America Corporation and Fujifilm Corporation (collectively, "Fujifilm") infringed and diluted Polaroid's alleged trade dress rights through the marketing and sale of Fujifilm Instax Square film. Fujifilm disputes the existence of any protectable rights, arguing, inter alia, that Polaroid abandoned its trade dress, failed to establish secondary meaning, and seeks protection for functional product features.

Presently before the Court are the parties' motions to exclude expert testimony under Federal Rule of Civil Procedure 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). For the reasons stated herein, Polaroid's motion to exclude Fujifilm's experts is granted in part and denied in part. Fujifilm's motion to exclude Polaroid's experts is granted in part and denied in part.

## I. Factual Background

The facts of this case have been set out in prior opinions issued by this Court. See Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC, 2019 WL 274967 (S.D.N.Y. Jan. 7, 2019); Fujifilm N. Am. Corp.

[1] On January 6, 2022, this Court granted a motion by Polaroid under Fed. R. Civ. P. 25(c) to substitute Polaroid IP B.V. for PLR IP Holdings, LLC and to change the names of Impossible B.V. and Impossible America Corp. to Polaroid Film B.V. and Polaroid America Corp., respectively. ECF No. 121.

v. PLR IP Holdings, LLC, 2025 WL 2444652 (S.D.N.Y. Aug. 25, 2025). Presuming the parties' familiarity with the relevant facts, we recite only those necessary to address the instant motions and reference the Court's prior opinions.

Polaroid Corporation, a predecessor to the entities in this action, began selling a variety of products bearing what Polaroid terms its "Classic Border Logo" or "CBL" in 1972. Fujifilm, 2025 WL 2444652, at *1. The CBL is a vertical rectangle surrounding a small inner square, creating the impression of thin, white borders along the top and sides and a thicker, white border along the bottom. Id. Polaroid owns two federal trademark registrations for the CBL. Id. The CBL is two-dimensionally depicted on packaging for Polaroid's products, and Polaroid characterizes the design of its film as a three-dimensional utilization of its CBL mark. Id.

In October 2001, Polaroid Corporation filed for Chapter 11 bankruptcy protection, and in 2008 it announced it would cease manufacturing instant film products, including those bearing the CBL. Id. Impossible B.V. ("Impossible"), an entity based in the Netherlands, acquired Polaroid's last remaining film manufacturing facility following the announcement. Id. In connection with Polaroid Corporation's Chapter 11 bankruptcy, several Polaroid

entities entered into an Asset Purchase Agreement and Assignment Agreement with PLR IP Holdings, LLC. Id. at *2. Pursuant to that agreement, PLR IP Holdings, LLC acquired all intellectual property used by Polaroid Corporation, including "all rights to the name 'Polaroid'" and "all rights to any other trade names, trademarks and service marks" owned by Polaroid Corporation. Id.

Impossible, and other retailers that partnered with Polaroid, continued selling Polaroid-manufactured and Polaroid-branded film bearing the CBL in the wake of Polaroid's bankruptcy. Id. During this time, Polaroid partnered with certain public figures and prominent companies, such as Instagram and Taylor Swift, to license its trademarks and other intellectual property, including the CBL. Id. Around September 2014, Fujifilm began developing an Instax camera that would use square-shaped film. Id. That camera and film entered the U.S. market in May 2017 under the brand name "Instax Square." Id.

In January 2017, Polaroid, via counsel, sent a letter to Fujifilm asserting that the Instax Square film was essentially identical to Polaroid's CBL, thereby infringing on Polaroid's intellectual property. Id. Fujifilm made no changes to the format of Instax Square film, nor did it delay the product's launch, following receipt of this letter. Id. Around September 2017,

Impossible began selling analog instant film, including film bearing the CBL, under the brand name "Polaroid Originals." Id. at *3.

## II. Procedural Background

On November 13, 2017, Fujifilm North America Corporation commenced this action against PLR IP Holdings, LLC and PLR Brand Services, LLC, seeking declarations that Fujifilm's Instax Square products neither infringed any Polaroid trademark or trade dress rights nor constituted unfair competition under federal or New York law. ECF No. 1 ¶¶ 27-47. Fujifilm also sought cancellation of Polaroid's trademark registration for the CBL on the grounds of non-use and functionality under 15 U.S.C. § 1064. Id. In response, PLR IP Holdings, LLC and PLR Brand Services, LLC, Impossible B.V., and Impossible America Corp., d/b/a Polaroid Originals (collectively, "Polaroid"), filed an Answer with Counterclaims against Fujifilm Holdings, Fujifilm North America Corporation, and Fujifilm Corporation (collectively, "Fujifilm"). ECF No. 14. Polaroid asserted seven counterclaims: (i) counterfeiting under 15 U.S.C. § 1114; (ii) federal trademark infringement under 15 U.S.C. § 1114; (iii) federal unfair competition under 15 U.S.C. § 1125(a); (iv) unfair and deceptive trade practices under state law; (v) common-law trademark

infringement and unfair competition; (vi) federal trademark dilution under 15 U.S.C. § 1125(c); and (vii) state-law trademark dilution and injury to business reputation. Id. ¶¶ 52-82. Less than one week later, Polaroid filed an Amended Answer with Counterclaims asserting the same causes of action. ECF No. 25 ¶¶ 51-81.

On June 1, 2018, Fujifilm moved to dismiss Polaroid's counterfeiting claim, arguing that Polaroid failed to plausibly allege the elements required to state a counterfeiting claim under Section 32 of the Lanham Act. ECF Nos. 35, 37 at 1. The Court granted the motion in part and denied it in part, dismissing the claim as it related to Fujifilm's packaging, but permitting the claim to proceed to the extent Polaroid alleged that Fujifilm's Instax Square film itself bore a counterfeit mark. See Fujifilm, 2019 WL 274967, at *7. Fujifilm filed an Amended Complaint on November 1, 2019. ECF No. 70 ("Am. Compl."). Polaroid answered and reasserted its counterclaims on December 19, 2019, ECF No. 80, and Fujifilm answered the counterclaims on January 10, 2020, ECF No. 83. The parties then proceeded to discovery.

On December 21, 2023, Fujifilm moved for summary judgment. ECF Nos. 147-54. Polaroid opposed the motion, ECF Nos. 155-78, and briefing concluded on February 16, 2024, ECF Nos. 181-85. The

Court denied the motion without prejudice after determining that the parties' Rule 56.1 statements violated the Court's Local Rules. See Fujifilm, 2024 WL 3520231, at *2 (S.D.N.Y. July 24, 2024). That same day, the Court filed a letter identifying deficiencies in the parties' submissions and directing Polaroid to file a stipulation identifying the claims it asserted and the source of its asserted right for each counterclaim. ECF No. 189. After Polaroid filed an Amended Stipulation on August 9, 2024, ECF No. 193, the Court directed the parties to confer and submit a proposed briefing schedule for renewed summary judgment motions, ECF No. 200. Pursuant to an approved briefing schedule, ECF No. 202, Fujifilm filed a renewed motion for summary judgment on December 13, 2024, together with a supporting declaration and Rule 56.1 Statement, addressing Polaroid's remaining six counterclaims. ECF Nos. 205-20. Polaroid filed its opposition on January 17, 2025, ECF Nos. 221-22, 224-25, together with a counterstatement to Fujifilm's Rule 56.1 Statement, ECF Nos. 226-27, its own Rule 56.1 Statement, ECF Nos. 228-29, and supporting declarations, ECF Nos. 230-45.

At the Court's request, Polaroid filed an Annotated Rule 56.1 Statement of Additional Material Facts on February 7, 2025. ECF Nos. 252-53. Fujifilm's motion was fully briefed on February 12,

2025. ECF Nos. 255-58. On August 25, 2025, the Court issued a fifty-five-page Memorandum and Order granting in part and denying in part Fujifilm's summary judgment motion. Specifically, the Court (i) granted Fujifilm's motion insofar as Polaroid's counterclaims are directed towards images of developed Instax Square film on Fujifilm's promotional materials and packaging, and (ii) denied the motion with respect to Polaroid's remaining counterclaims. ECF No. 263. Fujifilm moved for reconsideration on September 8, 2025, and briefing concluded on September 29, 2025. ECF Nos. 264-70. While that motion was pending, the parties filed pre-motion letters for proposed Daubert motions to exclude certain reports and opinions offered by the other party's experts. ECF Nos. 271-74.

On October 31, 2025, the Court denied Fujifilm's motion for reconsideration, holding that Fujifilm had failed to identify any controlling decision or factual matter that the Court overlooked. ECF No. 275. That same day, the Court issued a letter permitting the parties to bring their Daubert motions without the necessity of a pre-motion conference. ECF No. 276. On November 5, 2025, and at the Court's request, the parties informed the Court of their intention to file omnibus motions challenging the opposing party's experts and proposed a briefing schedule. ECF No. 277. Pursuant

to that briefing schedule, the parties filed their respective Daubert motions on November 19, 2025, with supporting briefs and declarations. ECF Nos. 279-93.

On December 8, 2025, Fujifilm filed a pre-motion letter for a proposed motion to strike certain portions of the Declaration of Dr. David Neal, one of Polaroid's rebuttal experts, arguing that Polaroid attempted to improperly supplement Dr. Neal's report more than two years after his deposition. ECF No. 294. Fujifilm and Polaroid filed oppositions to the other side's Daubert motions on December 10, 2025, together with supporting briefs and declarations. ECF Nos. 295-302. On December 11, 2025, Polaroid opposed Fujifilm's request to file a motion to strike portions of Dr. Neal's declaration. ECF No. 303. The Court denied Fujifilm's request to file a motion to strike the next day, explaining Fujifilm had not established a sufficient basis to modify the agreed-upon briefing protocol governing the parties' Daubert motions. ECF No. 304. The parties' Daubert motions were fully briefed on December 22, 2025. ECF Nos. 305-309.

## III. Legal Standard

The admissibility of expert testimony at trial is governed by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 charges courts with a "gatekeeping" responsibility to ensure that expert testimony is both reliable and relevant before it is presented to the trier of fact. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). Courts within this Circuit frequently distill Rule 702 to a three-part inquiry requiring the proponent of expert testimony to establish that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." Nike, Inc. v. StockX LLC, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing Nimely v. City of New York, 414 F.3d 381, 395-96 (2d Cir. 2005)).

In carrying out that function, courts must conduct a "flexible" inquiry focused on the particular facts of the case. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999) (citing Daubert, 509 U.S. at 591). To determine whether the expert's testimony will assist "the trier of fact to understand

the evidence or to determine a fact in issue," Fed. R. Evid. 702, the testimony must not only be reliable but also be relevant in the sense that it "fits" the facts of the case. Daubert, 509 U.S. at 591. Accordingly, expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id. (citation omitted).

A court's inquiry does not end with Rule 702. In evaluating proposed expert testimony, courts must also consider broader evidentiary limitations imposed by the Federal Rules of Evidence, including Rule 403, which "permits exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" United States v. Pollok, 139 F.4th 126, 140 (2d Cir. 2025) (quoting Daubert, 509 U.S. at 595).

## DISCUSSION

### I. Polaroid's Omnibus Daubert Motion

Polaroid has moved to exclude the testimony and opinions, in whole or in part, of three of Fujifilm's proffered experts: Dr. Deborah Jay; Dr. Itamar Simonson; and Mr. Jim Gandy. See ECF No.

282 ("Pol. Mot."). We address Polaroid's challenges to each expert in turn.

**a. Dr. Deborah Jay**

Dr. Deborah Jay is the principal and founder of Jay Survey Strategics LLC, a California-based research firm specializing in survey design, sampling, and statistical analysis. ECF No. 283-2 at 8. Dr. Jay testifies in state and federal proceedings, as well as before the U.S. Patent and Trademark Office ("USPTO") and U.S. International Trade Commission. Id. She has designed and directed more than 400 surveys in legal cases. Id. Dr. Jay obtained her doctorate and master's degree in political science from the University of California, Berkeley. Id. at 9. She also received a bachelor's degree in psychology and political science from the University of California, Los Angeles. Id.

Fujifilm offers Dr. Jay as a survey expert who conducted two point-of-sale confusion surveys in 2018 and 2020 involving Fujifilm's Instax Square packaging. See ECF Nos. 283-2, 283-3. Dr. Jay conducted the surveys to determine whether consumers would be confused by Instax Square packaging at the point-of-sale. ECF No. 283-2 at 1; ECF No. 283-3 at 1. Examining consumer reactions to the front panel of Fujifilm's Instax Square packaging, Dr. Jay's

surveys showed a net confusion of 1% and 0%, respectively. ECF No. 283-2 at 7, 13; ECF No. 283-3 at 7, 14-15.

Polaroid contends that Dr. Jay's opinions and surveys are irrelevant and should be excluded because they test only point-of-sale confusion arising from Fujifilm's packaging, whereas the only remaining confusion theories concern post-sale and initial-interest confusion relating to the film itself. Pol. Mot. at 5-7. Polaroid further contends that Dr. Jay's surveys are unreliable on the grounds that they fail to recreate marketplace conditions and employ an improper control stimulus. Id. at 7-14. Fujifilm responds that Dr. Jay's surveys are relevant because Polaroid's remaining confusion theories partly concern consumers' exposure to 2D depictions of developed Instax Square film, and the packaging tested in Dr. Jay's surveys featured similar 2D images of the film. ECF No. 301 ("Fuji. Opp.") at 4-12. Fujifilm further argues that Dr. Jay employed a widely accepted survey methodology and that Polaroid's criticisms concern, at most, the weight of the evidence, rather than its admissibility. Id. at 13-17.

The Court first notes that the dispute over Dr. Jay's surveys and testimony does not primarily concern qualifications or methodology. Rather, the parties' disagreement centers on Rule 702's relevance and "fit" requirements: whether Dr. Jay's surveys

meaningfully address the remaining confusion claims in this case and are "relevant to the task at hand." Daubert, 509 U.S. at 591-97. The Court agrees with Polaroid that they do not.

The Court's Memorandum and Order of August 25, 2025, in addition to Polaroid's earlier stipulation, eliminated any packaging confusion theory from the case. See Fujifilm, 2025 WL 2444652, at *20 (granting Fujifilm's motion for summary judgment "to the extent that Polaroid's counterclaims are directed towards images of developed Instax Square film on Fujifilm's promotional materials"); ECF No. 141 at 2 ("Polaroid hereby stipulates that it will not allege at trial that the **packaging** for Fujifilm's Instax Square film is likely to cause confusion.").[2] The only surviving confusion theories concern whether customers encountering Fujifilm's Instax Square film outside its packaging, either in post-sale settings or through initial-interest encounters, are likely to mistakenly associate the film with Polaroid.

Dr. Jay's surveys, by contrast, measured only consumer reactions to packaging and point-of-sale presentations featuring prominent "FUJIFILM" and "INSTAX" branding. ECF No. 283-2 at 3 ("Test Group respondents were shown the **package** for FUJIFILM's

[2] This Court also previously dismissed Polaroid's counterfeiting claim to the extent that it addressed Fujifilm's packaging and promotional materials. Fujifilm, 2019 WL 274967, at *5.

INSTAX SQUARE instant camera film.") (emphasis added); ECF No. 283-3 at 3 ("Each group of survey respondents was shown a different **package** of FUJIFILM's INSTAX instant camera film.") (emphasis added). Put simply, Dr. Jay surveyed packaging confusion in a case with no surviving packaging confusion claims. Courts in this Circuit routinely recognize that although flaws in survey design ordinarily go to weight, if a survey measures the wrong theory of confusion or otherwise lacks sufficient connection to the claims remaining for trial, exclusion or limitation is appropriate. See, e.g., Gucci America, Inc. v. Guess?, Inc., 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011) (explaining that "a survey whose stated purpose is to assess point-of-sale confusion will have nothing relevant to say about post-sale confusion.").

Fujifilm's argument that Dr. Jay's surveys are nevertheless relevant because certain of Polaroid's surviving theories involve consumer encounters with 2D depictions of Instax Square film, including on social media, is unavailing. First, Dr. Jay explicitly stated that she did not test consumer reactions to Fujifilm social media posts depicting Instax Square film and did not test consumer reactions to the film standing alone. See ECF No. 283-9 at 39:10-18, 61:2-8 (explaining that she "was testing packaging" and "didn't show any consumer a piece of film.").

Indeed, Dr. Jay acknowledged that such post-sale encounters and social-media materials "would not have been appropriate to show" because her surveys were designed to measure only the "point of purchase" conditions. Id. at 71:10-72:16. Second, the absence of confusion when consumers encounter Instax Square packaging, which prominently displays "FUJIFILM" and "INSTAX" branding and word marks, does not meaningfully inform whether consumers are likely to experience confusion when encountering the film itself outside its packaging in post-sale or initial-interest settings. Finally, permitting Fujifilm to present Dr. Jay's surveys without limitation would create a significant risk of the jury conflating packaging-based point of sale theories, which are no longer to be tried, with the narrower post-sale and initial-interest theories that remain. See Starter Corp. v. Converse, Inc., 170 F.3d 286, 296 (2d Cir. 1999) (recognizing district courts' broad discretion

to exclude marginally relevant evidence posing danger of confusion).

Accordingly, Dr. Jay's 2018 and 2020 surveys fail the Daubert "fit" requirement and are excluded as irrelevant to the remaining confusion theories.[3]

**b. Dr. Itamar Simonson**

Dr. Itamar Simonson is the Sebastian S. Kresge Emeritus Professor of Marketing at Stanford University's Graduate School of Business. ECF No. 284-1 at 2. Dr. Simonson's field of expertise concerns consumer behavior, marketing management, and the effects of product characteristics and marketing activities on buying decisions. Dr. Simonson received his Ph.D. in marketing from Duke University. Id. Dr. Simonson also holds a Master of Business Administration from the University of California, Los Angeles, and he received a bachelor's degree in economics and political science from the Hebrew University of Jerusalem. Id.

Fujifilm offers Dr. Simonson as a marketing and consumer behavior expert. Polaroid seeks to exclude two categories of opinions offered by Dr. Simonson: (i) opinions concerning whether consumers purportedly use "Polaroid" as a generic term rather than

[3] Because the Court excludes Dr. Jay's surveys on relevance and fit grounds, it need not separately reach Polaroid's methodological criticisms concerning Dr. Jay's survey controls.

source-identifying trademark; and (ii) his rebuttal survey concerning secondary meaning. Pol. Mot. at 15. We address each category in turn.

**i. Genericness Opinions**

Polaroid argues that Dr. Simonson's genericness opinions should be excluded because he lacks the qualifications and methodology necessary to opine on whether consumers use "Polaroid" generically rather than a source-identifying trademark. Pol. Mot. at 15-18. Specifically, Polaroid argues that Dr. Simonson is not a linguist, lexicographer, or language expert and, accordingly, is not qualified to offer the linguistic opinions underlying genericness analysis. Id. at 15-17. Further, Polaroid contends that, regardless of qualifications, or perhaps due to a lack thereof, Dr. Simonson conducted no linguistic analysis or systematic review of marketplace usage. Id. at 17-18. Instead, Polaroid argues that Dr. Simonson extrapolated broad conclusions regarding consumer perception after reviewing isolated, anecdotal examples, many of which were selected by Fujifilm's counsel. Id. Fujifilm responds that Polaroid improperly attempts to impose a requirement that only linguists may opine regarding genericness or consumer perception. Fuji. Opp. at 19-21. Fujifilm points to Dr. Simonson's expertise in consumer behavior and marketing as

evidence that he is qualified to evaluate how consumers understand and use brand names. Id. Further, Fujifilm argues that experts routinely rely upon materials providing by counsel and that Polaroid's criticisms can be addressed on cross-examination. Id. at 21-22.

Insofar as Polaroid's challenge is a qualifications dispute, the Court agrees with Fujifilm that Dr. Simonson's experience in consumer behavior and branding is sufficient to qualify him to address questions concerning marketplace understanding. However, this does not end the inquiry. Expert testimony under Rule 702 is reliable where (i) it is based upon sufficient facts or data, (ii) it is the product of reliable principles and methods, and (iii) the expert applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Here, Polaroid's methodological criticisms are more persuasive.

Dr. Simonson did not conduct survey research concerning generic usage, did not consult any dictionaries, and did not conduct a corpus or other systematic language analysis to test whether consumers primarily understand "Polaroid" as a generic product category rather than a source identifier. ECF No. 283-11 at 29:16-30:7. Rather, the challenged opinions appear principally derived from anecdotal examples and isolated marketplace

references, including references to the word "Polaroid" in popular songs, YouTube videos, and websites. ECF No. 284-1 ¶¶ 48-67. The methodological deficiencies are further illustrated by Dr. Simonson's reliance on examples in which consumers use "Polaroid" as a noun or in pluralized form as evidence of generic use. ECF No. 283-9 at 23:15-17 (Q: "[W]hat methodology, if any, did you use to code whether they were generic uses or non-generic uses?" A: "So if it's used as a noun, I assume that it's generic use. If [it is] stated in plural, they tend to be – to reflect generic use.").

Apart from citing a pamphlet from the International Trademark Association, Dr. Simonson's report identifies no established methodology supporting the proposition that noun usage or pluralization alone reliably distinguishes generic usage from source-identifying trademark usage. Further, Dr. Simonson did not assess whether a majority of real-world examples referred to Polaroid in a specific way and instead relied on examples provided by counsel. Id. at 30:3-7 (Q: "Did you conduct any searches of your own to collect and code real-world examples of the use of Polaroid by the public?" A: "No."). Without a framework explaining why the cited usage patterns reliably support the conclusions offered, together with the handful of counsel-picked

examples that Dr. Simonson examines, the Court cannot conclude that the methodology employed is sufficiently reliable to connect the cited examples to the conclusion that consumers generically use the term "Polaroid." Accordingly, Dr. Simonson's genericness opinions are excluded.

**ii. Secondary Meaning Rebuttal Survey**

Polaroid separately challenges Dr. Simonson's rebuttal survey concerning secondary meaning. Polaroid primarily contends that the survey employed an improper control stimulus because the selected control, Instax Wide film, contained visual characteristics that consumers may already associate with a single source. Pol. Mot. at 18-21. According to Polaroid, that created a risk that survey respondents would react to the appearance of Instax Wide, rather than treating it as a neutral comparison point, making it difficult to determine whether consumers associated Polaroid's claimed CBL with a single source. Id. Put simply, Polaroid argues that a proper control provides a baseline and shows how consumers react when the claimed border design is absent; however, if the control product itself, Instax Wide film, contains recognizable design features or creates its own source

associations, the control may no longer reliably isolate whether consumers are responding to Polaroid's asserted trade dress.

Fujifilm contends that Polaroid's criticisms reflect ordinary disputes regarding survey design and control selection that should be explored through cross-examination, not exclusion. Fuji. Opp. at 22-24. Fujifilm further argues that Dr. Simonson's control stimulus was proper because approximately 20% of respondents identified Polaroid, not Fujifilm, as the source of Instax Wide, proving that consumers do not exclusively associate Instax Wide with Fujifilm. Id. at 23. The Court agrees with Fujifilm.

Dr. Simonson employed a recognizable survey methodology and tested a question directly relevant to the issues remaining for trial. Polaroid's objections to Dr. Simonson's rebuttal survey resemble typical disputes regarding survey design, rather than methodological absence. Whether the control was imperfect, whether it sufficiently isolated background noise, and whether alternative controls would have been preferable are issues more appropriately addressed through cross-examination and competing expert testimony. See, e.g., GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc., 2023 WL 6614486, at *17 (S.D.N.Y. Sep. 20, 2023) (explaining that "issues with the control stimuli [] go only to weight but do not merit exclusion."). Accordingly, Polaroid's

motion to exclude Dr. Simonson's rebuttal survey testimony is denied.

**c. Mr. Jim Gandy**

Mr. Jim Gandy worked as a Design Patent Examiner for the USPTO for 24 years, where he examined and made patentability determinations on design patent applications. ECF No. 283-1 at 4-7. Since retiring in 2005, Mr. Gandy has served as an expert witness in federal and state proceedings and has counseled patent attorneys and agents who file design patent applications. Id. Mr. Gandy attended Temple University, where he received a bachelor's degree in architectural design technology. Id. Fujifilm offers Mr. Gandy as a rebuttal expert in USPTO design patent examination and procedures. Fujifilm specifically offers Mr. Gandy to rebut the testimony of Mr. Carani, Polaroid's design patent expert. Id. at 1.

Polaroid does not challenge Mr. Gandy's qualifications generally, nor does it argue that former patent examiners are categorically prohibited from testifying about USPTO practices and procedures. Rather, Polaroid's challenge to Mr. Gandy is narrow, contending that seven paragraphs in his report constitute improper speculation concerning what individual patent examiners considered, intended, understood, or relied upon during

examination of Fujifilm's design patents. Pol. Mot. at 21-23. Fujifilm responds that Mr. Gandy permissibly explains ordinary USPTO practices, examination procedures, and the objective implications of the prosecution record based on decades of experience. Fuji. Opp. at 25-30.

Experts may not offer speculative testimony about motivations and intentions, beliefs, or other states of mind. See, e.g., In re Terrorist Attacks on September 11, 2001, 2024 WL 5077293, at *12 (S.D.N.Y. Dec. 11, 2024) (collecting cases). Because the relevant question is whether the challenged opinions improperly speculate concerning the subjective reasoning of individual examiners, we address each of the challenged paragraphs below.

#### i. Paragraph 47

Paragraph 47 reads as follows:

> In discussing the examination of the D'484 patent, Mr. Carani states at paragraph 69 of his report that "inventors represented to the USPTO, and ultimately the public, that . . . the **designs** claimed are ornamental." (Emphasis added). That is incorrect and misleading. First, the D'484 only contains **one** claim for **one** design. There are not multiple "designs" claimed, but a single design considered as a whole. Second, as I pointed out above, there is no representation by the inventors that the design is non-functional.

ECF No. 283-1 at 16. The Court declines to exclude paragraph 47. Mr. Gandy's opinions concern objective features of the patent

examination framework, rather than speculation regarding an examiner's subjective reasoning. Mr. Gandy does not purport to reconstruct what any individual examiner thought or intended. Polaroid's motion is denied with respect to paragraph 47.

**ii. Paragraph 50**

Paragraph 50 reads as follows:

> In evaluating the application that matured into the D'484 patent for compliance with the ornamentality requirement, the examiner would have considered the entire overall design (including the front, back, sides, and top). As Mr. Carani recognizes at paragraph 77 of his report, the examiner found that the "design shown in Figure 1-5" satisfied the ornamentality requirement. The examiner would not have examined each figure individually for compliance with the ornamentality requirement. The examiner would not have made an individual finding as to the ornamentality of just one view (such as the front) showing just a partial feature of the design. Accordingly, the allowance of the design patent does not constitute a finding that an isolated element of the design (e.g., just the front of the film) is ornamental. As I indicated previously above, the MPEP makes clear that "[i]n determining whether a design is primarily functional or primarily ornamental the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article, in determining whether the claimed design is dictated by the utilitarian purpose of the article." Therefore, the claimed design must be "viewed in its entirety" in assessing the ornamentality requirement. To the extent the claimed design is disclosed in multiple

> drawing views, then all of the drawing views must be considered in assessing the "entirety" of the design.

ECF No. 283-1 at 17. Polaroid characterizes the opinions offered in paragraph 50 as speculative because Mr. Gandy repeatedly opines on what the examiner "would have" or "would not have" done. Pol. Mot. at 22. The Court disagrees. In context, paragraph 50 principally explains ordinary examination practice and the standards governing ornamentality review. These opinions are grounded not in the subjective reasoning of a particular examiner, but rather in the Manual of Patent Examining Procedure (MPEP) and design-patent examination framework. ECF No. 283-1 at 3, 17. Polaroid's motion is denied with respect to paragraph 50.

**iii. Paragraph 52**

Paragraph 52 reads as follows:

> During examination, the examiner would have evaluated whether the design claimed in the D'484 patent was novel and non-obvious in view of the prior art. If the prior art disclosed the same design as that claimed in the '484 patent, the examiner would have rejected the application as anticipated by the prior art under 35 U.S.C § 102, (i.e., not new or novel). Alternatively, if the differences between the prior art and the claimed design would have been obvious to a designer of ordinary skill in the analogous art at the time of the alleged

> invention, the examiner would have rejected the application as obvious under 35 U.S.C. § 103.

ECF No. 283-1 at 18. The opinions offered in paragraph 52 concern standard examination procedures and governing patent principles, namely, how examiners evaluate novelty and non-obviousness and the circumstances under which an examiner ordinarily would reject an application under 35 U.S.C §§ 102 or 103. Mr. Gandy does not purport to testify regarding what the examiner in fact believed or specifically considered during the prosecution of the D'484 patent. Polaroid's motion is denied with respect to paragraph 52.

**iv. Paragraph 55**

Paragraph 55 reads as follows:

> In allowing the design claimed in the D'484 patent, the examiner would have compared the claimed design (shown in Figures 1-5) to the prior art, including the Impossible film in the Classic Border Logo format, to assess patentability. In finding that Fujifilm's patent application should be allowed, and that a patent should issue, the examiner necessarily found the design claimed therein to be "patentably distinct" over the Impossible/Polaroid film. That means that Fujifilm's claimed design for instant film was considered "novel" and thus different from the Impossible/Polaroid instant film. It also means that Fujifilm's claimed film design was considered 'non-obvious' — i.e., that the differences between the claimed design and the Impossible/Polaroid film were significant enough that

> they would not have been obvious to a designer of ordinary skill in the art.

ECF No. 283-1 at 19. The first sentence of paragraph 55 states that the examiner would have compared the claimed design against prior art in assessing patentability, which constitutes permissible testimony concerning ordinary examination procedures. The remainder of paragraph 55 is likewise admissible. Mr. Gandy may permissibly explain the objective significance of patent issuance and the requirements that govern design-patent examination. Mr. Gandy may also transpose that significance to the design patent at issue and testify that the issuance of the D'484 patent reflects that the USPTO concluded that the claimed design satisfied applicable patentability requirements, including novelty and non-obviousness requirements under design-patent law.

Paragraph 55 does not impermissibly reconstruct any individual examiner's thought processes but rather draws objective conclusions from the fact of patent issuance and the governing patent framework. Accordingly, Polaroid's motion is denied with respect to paragraph 55.

**v. Paragraph 68**

Paragraph 68 reads as follows:

> Mr. Carani's conclusion is not supported by the examination of the design patents discussed at issue,

> none of which claim only "an instant analog film design consisting of a single square inside of a rectangle." As discussed at length in this report, the claimed designs at issue comprise multiple views, including not only the front but also the back, top, and sides of the film. Mr. Carani incorrectly focuses on an isolated feature, "a single square inside of a rectangle" that appears to refer to an isolated aspect of the front of the film. No examiner evaluated a claimed film design that was limited to just that isolated feature, and thus the USPTO's examination and allowance of the design patents does not support Mr. Carani's conclusion.

ECF No. 283-1 at 26. The Court declines to exclude paragraph 68. The paragraph primarily concerns the scope of the claimed designs and the examination framework applicable to multi-view design patents. Mr. Gandy states that "[n]o examiner evaluated" a design limited to a single isolated feature, but the thrust of the opinion is that the patent claims were broader than the feature identified by Polaroid's expert, Mr. Carani. This criticism does not speak to subjective examiner intent, but rather the interpretation of the claims and examination process. Polaroid's motion is denied with respect to paragraph 68.

**vi. Paragraph 70**

Paragraph 70 reads as follows:

> Mr. Carani in his report (paragraphs 99-107) also relies on five Japanese design registrations to which priority is claimed in the 4 U.S. design patents as further support that the designs claimed in those 4 U.S. design patents are ornamental. This makes no sense. Just as a design patent examiner would not apply law from

> trademark cases, they would not and do not apply the Japanese Patent Office non-functionality requirement in determining whether the claimed design in a U.S. design patent application met the requirements of ornamentality under 35 U.S.C. § 171. USPTO design patent examiners do not consider Japanese law, or the law of any other jurisdiction, in examining US design patent applications.

ECF No. 283-1 at 27. This testimony concerns standard USPTO practice and the scope of materials usually considered during examination, namely, that examiners do not consider Japanese law or foreign non-functionality standards when evaluating U.S. design patents. Because paragraph 70 does not speculate regarding the reasoning of any particular examiner, Polaroid's motion is denied.

**vii. Paragraph 73**

Paragraph 73 reads as follows:

> Mr. Carani does not discuss the role of foreign priority applications in U.S. design patent examination or how examiners evaluate foreign priority claims. Mr. Carani's opinions in paragraphs 100-106 of his report focus solely on the "description of the design" and "features of the design" portions of the Japanese design registrations. As discussed above, a USPTO design patent examiner would not consider those aspects of a foreign priority application in assessing entitlement to an earlier priority date (or in any other aspect of the U.S. design patent application process). Examiners are not required to look at the specification of a foreign priority document which in many instances would be in a foreign language. Even if the foreign priority document had a translation, which is not required, the examiner would not rely on anything other than the drawing figures

> of the claimed design for the purpose of determining patentability of the U.S. design patent application.

ECF No. 283-1 at 29. These opinions do not concern subjective reasoning and instead focus on ordinary examination procedures. Mr. Gandy explains what examiners generally review and how foreign priority claims are ordinarily evaluated. To the extent that Polaroid disagrees that examiners "would not" consider certain materials, such criticisms concern the weight of the testimony, not its admissibility.

As with the testimony in the preceding paragraphs, the use of "would have" or "would not have" language in Mr. Gandy's report is not speculative when describing ordinary practice. Such language only constitutes improper speculation when used to reconstruct the examiners' actual reasoning or state of mind. Polaroid's motion is denied with respect to paragraph 73.

## II. Fujifilm's Omnibus Daubert Motion

Fujifilm moves to exclude the testimony and opinions, in whole or in part, of five of Polaroid's proffered experts. See ECF No. 289 ("Fuji. Mot."). We address Fujifilm's challenges to each expert below.

### a. Mr. Christopher V. Carani, Esq.

Mr. Christopher V. Carani is a partner at McAndrews, Held & Malloy, Ltd., a Chicago-based law firm specializing in

intellectual property. ECF No. 290-1 at 3. Mr. Carani's practice focuses on design law and specifically concerns the "protection and enforcement of the appearance of products and packaging using the laws of design patents, trade dress and copyrights[.]" Id. Mr. Carani has been registered to practice before the USPTO for 25 years. Id. Mr. Carani has authored several amicus briefs on issues of design patent jurisprudence in federal patent cases. Id. at 7. Since 2015, Mr. Carani has served as an Adjunct Professor at Northwestern University School of Law, where he instructs on design patent and trade dress examination processes. Id. He also teaches "Design Law" at Chicago-Kent College of Law. Id. Mr. Carani received a Juris Doctor from the University of Chicago Law School, and he received a bachelor's degree in engineering from Marquette University. Id. at 5. Mr. Carani also served as a judicial law clerk to the Honorable Rebecca Pallmeyer at the United States District Court for the Northern District of Illinois. Id.

Polaroid offers Mr. Carani as a design patent expert to offer testimony about design patent examination practice and procedures before the USPTO. Fujifilm contends that Mr. Carani's testimony should be excluded on grounds that: (i) his testimony concerning patent examination procedures is irrelevant; (ii) he offers improper legal conclusions; (iii) he offers speculative testimony

regarding inventors' beliefs and examiner reasoning; (iv) he offers unsupported opinions concerning foreign design registrations; and (v) his testimony regarding alternative designs is unreliable. See generally Fuji. Mot. at 5-13.

The Court declines Fujifilm's invitation to exclude Mr. Carani's testimony in full. Mr. Carani's qualifications are not meaningfully disputed, and he possesses extensive experience concerning design patents and design-rights prosecution. The pertinent disputes concern relevance, fit, and whether certain opinions cross from contextual expert testimony into legal instruction or speculation. We address Fujifilm's specific challenges in turn.

**i. Relevance**

Fujifilm first argues that testimony concerning design-patent examination procedures is irrelevant because trademark functionality and design-patent ornamentality are distinct legal concepts. Fuji. Mot. at 6-7. As Polaroid correctly identifies, this Court has already held that genuine issues of material fact exist as to whether Fujifilm is estopped from arguing that Polaroid's CBL trade dress is functional, based on Fujifilm's prior representations to the USPTO that its "near-identical" Instax Square film design was sufficiently ornamental and not primarily

functional. Fujifilm, 2025 WL 2444652, at *10; ECF No. 297 ("Pol. Opp.") at 14. This bears directly on the availability and force of Fujifilm's functionality argument: even if Fujifilm is not estopped, its design patents for Instax Square and other instant film designs may constitute evidence that Polaroid's CBL trade dress is not functional. Fujifilm, 2025 WL 2444652, at *9-10; Krueger Intern., Inc. v. Nightingale Inc., 915 F. Supp. 595, 605 (S.D.N.Y. 1996), overruled on other grounds by Landscape Farms, Inc. v. Columbia Cascade Co., 113 F.3d 373 (2d Cir. 1997) ("The existence of a design patent . . . is relevant to the functionality defense" and "can serve as evidence that a plaintiff's trade dress is not functional" and "help rebut the functionality defense[.]").

This Court already held that Fujifilm's design patents are relevant to the functionality inquiry. That conclusion necessarily means that testimony assisting the jury in understanding what those patents represent, and what they do not represent, is likewise relevant. Accordingly, the Court declines to exclude Mr. Carani's testimony in its entirety on the ground of relevance.

**ii. Significance of Design Patents**

Fujifilm next argues that Mr. Carani improperly opines on the legal significance of issued design patents, specifically pointing

to paragraphs 30, 32, 49, 50, 77, 84, 91, 98, 111, and 113 as examples of his "expositions on the law." Fuji. Mot. at 9, n.6.

It is undisputed that trademark functionality and design-patent ornamentality are distinct doctrines governed by different legal standards. Compare Fuji. Mot. at 7-8 ("It is indisputable that 'the functionality doctrine in trademark law is quite distinct from the functionality determination in design patents.'") (citation omitted) with Pol. Opp. at 19 ("Carani does not claim that the functionality standard under design patent and trade dress law are interchangeable, nor does his report conflate the two standards."). The distinction affects the permissible scope of Mr. Carani's testimony, and the relevant question is whether his report improperly converts those concepts into legal conclusions.

Experts may not instruct the jury on the law or tell the jury what legal conclusions to draw from particular facts. United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (citations omitted). However, experts may explain technical or specialized processes unfamiliar to lay jurors. United States v. Duncan, 42 F.3d 97, 101 n.3 (2d Cir. 1994) (stating that expert testimony can

serve to shed "light on activities not within the common knowledge of the average juror") (citations omitted).

Many of the challenged paragraphs, standing alone or in context with other portions of the opinion, explain objective features of the design-patent process: such as that a design patent will only be granted if an applicant establishes the design for an article of manufacture is "new, original and ornamental" (ECF No. 290-1 ¶ 29); that a design is considered ornamental under design-patent law if its appearance is not primarily functional or dictated by function (ECF No. 290-1 ¶ 30); that design patent applicants submit inventor oaths or declarations (ECF No. 290-1 ¶¶ 41, 50); that those oaths or declarations represent that the applicant believes the application to be true, including that the design is "novel, original and ornamental" (ECF No. 290-1 ¶¶ 41, 50); and that issuance of a design patent reflects that the USPTO agreed that the application satisfied those requirements, including specifically that it meets the ornamentality requirement under design-patent law (ECF No. 290-1 ¶¶ 30, 32, 47, 49, 50).

Other paragraphs offer opinions specifically explaining the objective features of the design-patent process as applied to certain Fujifilm design patents: that in issuing the D'484 Patent, D'894 Patent, D'895 Patent, and D'400 Patent, the USPTO agreed

that the designs met the ornamentality requirement under design-patent law (ECF No. 290-1 ¶¶ 77, 84, 91, 98, 111, 113).

Fujifilm suggests that such testimony necessarily constitutes improper and potentially confusing legal interpretation. The Court disagrees. As an initial matter, Mr. Carani's testimony provides context for a technical subject matter outside the knowledge of ordinary jurors and therefore falls comfortably within Rule 702. Critically, Mr. Carani does not opine that design-patent issuance legally establishes non-functionality under trade dress law. Mr. Carani's report only testifies that, by issuing the design patents, the USPTO agreed that Fujifilm's claimed designs met the USPTO's requirements of ornamentality. ECF No. 290-1 ¶ 32. His report does not mention trade dress law, and he does not purport to offer any legal conclusions or instructions concerning any governing law at issue in this case or suggest that ornamentality under design-patent law and trademark non-functionality are interchangeable inquiries. Further, he offers no opinion on the ultimate issue the jury must resolve: the impact of Fujifilm's design patent representations.

Mr. Carani simply explains that inventors represented to the USPTO that the claimed designs satisfied the ornamentality requirements applicable to design patents and explains the

procedural significance of those representations within the patent system. That testimony is factual and provides necessary context.

Of course, Mr. Carani may not testify that design-patent issuance establishes non-functionality as a matter of trademark law, resolves the functionality inquiry, or dictates any ultimate legal conclusion reserved for the jury and the Court. His report, however, contains no such testimony. Accordingly, Fujifilm's motion is denied as to paragraphs 30, 32, 49, 50, 77, 84, 91, 98, 111, and 113.

**iii. Opinions Concerning Inventors' Intent**

Fujifilm separately argues that Mr. Carani improperly speculates regarding what Fujifilm's inventors believed or intended, specifically identifying paragraphs 69, 82, 83, 89, 90, 96, and 97. Fuji. Mot. at 10. Polaroid responds that Mr. Carani does not and will not opine on the subjective state of mind of any Fujifilm inventor, but rather he will testify as to the objective significance of the inventor oath or application accompanying the design patent application. Pol. Opp. at 16-17. The Court agrees with Polaroid.

Mr. Carani may explain what inventors' objectively and outwardly represented through their patent filings, including in the accompanying oath or declaration; namely, that the contents of

the application are true, including that the design satisfies the ornamentality requirement under design-patent law. He may also explain that examiners evaluate ornamentality and that the issuance of a design patent objectively reflects USPTO agreement that the requirements were satisfied. Those opinions are permissible because they translate specialized and complex patent procedures and prosecution materials into terms digestible to a lay jury. That testimony reflects Mr. Carani's analysis of the purpose and significance of outward representations and does not improperly speculate about the subjective intent of any individual inventor.

Accordingly, Fujifilm's motion is denied with respect to paragraphs 69, 82, 83, 89, 90, 96, and 97.

**iv. Foreign Design Registrations and Priority Materials**

Fujifilm argues that Mr. Carani improperly opines on Japanese design registrations, a subject Fujifilm claims he is not qualified to opine on, and which is irrelevant to the issues in this case. Fujifilm specifically challenges paragraphs 27, 99-107, and 110. Fuji. Mot. at 10-11. In response, Polaroid contends that Mr. Carani properly references Japanese design patents as additional

examples considered by the USPTO that support a finding of ornamentality. Pol. Opp. at 19-20.

As an initial matter, the Court does not find Fujifilm's argument that Mr. Carani is unqualified to opine on Japanese design registrations persuasive. Although not admitted to practice law in Japan, Mr. Carani devoted significant study to Japanese design law, has been involved in the prosecution of design rights in Japan, authored a book including a chapter on Japanese design law, and attended presentations and collaborative sessions in Japan at the Japanese Patent Attorney Association (Kansai and Tokyo Divisions), Industry Design 5 Annual Meeting, and Japanese Trademark Association. ECF No. 290-1 at 4.

Mr. Carani's report reviews certain Japanese design registrations and opines that the issuance of the registrations indicates that the Japanese Patent Office determined that the non-functionality requirement under Article 5(iii) of the Japanese Design Act was met. Id. ¶¶ 99-107. According to Polaroid, the Japanese design patents are referenced in the file wrappers for Fujifilm's design patent applications before the USPTO. Pol. Opp. at 20. Accordingly, Mr. Carani cites to those Japanese design patents as examples that the USPTO would have considered supporting a finding of ornamentality. Id. This testimony is analogous to

that proffered by Mr. Carani on the impact of the issuance of a U.S. design patent; namely, that the issuance of a design patent reflects that the USPTO agreed that the application met the ornamentality requirement under design-patent law. Similarly, Mr. Carani opines that by issuing Japanese design patents, "the Japanese Patent Office determined that the non-functionality requirement under Article 5(iii) Japanese Design Act was met." Id. ¶ 107.

Such testimony is permissible because it constitutes Mr. Carani's explanation of the objective features of the design-patent process as applied to certain of Fujifilm's design patents. To the extent that Fujifilm contends the Japanese registrations are entitled to little weight, reflect differing legal standards, or are poor indicators or ornamentality or functionality under the separate standard of trade dress law, those criticisms are, and will be, appropriately explored through cross-examination and competing expert testimony from Fujifilm's own expert, Mr. Gandy.

**v. Alternative Designs and Multiple Design Patents**

Finally, Fujifilm challenges Mr. Carani's opinions concerning alternative film designs reflected in other design patents, arguing that those opinions are irrelevant, misleading, and fail to satisfy that standards governing alternative-design evidence in

trade dress cases because he does not analyze whether the alternatives are functionally equivalent, practical, feasible, or viable. Fuji. Mot. at 12-13. As discussed above, Mr. Carani's testimony concerning design-patent procedures, ornamentality review, and the objective significance of issued patents is relevant because it assists the jury in understanding patent evidence already in the record. In other words, Mr. Carani can serve as a patent-process translator for the factfinder. However, Mr. Carani's opinions concerning alternative designs go further.

Specifically, Mr. Carani opines that the existence of multiple patented designs for instant film products demonstrates that those designs are ornamental and not primarily functional. ECF No. 290-1 ¶ 110. That testimony may create a substantial risk of confusing distinct legal concepts. First, while the existence of design patents may bear on functionality, trade dress and design patent ornamentality involve different standards, and the existence of multiple patented designs does not itself explain how a jury should evaluate trade dress functionality. Second, Mr. Carani does not perform the type of analysis ordinarily associated with alternative-design evidence. He offers no opinion regarding whether the proposed alternatives are functionally equivalent, practical, feasible, or viable. This is understandable, as Mr.

Carani is offered as a design patent expert, not a trade dress expert, and his report does not concern trade dress issues. Finally, the challenged opinions concerning alternative designs add little beyond Mr. Carani's admissible testimony concerning the significance of issued design patents and the design-patent examination process. Any marginal probative value is outweighed by the likelihood of confusion concerning the relationship between design-patent principles and trademark functionality.

Accordingly, the Court excludes Mr. Carani's opinion that the existence of multiple patented designs demonstrates ornamentality or non-functionality. Mr. Carani remains free to testify about the significance of the patents themselves, prosecution history, and design-patent procedures as outlined above.

**b. Mr. Hal Poret**

Mr. Hal Poret is a President at Hal Poret, LLC, where he designs, supervises, and implements consumer perception and opinion surveys. ECF No. 290-7 at 5. Mr. Poret has designed studies that have been admitted as evidence in legal proceedings, and he has been accepted as an expert in survey research in federal court proceedings, as well as before the Trademark Trial and Appeal Board and the National Advertising Division of the Council of Better Business Bureaus. Id. Mr. Poret received a Juris Doctor

from Harvard Law School and a master's degree in mathematics from the State University of New York at Albany. Id. He also received his bachelor's degree in mathematics from Union College. Id.

Polaroid offers Mr. Poret as a survey expert who conducted two secondary meaning surveys: (i) a 2017 survey of two-dimensional representations of the CBL (the "2017 Survey"); and (ii) a 2023 survey of three-dimensional representation of the CBL in the form of Polaroid's analog instant film (the "2023 Survey"). See ECF Nos. 290-7, 290-8. Mr. Poret also offers a responsive report critiquing Dr. Simonson's use of Instax Wide as a control stimulus. ECF No. 290-13.

Fujifilm argues that certain portions of Mr. Poret's testimony should be excluded because either or both surveys are irrelevant, produced weak results, were conducted too late to meaningfully assess consumer perception during the relevant time period, or only tested two-dimensional line drawings. Fuji. Mot. at 13-21. We address the challenges to each survey below.

**i. The 2017 Survey**

First, Fujifilm argues that because the 2017 survey tested only two-dimensional line drawings, rather than three-dimensional depictions of film, Mr. Poret cannot testify that the 2017 Survey is evidence of secondary meaning in three-dimensional product

configuration trade dress or two-dimensional depictions or images of Polaroid film. Fuji. Mot. at 15-17. That argument is unavailing.

This Court has already concluded that Polaroid's asserted trade dress encompasses (i) the three-dimensional configuration of Polaroid instant film, (ii) two-dimensional depictions of that film, and (iii) any line drawings depicting Polaroid instant film. Fujifilm, 2025 WL 2444652, at *5 n.12. Further, the Court previously rejected Fujifilm's argument that the 2017 Survey is irrelevant because it evaluated the two-dimensional drawing, rather than the three-dimensional configuration. Id. at *12. Given those holdings, Fujifilm's argument cannot be reconciled with the scope of the claims remaining in this case. While Fujifilm may argue that two-dimensional line drawings imperfectly replicate marketplace conditions or that alternative stimuli would have better captured consumer perception, such criticisms concern the persuasive force of the survey and are for the jury to consider.

Next, Fujifilm argues that the 2017 Survey yielded relatively weak recognition figures (35% and 26.5% recognition of the two images tested, respectively) and therefore lacks probative value. Fuji. Mot. at 15-17. Polaroid responds, and the Court agrees,

that Fujifilm's argument goes to the weight a jury ultimately assigns to the survey, not admissibility. Pol. Opp. at 6-8. Fujifilm points to no case law for the proposition that an expert should be precluded from testifying if a survey's recognition rate is below a certain threshold. Further, it is well-established that any contention regarding "statistical imperfections . . . affect[s] the weight accorded to the evidence rather than its admissibility." See, e.g., Lion Oil Trading & Transp., Inc. v. Statoil Mktg. and Trading (US) Inc., 2011 WL 855876, at *4 (S.D.N.Y. Feb. 28, 2011) (quoting Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987)).

Accordingly, Fujifilm's motion is denied with respect to the 2017 Survey.

**ii. 2023 Survey**

Fujifilm also argues that Mr. Poret's 2023 Survey is too temporally remote to shed light on consumer perception during the relevant period. Fuji. Mot. at 17-19. Specifically, Fujifilm contends that because Instax Square film entered the market in 2017, the 2023 Survey cannot show secondary meaning at the time of market entry. Id.

The Court has previously rejected that premise. See Fujifilm, 2025 WL 2444652, at *12 ("[T]he existence of continued consumer

recognition of the CBL approximately six years after the introduction of Fujifilm Instax Square film strongly suggests the existence of secondary meaning at the time of Fujifilm's entry into the market."). Further, as with Fujifilm's objections to the 2017 Survey, the temporal distance between the 2023 Survey and the relevant period affects the weight to be assigned to the evidence and not admissibility.

Fujifilm remains free to argue that marketplace conditions changed over time or that surveys conducted later in time should not be afforded significant weight. Those arguments are appropriate for cross-examination. Accordingly, Fujifilm's motion to exclude portions of Mr. Poret's testimony is denied.[4]

**c. Dr. Bruce Kahn**

Dr. Bruce Kahn is a professor, researcher, and consultant whose field focuses on "functional printing (electronic and 3D), printing and printed materials, flexible hybrid electronics, and nanotechnology." ECF No. 290-14, Ex. 1. Dr. Kahn teaches printing

[4] Fujifilm further asks this Court to exclude portions of Mr. Poret's rebuttal report criticizing Dr. Simonson's use of Instax Wide as a control stimulus in his secondary-meaning survey. Fuji. Mot. at 20-21. The Court likewise declines to exclude those opinions. As discussed, disputes concerning control selection and survey design concern weight, not admissibility. Whether Dr. Simonson's chosen control adequately isolated the claimed trade dress, or whether an alternative control would have better suited that purpose, presents a battle of the experts between Dr. Simonson and Mr. Poret. That battle is appropriately tested through cross-examination and competing testimony and is not well-suited for resolution by competing Daubert motions.

and packing science at the Rochester Institute of Technology and has taught graduate courses in materials science and engineering. Id. Previously, Dr. Kahn worked at the Eastman Kodak Company as a Senior Research Scientist. Id. Dr. Kahn obtained a Ph.D. in chemistry from the University of Nebraska, and he also received a bachelor's degree in chemistry from the University of Chicago. Id.

Polaroid offers Dr. Kahn as a trade-dress functionality expert. In his reports, Dr. Kahn opines on the existence of alternative instant film designs to the CBL, specifically identifying Kodak Trimprint, Polaroid Pad, and microcapsule technologies. ECF Nos. 290-14, 290-16. Fujifilm contends that portions of Dr. Kahn's reports should be excluded because (i) his opening report improperly offers a 23-paragraph historical narration of Polaroid's history, and (ii) his reports contain unsupported alternative-design options and provide insufficient detail concerning the feasibility and implementation of such alternatives. Fuji. Mot. at 21-26.

**i. Historical Narration**

Fujifilm contends that portions of Dr. Kahn's opening report improperly provide a narration of Polaroid's history without specialized expertise or personal knowledge. Id. at 25-26.

Polaroid responds that Dr. Kahn's discussion of Polaroid's early development of instant film will aid the jury in understanding the evolution of imaging design and provides context to his functionality analysis. Pol. Opp. at 25-26. The Court agrees with Fujifilm.

Expert witnesses may rely on facts or data in the record in formulating their opinions. See Fed. R. Evid. 703. Experts may not, however, be presented to the jury simply for the purpose of constructing a factual narrative based on record evidence. See, e.g., Highland Cap. Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). The concern is particularly acute where, as here, the expert was not personally involved in the events his report describes. To the extent that paragraphs 26-48 and exhibits 5-38 of Dr. Kahn's opening report recount the development of instant film products, describe marketplace trends, or present historical narrative untethered to specialized analysis, such testimony addresses lay matters that a jury can understand and is

not based on his specialized knowledge. See id. (citing Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d. Cir. 1989)).

Accordingly, Fujifilm's motion is granted with respect to paragraphs 26-48 and exhibits 5-38 of Dr. Kahn's opening report.

**ii. Alternative Designs**

Fujifilm also argues that Dr. Kahn's alternative-design opinions should be excluded because they lack sufficient detail, fail to provide implementation guidance, omit cost analyses, and, overall, do not establish that the proposed alternatives are functionally equivalent, practical, or feasible. Fuji. Mot. at 21-25. Fujifilm specifically challenges Dr. Kahn's three proposed alternatives, Kodak Trimprint, Polaroid Pad, and microcapsule technology, on grounds that he did not offer sufficient details about what a proposed alternative product would look like, how it would function or be developed considering the technologies are no longer on the market, or at what cost. Id. Polaroid responds that any perceived shortcomings in Dr. Kahn's alternative-design analysis can be addressed on cross-examination and that, in any event, the mere fact that the identified alternative designs are

presently theoretical does not render such evidence irrelevant. Pol. Opp. at 23-25. The Court agrees with Polaroid.

Alternative designs are relevant to the functionality inquiry because the existence of multiple workable designs may suggest that a particular design choice (here, the inclusion of the CBL) was not dictated solely by utility. See, e.g., Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 620 (2d Cir. 2008). Fujifilm criticizes the depth and specificity of Dr. Kahn's analysis and repeats the rule that, to be probative of non-functionality, alternative designs must be practical, feasible, and effective. Fuji. Mot. at 21-25 (citing Schutte Bagclosures Inc. v. Kwik Lok Corp., 193 F. Supp. 3d 245, 269-270 (S.D.N.Y. 2016), aff'd, 699 F. App'x 93 (2d Cir. 2017)). However, Fujifilm identifies no authority suggesting that Rule 702 requires an expert proposing alternative designs to provide engineering-level implementation details, manufacturing specifications, or formal cost studies for the testimony to be admissible.

Nor do the authorities cited by Fujifilm compel exclusion. In Schutte Bagclosures Inc., the court concluded, following a five-day bench trial involving testimony from nine witnesses, that the proposed alternative designs were too hypothetical to constitute viable alternatives. 193 F. Supp. 3d at 251, 271. Similarly, in

CeramTec GmbH, the Federal Circuit explained and did not disturb the U.S. Trademark Trial and Appeal Board's decision to assign reduced "weight" to evidence of potential alternative designs because those alternatives were too theoretical. CeramTec GmbH v. Coorstek Bioceramics LLC, 124 F.4th 1358, 1366 (Fed. Cir. 2025). Neither case addressed admissibility under Rule 702 or the exclusion of expert testimony at the Daubert stage.

Fujifilm remains free to attack Dr. Kahn's identified alternative designs as impracticable, commercially unrealistic, ineffective, or otherwise unpersuasive through cross-examination. Accordingly, Fujifilm's motion is denied as to Dr. Kahn's alternative-design opinions.

**d. Mr. John Plumpe**

Mr. Plumpe is a Managing Director at Epsilon Economics, an economic consulting firm. ECF No. 292-3 at 5. Mr. Plumpe's practice focuses on damages analysis and monetary relief in commercial disputes and transactions, including trademark, copyright, patent, and breach of contract issues. Id. at 5-6. He has testified in federal proceedings and arbitration hearings on Lanham Act monetary relief and issues relating to intellectual property damages. Id. Mr. Plumpe received a Bachelor of Science and Master of Science in Mechanical Engineering from the University

of Illinois. Id. He also received a Master of Business Administration from the University of Chicago Booth School of Business. Id. Polaroid offers Mr. Plumpe as a damages expert.

At the outset, several of Fujifilm's challenges to Mr. Plumpe do not meaningfully concern admissibility under Rule 702 but instead raise disclosure and scope issues under Federal Rule of Civil Procedure 26(a)(2)(B). Fujifilm argues that Mr. Plumpe should be precluded from testifying about certain topics at trial because those topics do not appear in his expert report. Fuji. Mot. at 27-30. For example, Fujifilm argues that Mr. Plumpe should be barred from testifying about secondary meaning and consumer confusion because he conducted no investigation regarding actual confusion or likelihood of confusion and because certain statements in his report repeat Polaroid's allegations. Fuji. Mot. at 27-28.

On the present record, there is little to exclude. Mr. Plumpe's report does not purport to offer opinions regarding secondary meaning or confusion, and the portions of the report that Fujifilm identifies are brief factual descriptions of the parties' positions, not substantive expert analysis. Indeed, Polaroid confirmed that it will not elicit testimony from Mr. Plumpe on direct examination concerning secondary meaning and

confusion, explaining that the challenged testimony arose only after questioning during deposition. Pol. Opp. at 27-28. Fujifilm's objection to Mr. Plumpe testifying about secondary meaning and consumer confusion is therefore moot.

Fujifilm raises a similar objection to testimony regarding a specific provision of certain Polaroid licensing agreements. Fuji. Mot. at 29. Once again, Mr. Plumpe's report does not discuss the specific provision, and during his deposition, Mr. Plumpe testified only that he had considered it within the context of a hypothetical negotiation. Id.; Pol. Opp. at 27. The Court declines Fujifilm's invitation to issue preemptive rulings regarding testimony that Mr. Plumpe does not presently offer or that Polaroid represents it does not intend to elicit.[5]

Accordingly, Fujifilm's motion is denied to the extent it seeks advance rulings precluding testimony concerning secondary meaning and alleged confusion and the specific provision contained in certain Polaroid licensing agreements. If there is an effort at trial to offer testimony from Mr. Plumpe concerning those topics, which Polaroid has represented it has no intention of doing

[5] Fujifilm also moves to preclude Mr. Plumpe from opining that Instax Square film caused Polaroid economic injury, including lost sales. Fuji. Mot. at 26-27. Polaroid represents, however, that Mr. Plumpe offers no such opinion regarding lost profits or sales. Pol. Opp. at 27. Fujifilm's challenge is therefore moot.

and which do not appear in his report, the Court can consider renewed objections from Fujifilm at that time. Old Gate Partners, LLC v. Paddock Enters., LLC, 2024 WL 3520168, at *13 (D. Conn. May 30, 2024); Phelps v. CBS Corp., 2020 WL 7028954, at *10 (S.D.N.Y. Nov. 30, 2020).

Fujifilm separately argues that Mr. Plumpe should be precluded from testifying concerning certain license agreements because they are not economically or technically comparable and therefore cannot reliably inform the royalty analysis in this case. Fuji. Mot. at 29-30; see also Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970). Fujifilm also argues that Mr. Plumpe should not be able to testify about the royalty treatise Licensing Royalty Rates – 2018 Edition because he did not rely on it in his report and therefore lacks reliable methodology connecting the treatise to his opinions. Fuji. Mot. at 30.

Polaroid responds that real-world licenses and industry royalty data are admissible inputs in a reasonable-royalty analysis, even when they are imperfect comparators. Pol. Opp. at 28-30. Polaroid cites to authority standing for the proposition that the degree of comparability is a factual issue pertaining to weight that is best addressed by cross-examination, not exclusion. Id. Further, Polaroid explains that Mr. Plumpe did not use the

challenged agreements or royalty treatise as inputs in calculating the reasonable royalty rate in this case. Id. Rather, as confirmed by his deposition testimony, Mr. Plumpe consulted these materials for the narrower purposes of (i) understanding the types and structures of royalty arrangements used in the industry and by the parties, and (ii) conducting a reasonableness check against royalty rates reflected elsewhere in the record. Id. The Court agrees with Polaroid.

With respect to the licensing agreements, it is true that an expert relying on comparable licenses generally must account for the economic and technological differences among those agreements. See, e.g., Wordtech Sys., Inc. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (citation omitted). However, that principle does not warrant exclusion here. Mr. Plumpe referenced the challenged license agreements as contextual benchmarks and did not rely on them to derive his royalty calculation. ECF No. 292-4 at 164:13-165:4. Mr. Plumpe accounted for the differences among the various agreements and did not treat them as direct substitutes for the hypothetical license at issue.

Nor is Mr. Plumpe precluded from referencing the royalty treatise. Mr. Plumpe did not use Licensing Royalty Rates – 2018 Edition as a substantive input to calculate the reasonable royalty

in this case. Rather, Mr. Plumpe referenced the treatise, which reports royalty ranges derived from industry surveys, as a benchmark against rates reflected elsewhere in the record. Ultimately, Fujifilm's criticisms go primarily to weight rather than admissibility. Whether the challenged agreements are sufficiently comparable and whether the contextual materials meaningfully inform the hypothetical negotiation are factual disputes better tested through cross-examination. See, e.g., Entangled Media, LLC v. Dropbox Inc., 2025 WL 3240878, at *5 (N.D. Cal. Nov. 20, 2025) (declining to strike damages opinion referencing imperfect comparators where those materials provide contextual insight and holding that alleged deficiencies affect weight, not admissibility); ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) (holding that the "degree of comparability" of license agreements presents a

"factual issue[] best addressed by cross examination and not by exclusion.").

Accordingly, Fujifilm's motion to exclude Mr. Plumpe's opinions concerning the challenged license agreements and royalty treatise is denied.

**e. Supplemental Materials Relating to Dr. David Neal[6]**

The procedural posture of Fujifilm's challenge to Dr. Neal warrants explanation at the outset. Dr. Neal primarily served as a rebuttal expert for Polaroid, responding to and critiquing the survey opinions of Dr. Jay. See ECF No. 241-2. Relevant here, Dr. Neal criticized Dr. Jay's use of Instax Mini packaging as a control stimulus in her survey testing. Id. at 14. Specifically, Dr. Neal explained that Instax Mini packaging may create source confusion with Polaroid products, making it difficult to determine whether survey respondents were reacting to the challenged trade dress or to confusion generated by the control stimulus itself. Id. at 41-47.

Unlike the other experts addressed in this opinion, Dr. Neal was not the subject of a specific challenge in Fujifilm's opening

[6] Because the challenged materials concern Dr. Neal's criticism of Dr. Jay's control stimulus, and because the Court separately excluded Dr. Jay's survey opinions as irrelevant to the remaining claims at issue in this case, the practical significance of the present dispute may be limited. The Court nevertheless addresses the issue for the sake of completeness.

Daubert briefing. The present dispute arose after Polaroid filed its opening Daubert motion and submitted a declaration from Dr. Neal attaching social media posts that Polaroid contends reflect consumer confusion involving Instax Mini film. ECF No. 285. After reviewing Polaroid's motion, Fujifilm filed a letter seeking leave to file a separate motion to strike paragraph 4 of Dr. Neal's declaration and exhibit 1 thereto, arguing that those materials constituted an improper and untimely supplementation of Dr. Neal's rebuttal opinions. ECF No. 294. Polaroid opposed that request, and the Court denied Fujifilm's application, concluding there was not a sufficient basis to modify the parties' Daubert briefing schedule. ECF Nos. 303, 304.

This dispute is governed primarily by Federal Rules of Civil Procedure 26 and 37. An expert's supplementation of additional examples in the context of a Daubert motion is not ideal and risks depriving the opposing party of an opportunity to meaningfully address those materials. Nonetheless, Dr. Neal's inclusion of additional materials here does not warrant exclusion because those materials are examples of a previously-disclosed and consistently-held opinion. Specifically, Dr. Neal's rebuttal report expressly criticized Dr. Jay's use of Instax Mini as a control on the ground that the control may be confusing. ECF No. 241-2 at 41-47. The

additional declaration materials are social media posts that Polaroid contends reflect that confusion and do not introduce a new theory of confusion or novel critique of Dr. Jay's methodology. Further, Fujifilm has not demonstrated prejudice sufficient to warrant exclusion. The challenged social media materials were produced years before the declaration, and Fujifilm questioned Dr. Neal during his deposition regarding the categories of materials he reviewed in reaching his conclusions. ECF No. 285 ¶ 4. Finally, because the Court has already excluded Dr. Jay's survey opinions as irrelevant, the present dispute is academic. Under the circumstances here, there is no reason to grant Fujifilm's motion with respect to Dr. Neal's declaration.

**CONCLUSION**

For the foregoing reasons, Fujifilm's motion is granted in part and denied in part. Polaroid's motion is granted in part and denied in part. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 271, 272, and 281.

Dated: July 7, 2026
New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE